2:08 cv 1659 EGH

# United States District Court

| | District | EASTERN |
|---|---|---|

| Name | Prisoner No. | Case No. |
|---|---|---|
| LIONEL NAVARRO | B-91886 | |

## CV 08    3928

## MMC

| Place of Confinement | | |
|---|---|---|
| SAN QUENTIN STATE PRISON, SAN QUENTIN, CA 94974 | | |

| Name of Petitioner (Include name under which conviction | Name of Respondent (authorized person having custody of petitioner) |
|---|---|

E-filing

LIONEL NAVARRO

v.

ROBERT AYERS, JR., Warden et al

**FILED**

The Attorney General of the State of: CALIFORNIA

AUG 18 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

## PETITION

1. Name and location of court which entered judgment of conviction under attack _Tulare County Superior Court_

2. Date of judgment of conviction _November 10, 1977_

3. Length of sentence _Seven years-to-life with possibility of parole on or after May 15, 1984._

4. Nature of offense involved (all counts) _First degree murder and attempted robbery with use of a weapon, a metal pipe._

5. What was your plea? (Check one)
   - (a) Not guilty [X]
   - (b) Guilty [ ]
   - (c) Nolo contendere [ ]
   - If you entered a guilty plea to one court or indictment, and a not guilty plea to another court or indictment, give details:

6. If you plead not guilty, what kind of trial did you have? (Check one)
   - (a) Jury [X]
   - (b) Judge only [ ]

7. Did you testify at the trial? No

**FILED**

JUL 18 2008

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

(2)

Yes ☐ No ☒

8. Did you appeal from the judgment of conviction?

Yes ☒ No ☐

9. If you did appeal, answer the following

(a) Name of court ___California Court of Appeal, Fifth Appellate District.___

(b) Result ___Denied___

(c) Date of result and citation, if known ___Unknown___

(d) Grounds raised _____

_____

(e) If you sought further review of the decision on appeal by a higher state court, please answer the following:

(1) Name of court _____

(2) Result _____

_____

(3) Date of result and citation, if known _____

(4) Grounds raised _____

_____

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal

Yes ☒ No ☐

11. If your answer to 10 was "yes" give the following information:

(a) (1) Name of court ___Tulare County Superior Court___

(2) Nature of proceeding ___Habeas Corpus Petition___

_____

(3) Grounds raised ___Same as in instant petition.___

_____

(3)

(4) Did you receive an evidentiary hearing on your petition, application or motion?

Yes ☐ No ☒

(5) Result _____Denied_____

(6) Date of result _____Feb 29, 2008_____

(b) As to second petition, application or motion give the same information:

(1) Name of court _____California Court of Appeal, Fifth Appellate District___

(2) Nature of proceeding _____Habeas Corpus Petition_____

(3) Grounds raised _____Same as in instant petition_____

(4) Did you receive an evidentiary hearing on your petition, application or motion?

Yes ☐ No ☒

(5) Result _____Denied_____

(6) Date of result _____April 25, 2008_____

(c) Did you appeal to the highest state court having jurisdiction the result of action taken on any petition, application or motion?

(1) First petition, etc.    Yes ☒ No ☐

(2) Second petition,    Yes ☒ No ☐

(d) If you did not appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

12. State *concisely* every ground on which you claim that you ae being held unlawfully. Summarize *briefly* the facts supporting each ground. If necessary, you may attach pages stating additional grounds and *facts* supporting same. CAUTION: In order to proceed in the federal court, you must ordinarily first exhaust your available state court

(4)

remedies as to each ground on which you request action by the federal court. If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds at a later date.

For your information, the following is a list of the most frequently raised grounds for relief in habeas corpus proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you may have other than those listed if you have exhausted your state court remedies with respect to them. However, *you should raise in this petition all available grounds* (relating to this conviction) on which you base you allegations that you are being held in custody unlawfully.

Do not check any of these listed grounds. If you select one or more of these grounds for relief, you must allege facts. The petition will be returned to you if you merely check (a) through (j) or any one of these grounds

(a) Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea

(b) Conviction obtained by use of coerced confession.

(c) Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

(d) Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.

(e) Conviction obtained by a violation of the privilege against self-incrimination.

(f) Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favarable to the defendant.

(g) Conviction obtained by a violation of the protection against double jeopardy.

(h) Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.

(i) Denial of effective assistance of counsel

(j) Denial of right of appeal.

A. Ground one: See Attached "INSERT A," Ground 1, pages 1 through 31 _____

_____

Supporting FACTS (state *briefly* without citing cases or law): _____

_____

_____

_____

_____

_____

_____

B. Ground two: See Attached "INSERT B," Ground 2, pages 32 through 35 _____

_____

Supporting FACTS (state *briefly* without citing cases or law): _____

_____

_____

_____

(5)

C. Ground three:  See Attached "INSERT C," Ground 3, pages 36 through 42

Supporting FACTS (state *briefly* without citing cases or law): _____

_____

_____

_____

_____

_____

_____

D. Ground four: _____

_____

Supporting FACTS (state *briefly* without citing cases or law): _____

_____

_____

_____

_____

_____

_____

13. If any of the grounds listed in 12A, B, C, and D were not previously presented in any other court, state or federal, state *briefly* what grounds were not so presented, and give you reason for not presenting them: _____

_____

_____

_____

14. Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?

Yes [X]  No [ ]

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

(a) At preliminary hearing _____

(6)

INSERT A

## Ground 1

THE BOARD OF PAROLE HEARINGS VIOLATED PETITIONER'S STATE AND FEDERAL DUE PROCESS WHEN IT DID NOT APPLY THE PROPER CRITERIA AND ITS DECISION DENYING PETITIONER PAROLE WAS NOT SUPPORTED BY "PREPONDERANCE OF THE EVIDENCE" (Cal. Regs. Tit. 15 § 2000 subd. (50)), OR NOT EVEN "SOME EVIDENCE," THAT HE POSES A CURRENT UNREASONABLE THREAT TO THE PUBLIC.

This petition addresses violations of petitioner Lionel Navarro ("Petitioner") state and federal due process rights at his fifteenth (15th) subsequent hearing for parole before the Board of Parole Hearings ("Board"), wherein he received a three year denial.

Petitioner was convicted of first degree murder and attempted robbery with use of a weapon, a metal pipe, in Tulare County [Case Number 18308] and sentenced to a term of seven years to life. Despite being disciplinary free since 1990, Petitioner has been denied parole sixteen times and received a three year denial at his 15 subsequent hearing again based on the commitment offense being carried out in an "especially cruel and callous manner." (Exhibit 1, Hearing Transcript ("TR") at 53.)

Petitioner asserts that the 2007 Board panel violated his state and federal due process rights by failing to set his term in accordance with Penal Code Section 3041, et. seq.: by engaging in an arbitrary and unconstitutional determination that his crime was particularly egregious; by failing to adduce any evidence that was probative of a finding that he is currently dangerous; by failing to find him suitable for parole in accordance with the Board's Regulations set forth in section 2280-2343 of the Title 15, California Code of Regulations ("15-CCR"); and by violating the due process requirements by applicable case law. Petitioner also maintains that there was no evidence underlying the "reason" the Board articulated for finding him unsuitable for parole and more importantly NO NOTICE that he is currently dangerous.

The 2007 Board panel also cited other factors for denying parole. The

1.

INSERT A

Board stated:

1.     Multiple victims were attacked or killed in the same incident.

2.     The victim was hit on the head with a metal pipe approximately
       three feet long, which was found at the scene. He was
       transported to Delta Hospital and died several hours later.

3.     [Y]ou have a juvenile history of burglary, an adult history
       of public intoxication, possession of a switchblade, assault
       with a deadly weapon. You do have a history of prior criminality
       that shows an escalating pattern of criminal conduct.

4.     And we don't feel you're an alcoholic, but you're an addict,
       a recovering addict at that. But he does not reconcile that
       with the need for a structured drug treatment program and you've
       made no plans for a drug treatment program.

5.     Also seemingly contradicted is his feeling that you in fact
       have insight and remorse and basically, we have no evidence
       of that.

6.     As to parole plans, you presented no documents for current
       parole plans and you don't appear to have realistic parole
       plans. Paroling back to an area that is still rife with gangs
       and drugs, so you may feel that you're too old to be a gang
       member, still the drugs are rife in that area and it's not
       clear that that would be the best plan for you and basically
       you don't have any documentation to support that.

(TR 53-57. )

       The 2007 Board denied Petitioner parole for three years, during which

time he completed another two years of disciplinary free period, Anger

Management, Narcotic Anonymous (NA), Prison Industry Authority (PIA) and

recent psychologist evaluation supporting a finding of parole suitability.

       Petitioner contends that the Board's conclusion that he is unsuitable

for parole and its failure to set a term despite his accomplishments and

despite having served over 30 years (with good time credit, over 45 years)

on a sentence of 7 years to life, twice the maximum in the Matrix guideline

(15 CCR § 2282) for first degree murder, is clearly erroneous, arbitrary

and capricious.

2.

a right to due process in the parole suitability proceedings. See <u>Sass v.</u>
<u>California Board of Prison Terms ("Sass")</u>, 461 F.3d at 1127–28 (9th Cir.
2006ll; <u>Greenholtz v. Inmates of Nebraska Penal Corr. Complex ("Greenholtz")</u>,
442 U.S. 1, 7 (1979); <u>Board of Pardons v. Allen ("Allen")</u>, 482 U.S. 369,
373 (1987); Cal. Penal Code § 3041 (b).

    B.  The California Parole Scheme Requires That Parole Shall Normally
Be Granted At The Initial Parole Consideration Hearing To Be Held 13 Months
Prior To Inmates' Minimum Eligible Parole Dates.

The California Legislature has clearly expressed its intent that when
murderers – who are the great majority of inmates serving indeterminate
sentences – approach their minimum eligible parole date, the Board "shall
normally set a parole release date." (Pen. Code § 3041, subd.(a).) The Board's
authority to make an exception based on the gravity of a life term inmate's
current or past offense should no operate so as to swallow the rule that
parole is "normally to be granted." <u>In re Rosenkrantz</u>, <u>supra</u>, Cal.4th at
p. 683, 128 Cal.Rptr.2d 104, 59 P.3d 174.

The Board denies due process and fails to act impartially by denying
parole to approximately 95 percent of the inmate it reviews for parole
suitability

Petitioner contends that a as matter of law and logic, a parole granting
rate of five percent by the Board fails to comply with the mandates of Penal
Code § 3041(a) which requires that parole is normally to be granted.
Petitioner maintains that applying the exception of Section 3041(b) to well
over ninety percent of the applicants considered by the Board violates due
process.

    C.  The Matrix Is Designed To Quantify The Factors Present In Murders
Considered By The Board. The Board Violates Due Process In Denying Parole
Based On A Crime Being "Exceptional" When The Matrix Already Takes Those
Factors Into Account.

The Board ignores the existence and purpose of the matrix when

4.

considering whether a crime is "exceptionally, heinous, atrocious or cruel." Such a position is untenable. "It is well-established rule of statutory construction that when a word of phrase as been given a particular scope or meaning in one part or portion of a law it should be given the same scope and meaning in other parts or portion of the law." People v. DeGuzman (2003) 113 Cal.App.4th 538, 547-548, citing People v. Mckay (2002) 267 267 Ca.4th 601, 621. The Board copied the language from Cal. Penal Code § 190.2, a "Special circumstance" applicable only to particularly egregious first degree murders punishable by the "death penalty or life imprisonment without parole." Subsection (a)(14) of the special circumstances statute. Cal. Penal Code § 190.2, reads, "the murder was especially heinous, atrocious, or cruel" which, the statute explains, means "manifesting exceptional depravity ... a conscious or pitiless crime that is unnecessarily tortuous to the victim." This element, according to Cal. Penal Code § 190.4, must be found true by a jury. Accordingly, the Board deemed Petitioner a current unreasonable risk to public safety by arbitrarily characterizing his commitment offense as a special circumstance first-degree murder. Because, despite its egregious, Petitioner's offense was clearly not in that category, the decision on that basis abrogated due process.

Since it is clear within one part of the statutory scheme governing parole that there is a mandatory framework for quantifying the severity of any given instance of murder, it seems equally clear that the Board is precluded from adopting contrary standards for similar and related parts of the same scheme.

Federal case law explains that the Board's decision to deny parole in this case based on a finding that the crime was exceptional masks an underlying decision that the crime is "more serious than the 'ordinary'

5.

INSERT A

[murder] contemplated by the published guidelines. There is no basis in law

for such a distinction. The guidelines clearly indicate the class of offense

severity into which a case falls, based on the act committed..." As explained

in Little v. Hadden, 504 F.Supp. 583, 564 (1980), "... It is unreasonable

and impermissible for the [Board] to base a decision to continue beyond the

guidelines on the same factors that went into formulating the guidelines

in the first place. No one disputes that this was a serious crime, but the

factors of seriousness indicated by this record are included in the guidelines

themselves. Thus, something more must be stated. The [Board] however, has

failed to state any other basis that is supported by any evidence."

   D. The "Some Evidence" Standard Requires That There Be Some Evidence
That Is Probative Of Current Dangerous.

   Due Process requires that "some evidence" support the parole board's

determination and that the evidence relied upon must possess "some evidence

of reliability." Caswell v. Calderon, 353 F.3d 832, 839 (9th Cir. 2004).

See Cass v. Woodford, 2006 WL 1304953 at *9 (S.D. Cal. 2006).

   It is not enough that there is some evidence to support the factors

cited for denial of parole; the evidence must also rationally support the

core determination required by the statute before parole can be denied, i.e.,

that a prisoner's release will unreasonably endanger public safety. In re

Lee (2006) 143 Cal.App.4th 1400, 1408. Because the overarching consideration

is public safety, the test in reviewing the Board's decision denying parole

"is not whether some evidence supports the reasons [the Board] cites for

denying parole but whether some evidence indicates a parolee's release

unreasonably endangers public safety." In re Barker (2007) 151 Cal.App.4th

346, 366 (italic omitted).

   The Federal "Some Evidence" standard as applied in Rosenkrantz v.

Marshall (C.D. Cal. 2006) 444 F.Supp.2d 1063 and Martin v. Marshall (N.D.

6.

INSERT A

Cal. 2006|| 431 F.Supp.2d 1038 finds that an aging commitment offense falls short of providing "some evidence" sufficient to justify a denial of parole. See also. Willis v. Kane (N.D. Cal. 2007) 485 F. Supp.2d 1126.

The "some evidence" standard is not appropriate at the fact finding level but only suitable use by an appellate court in the context of reviewing lower court decisions. The Supreme Court recently explained in a plurality opinion that it has utilized the "some evidence" standard not as a standard of proof, but rather as a standard of review when examining an administrative record developed in an adversarial proceeding. Hamdi v. Rumsfield, 542 U.S. 5507, 124 S.Ct. 2633, 2651, 159 L.Ed.2d 578 (2004), n. 8.

E.  The Board's Reliance On The Commitment Offense And Immutable Pre-Conviction Factors To Deny Parole Violates Petitioner's Due Process Rights.

In Biggs v. Terhune (9th Cir. 2003) 334 F.3d 910, the Ninth Circuit cautioned that continued reliance on the circumstances of the offense could result in a due process violation if the prisoner continually demonstrates exemplary behavior and evidence of rehabilitation. The Board's decision to deny parole in this case relied on the commitment offense and petitioner's conduct prior to the commitment offense.

The Board's characterization of Petitioner's crime as exceptional was arbitrary since the Board routinely and invariably characterizes all first and second degree murders as exceptional. (The Court is requested to take judicial notice of the pleadings and records in the matter of In re Morris Bragg, on Habeas Corpus, Case No. 108543; In re Jameison, on Habeas Corpus, Case No. 71194; In re Criscione, on Habeas Corpus, Case No. 71614, where Santa Clara County Superior Court, the Honorable Linda Condron, found comprehensive evidence indicating that the state's Board of Parole Hearings completely disregards the detailed standards and criteria of the parole release statute, 15 CCR § 2402(c.), and thereby denies prisoners' due process

7.

INSERT A

rights; and Stephen Liebb v. Jill Brown, Case No. 04-4213 CW (JL), Northern
District of California, where Honorable District Judge Claudia Wilkins found
that Liebb has good cause for determining whether the Board routinely
categorizes convicted life-term murders as exceptional in order to deny parole
and whether such a policy is in violation of a prisoner's due process rights.
It is clear that in the case of 15 CCR § 2280, subds, (c.)(1)(A)-(E), and
§ 2402, subd. (c)(1)(A)-(E), the guideline fails to adequately inform the
Board how to determine crime factors to render the crime "exceptional."

The California Court of Appeal in In re Elkins (2006) 144 Cal.App.4th
discussed the use of the gravity of the commitment offense to support a denial
of parole: "Scott II summarizes the law in this situation. 'The Governor's
assumption that a prisoner may be deemed unsuitable for release on the basis
on the commitment offense 'alone' is correct [citation], but the proposition
must be properly understood. The commitment offense is one of only two factors
indicative of unsuitability a prisoner cannot change (the other being his
'Previous Record of Violence')."

"The Commitment offense can negate suitability only if circumstances
of the crime reliably established by evidence in the record rationally
indicate that the offender will present an unreasonable public safety risk
if released from prison." In re Tripp (2007) 150 Cal.App.4th 306, 319.

In the case In re Dannenberg (2005) 34 Cal.4th 1061 (Dannenberg I),
the California Supreme Court addressed what standard was valid for not finding
the prisoner suitable for parole. In that case, Dannenberg was convicted
of a second degree murder when he got into a fight with his wife, repeatedly
beat her on the side of her head with a pipe wrench rendering her unconscious,
and then Dannenberg drowned her in their bathtub. (Id. at p. 1073.) The parole
board fond the primary reason for not granting parole was the especially

8.

INSERT A

cruel manner in which the murder was carried out. (<u>Id</u>. p. 1074.) Dannenberg claimed his wife must have lost consciousness from hitting her head on the bathtub spout and not from the blows he rendered with the pipe wrench. (<u>Id</u>. at p. 1073.) The jury did not believe Dannenberg, and neither did the parole board. The parole board found Dannenberg did not take responsibility for his crime, and therefore continued to be unpredictable and remained a threat to others if released. (<u>Id</u>. at pp. 1075, 1095.) The Supreme Court found, in a three to four decision, that there was "some evidence" the crime was "especially callous and cruel" and there was little doubt the crime went beyond the minimum elements of a second degree murder, a requirement that must be shown in order to deny parole solely based upon the commitment offense. (<u>Id</u>. at p. 1095.)

Recently, <u>Dannenberg II</u> was published. The Sixth Appellate District held the Governor's reversal of a BPH finding of suitability was not supported by some evidence and cannot be upheld. Because the evidence did not support the Governor's reversal, it would be futile to remand the matter to the Governor. (<u>In re Dannenberg</u>, <u>supra</u>, _____ Cal.App.4th at p. 9.) "While Dannenberg's commitment offense was grave, the record that was before the Governor lacks any evidence that now, more than two decades after his offense, the nature of Dannenberg's offense alone continues to support a conclusion that he poses an unreasonable risk to society if released. (<u>Ibid</u>). The test is not whether some evidence indicates a parolee's release unreasonably endangers the public, but whether some evidence exists that support's the Governor's conclusion that release of the inmate would pose an unreasonable risk to the public. (<u>Id</u>. at p. 8.)

<u>Irons v. Carey</u> (9th Cir. 2007) 479 F.3d 658 ("<u>Irons</u>") is the Ninth Circuit's third in a line of cases that includes <u>Biggs v. Terhune</u> (9th Cir.

9.

INSERT A

2003) 334 F.3d 910 ("Biggs"), and Sass v. California Board of Prison Terms
(9th Cir. 2006) 461 F.3d 1123 ("Sass"), looked at the continued use of the
commitment offense to justify a denial of parole.

   F.  The Board's Determination That A Crime Is Particularly Cruel Or
Egregious Is Made In An Arbitrary And Unconstitutional Manner.

   The Board's determination that a murder is especially cruel or egregious

is unconstitutionally vague and standardless. See United States v. Doremus

(9th Cir. 1989) 888 F.2d 630, 634.

   The Board relies on any fact of the crime to bolster its conclusion

that the crime is particularly egregious. The Board makes a determination

that virtually All murders are particularly egregious.

   The Board's use of unchanged and unproven elements of Petitioner's crime

to continue denying parole violates his constitutional right to a jury trial.

See Aprendi v. New Jersey, 530 U.S. 466, 490; and Cal. Penal Code § 190.4.

   G. The Board's Finding That Petitioner Needed Show Insight And Remorse
Lacks Evidentiary Support And Are Not Evidence Of Unsuitability.

   The Board stated: "We felt that the doctor in saying you have insight

and remorse —— we don't know where he got that because you certainly really

didn't discuss it in any detail with him. You haven't internalized AA/NA

steps despite years of attendance." (TR 61.) This conclusion is refuted by

three decades of vocational training and positive programming within prison

as is documented in the Board Report. Compliance with the Board's

recommendations is a factor to be considered in favor of suitability and

release no matter how long-standing or recent it is. See In re Lee (2006)

143 Cal.App.4th 1404, 49 Cal.Rptr.3d 931; also see In re Elkins (2006) 144

Cal.App.4th 475.

15 CCR § 2236 is unequivocal in its demands that when a prisoner "refuse[s] to discuss the facts of the crime in which instance a decision shall be made based on the other information available and the refusal shall not be held against the prisoner...." In the instance case, it is clear that Petitioner's refusal to talk about the crime was held against him. Although the Board recognized that Petitioner has "worked well" and should "be commended for that[,]" it stated that "seemingly contradicted is [his] feeling that you in fact have insight and remorse and basically, we have no evidence of that." (TR 55, 56.) Had the Board reviewed Petitioner's entire incarceration history it would have found that he had shown insight and remorse through his programming and psychological evaluations. 15 CCR § 2281(d)(3) states: "(3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or the prisoner has given indications that he understands the nature and magnitude of the offense. Petitioner's behavior had been exemplary. The Board did not consider it, if it had, the result would have been different. Petitioner's Central file reveals that Petitioner has met the requirements to be found suitable.

1. Petitioner's Programming

Petitioner had been free of discipline since 1990, a period of over 17 years. During the course of his 30 years (at the time of the 2007 hearing) in custody, Petitioner received four CDC-115 violations, all for non-violent violations. In addition, Petitioner has maintained the lowest possible classification score since January 3, 1992.

2. Work, Education, and Self-help Therapy

a. Work

Petitioner has an excellent work record while in custody. He has

11.

INSERT A

completed two vocational certificates, receiving one in Dry Cleaning and one in Bakery. In addition to his vocational accomplishments, Petitioner has been involved in Prison Industry Authority (PIA), Joint Venture and Mill and Cabinet where he regularly received exceptional work chronos. While working in Joint Venture, Petitioner saved approximately $1,700, paid restitution and provided regular support payments to his mother.

Throughout his period of custody, Petitioner has consistently been lauded as an "excellent" and "outstanding" worker who gets along with staff and inmates. With respect to his work skills, Petitioner has been described as a "quick learner," "consistent," "dependable," "cooperative," and "an asset." In sum, Petitioner's work history is beyond repute.

b. Education

Petitioner received his GED in 1987, and has continued to educate himself by reading in his spare time.

c. Self-help and Therapy

Though Petitioner has never been diagnosed with mental illness, he has participated in self-help and therapy programs throughout his entire term in custody. Petitioner was involved in both group and individual therapy. Petitioner completed a year of group therapy in 1988. He was also in the CAT T program at CMF, and prior to that he had approximately three years of individual psychotherapy, ending in 1985.

Since then, Petitioner has focused upon his past problems with substance abuse. In this respect, Petitioner began participating in Alcoholics Anonymous (AA) in 1987 and Narcotics Anonymous (NA) in 1988. He has continued his involvement with NA during the course of his time in custody and plans to remain in NA upon his release.

3. Psychological Evaluations

12.

INSERT A

Petitioner has obtained positive and supportive psychological evaluations for over 22 years, the great majority of which have been consistently supportive of parole. Beginning in 1986, for a period of approximately 22 years at the time of the 2007 hearing, Petitioner began receiving positive psychological evaluations.

a. 1986 Psychological Evaluation

Dr. Philip Hicks, M.D., analyzed Petitioner on May 30, 1986, in preparation for Petitioner's parole consideration hearing. Dr. Hicks had evaluated Petitioner the prior year, and his fellow-up evaluation noted significant improvement. In particular, Dr. Hicks found:

> The aspects of his personality described a year ago principally as antisocial orientation appears to be modified somewhat in a positive direction. He seems to be more comfortable with himself, has less of a "chip on his shoulder" attitude and is somewhat more thoughtful about himself in relationship to others.... He appears to be maturing somewhat during the past year and no longer demonstrates active antisocial attitudes or behavior. He has remained disciplinary free, he has, however, avoided involvement with A.A. and this is recommended. No psychiatric treatment per se is indicated and his prognosis has improved over the last report.

b. 1987 Psychological Evaluation

On June 29, 1987, Dr. F.H. Ernst, M.D., evaluated Petitioner, noting a generally positive view of petitioner. Dr. Ernst described petitioner, stating:

> He is forthright in talking about himself, including admitting the demonstrated problem of talking about his offense. He describes other offenses clearly. He describes his past use of narcotics. He is open about his previously getting tattooed and his decision some years back to discontinue any more tattoos. He admits being a past drug user. He is clear about his lack of commitment during his use to any working activity; this was prior to coming to CDC. He is clear about the use of alcohol in his youth. He tells of having a quick temper in the past. Apparently that is not as much of a problem now as it used to be. This is especially borne out by the lack of disciplinaries.... Violence potential of the crime for which subject is committed is very high. This potential is estimated to have subsided and now be in the range of normal for the

13.

institutional population.

Dr. Ernst concluded the evaluation with praise for petitioner, stating, "If not paroled, continued present program. Subject is to be commended for his work on himself, improving himself and his self-controls, plus also commended for his contributions to the institution."

c.  1988 Psychological Evaluation.

Dr. Issac Slaughter, M.D., evaluated Petitioner on July 27, 1988, and gave a very positive review of petitioner. Dr. Slaughter based his evaluation upon a year-long relationship with Petitioner as a member of his group therapy. Initially, Dr. Slaughter described Petitioner, stating:

> In all my contact with Mr. Navarro he has been found to be alert, cooperative, and in good control with his environs. He is always neat, prompt and courteous. He does not exhibit any overt thought disorder, delusion, hallucinations, or paranoid ideations.... His grasp, comprehension, and mental ability are above average. His judgment and insight are good.

In evaluating Petitioner's violence potential, Dr. Slaughter found, "While his commitment offense is one of ultimate violence, his violence potential at this time is assessed at a level lower than average for this population." Finally, Dr. Slaughter concluded, "It is my opinion that he has maximized the psychological gains available to his therapy and that there are no psychological contraindications to his being paroled. Any future decision made to not parole him must be based on other than psychological reasons."

d.  1989 Psychological Evaluation

On May 18, 1989, Dr. Bramley Benton, M.D., evaluated Petitioner and gave a very positive review of petitioner, stating, "In his incarceration, Navarro has improved considerably. He is able to socialize well and apparently has the respect of both, other inmates and custody. His violence potential is estimated not to exceed that of the average inmate. If paroled his violence

14.

INSERT A

potential would probably not be greater than it presently is." Dr. Benton

concluded, "While incarcerated, further psychiatric intervention will probably

not be required."

　　e.　1990 Psychological Evaluation

　　On May 31, 1990, Dr. Clyde Martin, M.D., interviewed Petitioner and

gave him a very positive review, finding that, "He seems to understand the

causative factors of his crime. He has good self-understanding, positive

attitudes, good motivation for change and seemed sincere in his

rehabilitation." Dr. Martin also noted that, "In a less controlled setting,

such as a return to the community, the inmate is considered likely to hold

his present gains unless he returns to his drug and alcohol use." In

conclusion, Dr. Martin found Petitioner's "violence potential outside a

controlled setting in the past is considered to have been about the same

as the average inmate. It is currently decreased."

　　f.　1992 Psychological Evaluation

　　On June 22, 1992, Dr. Sophia Konstantinou, Ph.D. interviewed Petitioner

and provided a psychological evaluation. Dr. Konstantinou noted that, "Based

on history only, violence potential outside a controlled setting in the past

is considered to have been average. At present, inmate Navarro is programming

well vocationally and through weekly participation in Narcotics Anonymous

meetings."

　　g.　1994 Psychological Evaluation

　　On June 16, 1994, Dr. M.E. Roudebush, M.D., interviewed petitioner for

approximately one half-hour. After the brief interview, Dr. Roudebush found,

"While inmate Navarro is making a good institutional adjustment, he provides

no basis for predicting that he would be able to make an acceptable adjustment

in the free world."

15.

INSERT A

    h.  1995 Psychological Evaluation

On December 31, 1995, Dr. J. Temkova, Ph.D., interviewed Petitioner
for approximately one half-hour and provided a limited analysis of petitioner.
Dr. Temkova found that while petitioner was "polite," he was "quite guarded
and provided very little if any information about himself and his behavior."
Based upon the foregoing, Dr. Temkova was "unable to formulate any specific
opinion."

    i.  1998 Psychological Evaluation

On March 25, 1998, Dr. Les Carr met with Petitioner and conducted an
in-depth clinical interview combined with psychological testing. Dr. Carr's
findings were very supportive of release. Dr. Carr found petitioner to be
"friendly and cooperative throughout the psychological examination." Based
upon his in-depth analysis of petitioner, Dr. Carr found, "By history, Mr.
Navarro can be classified as an antisocial personality. However, he has
continued to make progress in developing goals and values more in line with
being a responsible member of society. His acquisition of skills while
incarcerated has been a significant factor contributing to his positive
development and maturity." In conclusion, Dr. Carr recommended that "Mr.
Navarro's release date can be based on other than psychiatric considerations."

    j.  2000 Psychological Evaluation

On November 20, 2000, Dr. Susan Buchan, Ph.D. interviewed Petitioner
and provided an extensive psychological analysis. Dr. Buchan's evaluation
was extremely positive, finding Petitioner's prognosis to be "excellent,"
further stating that "[h]e has never had any symptoms of mental illness and
he is a very strong minded person." In addressing Petitioner's conscious
choice not to talk about the specific details of the commitment offense,
Dr. Buchan noted that this is "surely not motivated by self-interest."

INSERT A

Further, with respect to the commitment offense, Dr. Buchan found that

Petitioner "has sufficient insight into the behavior that led to his crime.

He acknowledges that he was a drug addict since his early teenage years and

was leading a crime-ridden life, without much constructive activity." Based

upon this factor, Dr. Buchan declared, "It is very clear to me that he takes

full responsibility for his crime and has deep remorse about participating.

He particularly regrets the impact on the victim's family."

Dr. Buchan also addressed Petitioner's acknowledged past substance abuse

problems, finding that, "Mr. Navarro's present lifestyle and persona are

antithetical to drug and alcohol use. He is quite invested in his health

and physical fitness. His major hobby is 'working out.' He runs for hours

each day and he does a variety of strength training exercises. He does not

seem at this time to be driven by impulse. Rather he is very self-

disciplined."

Dr. Buchan assessed Petitioner's potential dangerousness as follows:

A. Within a controlled setting: For many years now the subject
has felt that he had moderated his temper and is no longer
reactive in his behavior. This change is certainly underscored
by his conduct in prison. He is consistently noted to be
cooperative and constructive in occupational settings. Mr.
Navarro has not had a CDC-115 for over a decade and he has
not behaved violently in prison. He has had zero classification
points since 1/2/92.

B. If released to the outside community: Mr. Navarro is not
considered as potentially dangerous if released to the outside
community. Mr. Navarro's criminal behavior is related to
substance use. He was intoxicated at the time of his life crime
and he had for years been a heroin addict who ran the streets.
He has consistently attended 12-step programs for the past
14 years. He knows the cost of drug and alcohol use. Of his
past associates, most are dead or in prison. Mr. Navarro has
lost several brothers to heroin addiction and crime associated
with it. He knows better than to seek out this lifestyle. He
wants to avoid the Central Valley, in order to stay away from
influences that led him to prison. If forced to go there because
of parole, he knows to stick to himself and to family. This
is a very practical and strong-minded man. I am confident that
he will do what it takes to stay out of prison.

17.

> Significant risk factors/precursors to violence: As long as
> Mr. Navarro stays away from heroin and other drugs, which he
> is likely to do, there are no risk factors in this case.

In her summary, Dr. Buchan described Petitioner as "a moral person of

good conduct" who is "honest and straightforward in his assertion that he

would rather die in prison than speak of his crime. . . . He asks only to

be judged for his current conduct, for the person who he now." Dr. Buchan

ended her evaluation by concluding, "There is no psychological barriers to

the immediate parole of Lionel Navarro."

   k.  2004 Psychological Evaluation

   On November 16, 2004, Dr. E. Zak Bencich, Ph.D., interviewed Petitioner

for approximately one hour. Dr. Bencich noted that Petitioner did express

remorse for his role in the commitment offense, specifically he felt empathy

towards the family members of the victim. In addition to expressions of

remorse, Dr. Bencich also commended Petitioner for his disciplinary free

behavior since 1990. In the end, Dr. Bencich's report was brief, and he did

not feel as though he had enough information from Petitioner in order to

provide a detailed analysis.

   l.  2007 Psychological Evaluation

   On March 22, 2007, Dr. Starett, Ph.D., interviewed Petitioner and

evaluated his future propensity for violence to be in the low range. Dr.

Starrett rated Petitioner's overall risk assessment to be in the low range

compared to similar inmates. Dr. Starrett stated that "When asking the inmate

why he  participated or got involved in this crime, the inmate states he

does not like to talk about it. He says he was convicted. The inmate states

he refuses to think about it. He said, quote, it happened, everyone got hurt,

end of quote. He did not want to talk about it. The inmate states that he

feels bad about what happened. He cannot change it. He said, quote, it's

18.

INSERT A

been a long time, I don't like to talk about it, end of quote." (TR. 31-33.)

    4. Parole Plans

    At the 2007 hearing, Petitioner explained to the Board that his parole

plans have not changed since his previous hearings and that due to the death

of his brother, did not receive any updated letters of support. Mike Gunning,

Petitioner's Board appointed attorney explained as followed:

> He's developed marketable skills that he didn't have beforehand.
> He has apparently a very good work ethic and that will bode
> well for him upon release. And as the Board is well-aware,
> you don't need letters of support. There's nothing in Tittle
> 15 that indicates that. I understand the Boards asks that,
> but there's nothing in Title 15 to require that. He has
> marketable skills, they're viable, he does have old letters
> of support from his family. There's nothing to indicate that
> they have -- based on what I've seen or heard, that they are
> no longer in support, so I would submit that the same support
> that they've been providing him since 1983 are still in place.
> The only reason he didn't go and request new ones was because
> of the fact he lost someone in the family and he did [not]
> want to bother his family."

(TR 50.)

    At the previous hearing, in 2005, Petitioner presented realistic parole

plans based upon his extensive familial support in the community. When

released, Petitioner plans to live in Famerville, Tulare County, California,

with his mother. He has also made alternative arrangements with his brother,

Raymond, who lives in Exeter, California. With regard to employment,

Petitioner has offers of employment from Alfred Munoz who owns a landscaping

business and his brother Hector. In addition, Petitioner is skilled in dry

cleaning, woodworking, and he has expressed interest in pursuing one of these

possible areas of employment.

    D.  Parole Suitability Proceedings

    I.  Initial Parole Consideration Hearing - August 9, 1983

    On August 9, 1983, Petitioner attended his initial parole consideration

hearing. During the hearing, petitioner presented evidence of his

19.

INSERT A

participation in AA, his good work reports, and his disciplinary-free behavior. After hearing the evidence of suitability, the Board denied parole based upon the following factors: (1) The commitment offense; (2) Prior criminal history; (3) Psychiatric factors; and (4) Institutional adjustment.

The Board denied parole for two years and recommended that Petitioner: (1) Remain disciplinary free; (2) Upgrade academically; and (3) Participate in self-help programs which will assist him in understanding the social factors of society.

2. First Subsequent Parole Consideration Hearing - August 29, 1985

After considering Petitioner's record, the Board denied parole based upon the following factors: (1)The commitment offense; (2) Previous record; (3) Institutional behavior; (4) Psychiatric factors. The Board noted that petitioner had received a 115 disciplinary for possessing approximately 3 gallons of prison-made alcohol. In its conclusion, the Board recommended that Petitioner: (1) Be disciplinary-free; (2) Work towards reducing his custodial level so that program opportunities will become more available; (3) participate in a substance abuse program, such as AA; (4) Upgrade vocationally and educational.

3. Second Subsequent Parole Consideration Hearing - August 27, 1986

Petitioner attended his third parole hearing and presented the Board with his disciplinary-free behavior. After the presentation of evidence, the Board denied parole for one year. In its decision, the Board cited the following factors: (1) Commitment offense; (2) Previous record; (3) Institutional behavior; and (4) Psychiatric factors. In its conclusion, the Board recommended that he: (1) Remain disciplinary free; (2) Continue to upgrade vocationally and educationally; and (3) Participate in self-help and/or therapy programming.

20.

INSERT A

4. Third Subsequent Parole Consideration Hearing – August 28, 1987

At his fourth hearing overall, Petitioner presented the Board with evidence of compliance with previous Board recommendations – disciplinary-free behavior, educational upgrading and completion of his GED, and positive work reports. After reviewing the evidence, the Board commended him "for his work performance and his overall positive institutional adjustment."

Following the presentation of Petitioner's positive programming, the Board denied parole for one year. In its decision, the Board relied upon the following factors for its denial: (1) Commitment offense; (2) Previous record; (3) Psychiatric factors. In conclusion, the Board recommended that Petitioner: (1) Remain disciplinary free; (2) Upgrade vocationally and/or educationally; (3) Participate in self-help and/or therapy programming to address his past history of drug and alcohol dependence.

5. Fourth Subsequent Parole Consideration Hearing – August 24, 1988

At Petitioner's fifth overall hearing, the Board denied parole for one year. In its decision denying parole, the Board relied upon the following factors: (1) Commitment offense; (2) Previous record; and (3) Psychiatric factors.

The Board noted that Petitioner had received a 115 on October 10, 1987, for possession of marijuana. Further, the Board commended Petitioner for obtaining his GED and for his excellent work record. In conclusion, the Board recommended that Petitioner: (1) Become disciplinary free; (2) Upgrade vocationally in an area that is of interest to the prisoner; (3) upgrade educationally; (4) Participate in self-help and/or therapy programming; (5) Remove tattoo if possible.

6. Fifth Subsequent Parole Consideration Hearing – September 15, 1989

On September 15, 1989, Petitioner attended his sixth parole hearing.

21.

INSERT A

Following the hearing, the board denied parole for one year. Again, the Board cited the following factors in denying parole: (1) Commitment offense; (2) Previous record; (3) Institutional behavior; and Psychiatric factors.

The Board noted that Petitioner had received a 115 on August 23, 1989, for possession of a banned substance. In conclusion, the Board recommended that Petitioner: (1) Become disciplinary free; (2) Upgrade vocationally; (3) Participate in self-help and/or therapy programs.

7.  Sixth Subsequent Parole Consideration Hearing – August 13, 1990

At his seventh overall hearing, Petitioner presented evidence of his parole suitability, including his discipline free behavior, participation in NA and overall self-improvement.

Despite the evidence of suitability, the Board denied parole for seventh time. In its two-year denial, the Board specifically identified following grounds: (1) Commitment offense; (2) Previous record; (3) Institutional behavior; and (4) Psychiatric factors.

In conclusion, the Board recommended that Petitioner: (1) Remain disciplinary free; (2) Upgrade vocationally and/or educationally; (3) Participate in self-help and/or therapy programming.

8. Seventh Subsequent Parole Consideration Hearing – September 30, 1992

Petitioner attended his eighth parole hearing before the Board and presented significant evidence of suitability, including: exceptional work reports, committed participated in NA and vocational accomplishments. The Board wrote the first full decision of its findings, denying parole for two years. In the decision, the Board explained the reason for denying parole, stating, "Basically, it's because of the commitment offense itself. In which you and two other crime partners engaged in a murder of one, Mr. Gonzales over money." The Board also cited an escalating pattern of criminal conduct

22.

INSERT A

and violence, lack of programming, and the negative psychological evaluation.

The Board recommended that Petitioner "remain disciplinary-free, that you continue in metal fab, that you continue your NA, that you attend Breaking Barriers, that you attend a board group, that you attend vital issues and [inaudible]."

9. Eighth Subsequent Parole Consideration Hearing —August 16, 1994

At his ninth hearing, Petitioner presented the Board with evidence of his exceptional programming and suitability, as well as his vocational upgrading and commitment to NA — in substantial compliance with the past Board recommendations.

With the overwhelming evidence of suitability, the Board nonetheless denied parole for the ninth time based primarily upon the commitment offense. In its decision, the Board found:

> The offense was carried out in a manner which exhibits a callous disregard for the life and suffering of another. The offense was carried out in a dispassionate and calculated manner.... Previous record: You have a record of violence or assaultive behavior, an escalating pattern of criminal conduct and/or violence, a persistent pattern of tumultuous relationships and criminal behavior which commenced at an early age,,,, Institutional behavior: You've programmed in a limited manner while incarcerated.... The psychiatric factors: The psychological report dated 6/16/94, authored by Dr. M.E. Roudebush — and briefly, in this report Dr. Roudebush says under conclusions, "While inmate Navarro is making a good institutional adjustment, he provides no basis for predicting that he would be able to make an acceptable adjustment in the free world."

Following its denial, the Board recommended that Petitioner:(1)  Remain disciplinary free; (2) Upgrade vocationally and educationally; and (3) Participate in self-help and therapy programming.

In closing, Commissioner Guaderrama remarked upon Petitioner's silence in response to questions regarding his commitment offense, stating:

> You know, I'm just a little at loss to understand why your attitude is like it is here today. You don't sound like a man

23.

INSERT A

that wants to get out of prison. I'm not sure that's because
you feel comfortable here or you like prison. But like your
attorney said, you're going to have to convince the panel one
of these days that you're ready to go, get out on the outside
and be a free person. But until you start really become
convincing that that's what you want to do, it's not going
to happen. Because you've got to remember that you're a life
prisoner and you could stay here until you die. You know that's
a long time.

   10.   Ninth Subsequent Parole Consideration Hearing - March 28, 1996

   At Petitioner's tenth overall hearing, the Board had before it evidence

of his exceptional work reports, his participation in AA and NA, and his

disciplinary free behavior. Despite Petitioner's showing, the board denied

parole, stating:

> The reasons are, number one, the very violent type of crime
> committed, a crime committed during the course of an attempted
> robbery, His prior criminal record began at an early age....
> The third reason insufficient programming in the institution.
> We commend the prisoner for upgrading in the vocational area.
> We note that he has had six 115's since he's been incarcerated,
> the last being on 11/30/90 for disobeying orders. We also note
> that he has upgraded in the self-help area and participated
> in the self-help arena, particularly AA. And his work reports
> are good. The board report by CCI Jeppeson, dated March of
> 1995 states the prisoner would pose a moderate degree of threat
> to society if released.

   In closing, Presiding Commissioner Koenig warned Petitioner about

asserting his right to remain silent on the issue of his commitment offense,

declaring:

> Just one word, I know you did the same thing last time, but
> we could conduct hearings without the prisoner simply by going
> through the records in the file, but society feels it's
> important that the panel meet with the prisoner and talk with
> the prisoner and get his feelings about the crime and remorse
> ad et cetera, that's how we come to a conclusion. It's too
> bad that you don't participate in the hearings. I just want
> to advise you that that's your right, also you don't have to
> come to a hearing period, you don't have to come here and sit
> if you don't want to. I would advise you in the future that
> you do participate in the hearing, but I know other panels
> have advised you of this also. So you're really only hurting
> yourself. Okay.

24.

INSERT A

11. Tenth Subsequent Parole Consideration Hearing - June 17, 1998

Petitioner attended his eleventh hearing on June 17, 1998. At the hearing, Petitioner presented the Board with eight years of disciplinary-free behavior and exceptional work reports and self-help programming.

After considering the overwhelming evidence of suitability, the Board denied parole. In its decision, the Board stated:

> The first reason is the commitment offense which was carried out in a manner that shows no regard for the suffering of other people.... We find our second reason is your previous history. You had a very unstable social history and an early involvement with drugs.... We find our third reason is in prison you've been (sic) some things real well. You've been disciplinary-free for the past eight years, you've upgraded vocationally, and you've, but you've done something that has not been good and that's that you've gotten out of NA, and you've just got to make that a life time commitment to follow through with that and learn the 12 steps.

At the conclusion of the hearing, the Board recommended that Petitioner, "remain disciplinary free, that [he] continue upgrading as you can vocationally and educationally, that [he] participate in self-help and any available therapy. Presiding Commissioner Bently ended the hearing by stating, "I'd really like to encourage you to consider for your next hearing, is to talk to us about the crime. Tell us what your role was in it, because it's not clearly not clear to us in the reports and it will help us understand you a little bit better in determining whether you've got, gained any insight."

12. Eleventh Subsequent Parole Consideration Hearing - February 27, 2001

On February 27, 2001, Petitioner attended his twelfth hearing. At the hearing, the Board considered Petitioner's disciplinary free behavior for over a decade, his completion of two vocations, his exceptional work reports, and laudatory chronos for his NA participation. In denying parole for one year, the Board listed its reasons, stating:

25.

INSERT A

> Many factors were considered. First and foremost was the
> commitment offense itself. This offense was carried out in a
> cruel manner, a manner -- a manner which demonstrates a callous
> disregard for human suffering. And it was also carried out in
> a calculated manner, a vicious and violent manner.... Regarding
> the inmate's criminal history, the prisoner has, on previous
> occasions, inflicted or attempted to inflict serious injury
> on a victim.... He was -- he has a history of unstable and
> tumultuous relationships. I'm referring to his emerging in the
> drug lifestyle and his relationships with his -- with what I
> would consider gangs, his peers in his neighborhood. He denies
> there was a gang relationship. I disagree.... In regards to
> his institutional behavior, the inmate has programmed fairly
> well, but this Panel feels he has not sufficiently participated
> in beneficial self-help and therapy programming.... And as far
> as the psychiatric factors go... [the most recent report] is
> not totally supportive.

The Board recommended that Petitioner, "remain disciplinary-free and

when available, participate in any and all self-help therapy," for his future

parole suitability.

### 13. Twelfth Subsequent Parole Consideration Hearing - April 24, 2002

Petitioner, again, substantially complied with the Board's

recommendations - remaining disciplinary-free and attending his NA meetings

regularly. Despite the showing of compliance at his thirteenth hearing, the

Board, again, found him unsuitable for parole, finding that he would "pose

and unreasonable risk of danger to society or a threat to public safety if

released from prison." In its decision, the Board again relied primarily

upon the commitment offense, explaining:

> Number one, the committing offense, The offense was carried
> out in an especially cruel and callous manner. The offense
> was carried out in [a] manner which demonstrates an
> exceptionally callous disregard for human suffering.

The Board cited additional factors of unsuitability in support of its

decision, including: previous record, institutional behavior, and insufficient

parole plans. Further, the Board suggested:

> That the prisoner still needs therapy in order to face, discuss,
> understand, and cope with stress in a nondestructive manner.
> Until then -- The prisoner can (indiscernible) understand the

26.

INSERT A

causative factors of why the prisoner is here today. Until
progress is made the prisoner continues to be unpredictable
and a threat to others. Therapy in a controlled setting is
needed but motivation or amenability are questionable.

The Board made the following recommendations: (1) Remain disciplinary

free; (2) If available, participate in beneficial self-help and therapy

programming; and (3) Verify parole plans.

In closing, Presiding Commissioner Moore admonished Petitioner, warning:

The other point to you, Mr. Navarro, is that don't waste your
time or mine. If [you] know that you are not ready because
you haven't done the work, then don't waste people's time.
Don't waste your time, don't waste your counselor's time, don't
waste the Board's time.

The Board denied parole for two years.

14. Thirteenth Subsequent Parole Consideration Hearing — August 24, 2004

At his fourteenth hearing, the Board requested a one-year postponement

in order to obtain an updated psyche report for petitioner.

15. Fourteenth Subsequent Parole Consideration Hearing — June 30, 2005

On June 30 2005, Petitioner attended his fifteenth parole consideration

hearing. At the very beginning of the hearing, Presiding Commissioner Lee

admonished petitioner about exerting his right to remain silent regarding

the commitment offense, stating:

Alright. Mr. Navarro, the law says very clearly you are not
required to admit the crime. Do you understand that and I
understand that.... However, I will indicate to you that you
know in the Board packet there is evidence against you and
you have no version every (sic) you were originally arrest[ed]
you have never indicated your version of the story. My personal
belief having been a prosecutor as well as sitting on the
bench and being a defense counsel it looks like you're covering
somebody and it's probably your brother who was found with
the knife and (indiscernible). And that you feel a
responsibility toward him and that over these years you have
kept that responsibility and you don't want to lay it off
on him. Something of that nature. Having said that, I will
indicate to you that that will be problematic, that there
is only one version and that version puts you in a very poor
light. So having said that are we ready to proceed?.... Are
you sure you don't want me to recuse myself right now?

27.

INSERT A

Petitioner declined Presiding Commissioner Lee's offer to recuse himself,

and the Board proceeded with the hearing. During the course of the hearing,

the Board considered Petitioner's disciplinary free behavior for a period

of over 15 years, his exceptional work report, his positive psychological

evaluation and counselor reports, his vocational and educational upgrading,

and his ongoing participation in NA. In sum the Board considered the

overwhelming evidence of suitability, but chose to deny parole once again.

In its decision the Board found:

> The offense was carried out in a cruel and callous manner,
> (indiscernible) inexplicable and very trivial in relationship
> to the offense. It is very clear that the facts of the case
> the inmate was involved in a robbery of an individual who
> ended up dying (indiscernible) is because of that particular
> case, that robbery is a dangerous enterprise and that
> individuals do get injured or killed ant that no one is excused
> from their activities even though they were not the actual
> (indiscernible) did not intend to kill someone. However, I
> will note the following. Mr. Navarro, (indiscernible) to pay
> attention to me. I went over the facts of this case. The facts
> of the case are very unique. The witnesses there were [two]
> individuals who approached the victim. One individual who
> approached the victim. One individual had a knife, the other
> individual later struck the person in the head. Neither of
> those individuals was you. Also, immediately after the offense
> they went and attempted to rob another individual by the name
> of Mr. Silva. That individual identified two individuals that
> was not you. The other reason for the denial, and maybe the
> District Attorneys in the past review factual, actual scenarios
> and actually look into the case. How your brother, Andy, got
> a second degree murder I do not know in light of the individual
> with the pipe and you ended up with a first degree murder.

The Board, secondarily, cited the other factors of Petitioner's previous

record, and the Tulare County District Attorney and Farmersville police

department opposition.

In closing, Presiding Commissioner Lee explained the multiple year

denial, stating:

> In a separate decision, this Panel finds that it is not
> reasonable to expect parole would be granted in the next two
> years. Most of your denials have been two years. There's no
> difference in this Board, this time. One year would give you

28.

INSERT A

> false hope.... The reason for the two year denial is the
> multiple victims were attacked (indiscernible) defense though
> as I indicated it appears that you were not involved in it
> in some way....

The Board close the hearing, recommending that Petitioner, "remain[]

disciplinary free, continue to upgrade vocationally and educationally if

possible, participate in self-help and therapy programming (indiscernible).

16. Fifteenth Subsequent Parole Consideration Hearing - July 24, 2007

On July 24, 2007, Petitioner attended his sixteenth parole consideration

hearing. Despite the evidence of complying with the Board's recommendations

when he received a two year denial in 2005, the Board denied petitioner

parole for three years. There is no evidence that indicates that Petitioner

needs to show insight and remorse in order to be found suitable. Petitioner's

psychological evaluations do not support the Board's conclusion.

All the above information was available in Petitioner's Central-File

and before the Board in 2007, but the Board ignored it.

H.   The Board's Use Of The District Attorney's Opposition Of Parole
As Evidence To Deny Parole Violates Due Process.

In Hayward v. Marshall, (2008) DJDAR 93, the Ninth Circuit Court of

Appeal stated that "Even though the district attorney is permitted to attend

parole hearings and express an opinion on the prisoner's suitability for

parole, see Cal. Penal Code § 3041.7 (providing that prosecutor may be

present at a parole hearing 'to represent the interest of the people'),

the district attorney's opinion, without more, cannot be considered 'some

evidence' under Hill that supports the Governor's reversal of parole.

Rosenkrantz v. Marshall, 44 F. Supp.2d 1063, 1080 n. 14 (C.D. Cal. 2006).

(Id. at n. 9.)

I. There Is No Evidence Of A Previous Record Of Violence And The Board's
Reliance On Pre-Commitment Behavior To Deny Parole Violates The State And
Federal Constitution Due Process Clauses.

29.

INSERT A

   In its decision, the Board also cited Petitioner's "previous record,"
as a factor of unsuitability supporting denial of parole. Under the
regulations, the fact that a prisoner has a previous record of violence,
or that "[t]he prisoner on previous occasions inflicted or attempted to
inflict serious injury on a victim, particularly if the prisoner demonstrated
assaultive behavior at an early age," tends to indicate that he is unsuitable
for parole. 15-CCR § 2281(c)(2). Accordingly, evidence that a prisoner "lacks
any significant history of violent crime" tends to indicate suitability.
15-CCR § 2281(d)(6). The Board does not use the precise phrasing of the
regulations, but it clearly uses the general language of the regulations
to indicate a factor of unsuitability. There is simply no evidence to support
the Board's finding.

   While Petitioner has a prior record of convictions, only one of the
convictions involved violence (assault with a deadly weapon), and one of
the convictions constituted serious offenses. The Board emphasized the
assault with a deadly weapon charge from 1972, as it was the only prior
conviction involving violence, however Petitioner did not receive any prison
time for this offense. Indeed, Petitioner was granted probation based on
the assault offense, indicating that it was not particularly serious.
Moreover, it is unreasonable to conclude that Petitioner's criminal history
sets forth an "escalating pattern of criminal conduct," as the last five
offenses leading up to the commitment offense were petty offense, the most
recent conviction being possession of an open container (in an automobile).

   Thus, in asserting future dangerousness, Petitioner's convictions related
to his substance abuse provide no reasonable relationship to the commitment
offense such that they indicate an "escalating pattern" of violence. Common
sense and professional opinion in the record contradict the Board's finding.

30.

INSERT A

The Board's reliance on Petitioner's past offense as escalating a pattern of significant violence and a factor of unsuitability is unreasonable.

   Denial of parole where there are no circumstances that could be considered more violent or aggravated than the minimum necessary to sustain a conviction for that offense "would be inconsistent with the statutory requirement that a parole date normally shall be set 'in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public....' (Pen. Code, § 3041, subd. (a).) 'The Board's [and the Governor's] authority to make an exception [to the requirement of setting a parole date] based on the gravity of a life term inmate's current or past offenses should not operate so as to swallow the rule that parole is "normally" to be granted.'" (In re Rosenkrantz, supra, 29 Cal.4th 616, 683.)

   In this instance, the Board has denied parole sixteen times based upon the same reasoning and unchangeable factors. To remand for reconsideration to the Board would "amount to an idle act." (In re Scott, supra, 133 Cal.App.4th 573, 603; see also In re Smith (2003) 109 Cal.App.4th 489, 507.

   For the foregoing reasons, the Court should reverse the Board's decision and order that the Board release petitioner immediately and discharged from parole. 15 CCR § 2345.

INSERT B

Ground 2

THE BOARD OF PAROLE HEARING'S THREE-YEAR DENIAL WAS NOT WARRANTED
OR SUPPORTED BY "SOME EVIDENCE" AND THEREFORE ARBITRARY AND
CAPRICIOUS IN VIOLATION OF STATE AND FEDERAL DUE PROCESS.

On July 27, 2007, the Board of Parole Hearings issued a three-year denial

of parole to Lionel Navarro ("Petitioner"). To do so was arbitrary. Generally,

if the Board finds an inmate unsuitable for parole it must conduct subsequent

parole consideration hearings annually. See Penal Code § 3041.5(b)(2). One

exception relevant here is that if an inmate has been convicted of murder,

the hearing may be deferred for "up to five years" if the Board "finds that

it is not reasonable that parole would be granted at a hearing during th[ose]

years." See Penal Code § 3041.5(b)(2)(B). The Board's decision to defer the

annual hearing is guided by the same criteria used to determine parole

suitability. See 15 CCR § 2270(d), citing 15 CCR § 2402.

In an unpublished decision (referred to herein because of its unique

relevance to the instant Petition) the Court of Appeals held that an inmate

should not receive a multi-year denial when the grounds for unsuitability –

namely, limited insight into the instant offense – could not be cured within

one year. See  In re Lozano 2007 WL 117709. As applied to Petitioner, any

alleged defects in his parole suitability – such as needing additional time

for therapy or rehabilitative programming – could be easily accomplished via

additional insight within one year. For Petitioner in the instant case, a three

year denial by the Board was arbitrary and capricious given that: (a) Courts

have previously reasoned that the recent timing of additional insight should

not be of relevance in determining parole suitability (In re Lee, supra.);

(b) the prison psychologist did not suggest the need for additional therapy

as being pivotal to Petitioner's risk to society; and (3) Petitioner's

in-custody history does not demonstrate impulse control issues, assaultive

behavior, or other criminal proclivities which would indicate a need for long-

32.

INSERT B

term therapy.

California case law provides that the decision to defer a parole hearing longer than one year "may involved some of the same facts on which the unsuitability determination is based. What is required ... is an identification of reasons which justify the postponement," and a recognition that the Board is making a separate decision. In re Jackson (1983) 39 Cal.3d 464, 479; see also People v. Belmontes (1983) 34 Cal.3d 335, 347-348.

The Board not only erred in denying parole but in issuing a multi-year denial of three years because Petitioner's case for parole (from his previous hearing of 2003 and 2005) had improved, not worsened, despite the Board's issuance of a three year denial. In fact, since his previous parole denials of two years in 2005 and one years in 2004, two years in 2002, one year in 2001, two years in 1998, two year in 1996, two year denial in 1994, two years in 1992, two years in 1990, one year in 1989, one year in 1988, one year in 1987, one year in 1986, one year in 1985, and two years in 1983, the initial parole consideration hearing. Petitioner had continued to remain disciplinary free since 1990; had maintained his classification score to 19 (the established minimum); had participated in additional self-help programs including: Necrotic Anonymous issued a three-year denial while failing to discuss why a longer period of denial was warranted.

California courts have recently scrutinized the practice of issuing multi-year denials after single year denials when inmates' parole have improved as indicative of pro forma consideration meant to address the Board's large backlog problem by reducing the number of annual hearings rather than giving the required individualized consideration required at such hearings. In re Rutherford, Case No. SC135399, CAL. No. A114357 (Marin County Superior Court)(pending appeal). In In re Rutherford, which is styled as a class action,

33.

INSERT B

the Marin County Superior Court prescribed remedies and scheduling requirements to eliminate the 3,000 plus cases of late parole hearings by setting limits on the circumstances under which a panel could issue a multi-year denial. (See Exhibit 2, attached hereto, wherein the Marin County Court observed, "Respondents are ordered not to deny further parole consideration for more than one year in the case of prisoners who have formally denied for one year, in the absence of a significant change in circumstances, which must be stated on the record.")Given this strong directive of the Marin County Superior Court in a class action and the above authorities, it is notably suspect that Petitioner was given a multi-year denial after without explanation as to any alleged changed in circumstances.

As previously pointed out, the Board must do more than merely commend Petitioner for his programmatic achievements while in prison. They must actually consider these factors "as circumstances tending to show suitability for parole." Ramirez, (2001) 94 Cal.App.4th 571-72.

Furthermore, there is nothing in the entire record of numerous psychological evaluations to suggest that Petitioner needs additional time for self-help or therapy. To the contrary, Petitioner's most recent psychiatric evaluation found that, his "propensity for future violence" is in the "low range." (TR 31.) Under California law, Ramirez, supra, at 571-572  the Board cannot ask for anger management when this requirement or suggestion is not supported by the psychiatric reports. Ramirez found, "The Board's readiness to make a finding so at odds with the record supports Ramirez's claim that his parole hearing was a sham. It is not surprising that the trial court regarded the Board's finding with deep suspicion." The same may be said in Petitioner's case when the Board calls for three years of additional self-help when none is mandated by the person's own psychiatrist or evidence by

34.

INSERT B

Petitioner's in-custody history.

It should be noted that just last month, it was made public that Robert "Bobby" Rodriguez, a veteran employee of the BPH who supervises more than 100 deputy commissioners who make decisions on tens of thousands of parole revocation cases every year, was arrested for driving under the influence at twice the legal limit. In the state owned vehicle with Mr. Rodriguez, was John Monday, the executive director of the parole board, who was a passenger was believed to also have been intoxicated. (http://www.latimes.com/news/local/la-me-parole8dec08,15986773.story?coll=la-headlines-california&ctrack=1&cset=true.) While Mr. Monday and Mr. Rodriguez were fortunate nobody was hurt or killed as their car veered into the incoming traffic lane, it puts into perspective how dangerous alcohol abuse can be and how wrong choices can be made by even those who condemn such behavior as reason to deny parole, but how one can still overcome that problem, bad choices, and function in society without an unreasonable risk to public safety. Mr. Monday and Mr. Rodriguez are still on the job overseeing the parole process today, without the safeguards the parole board places on Petitioner, or others similarly situated. It is hoped Mr. Rodriguez and Mr. Monday will rise to their alcohol problem in a positive manner as demonstrated by Petitioner.

In conclusion, this Court should order Petitioner released from prison. Petitioner is a reformed man who has addressed the issues that resulted in his incarceration, with an impeccable record of prison behavior who has much to contribute to society. He has now been in prison for over twenty-three years longer than his minimum eligible release date of May 15, 1984. The BPH's abuse of discretion, which it committed by failing to consider all of the evidence in support of paroling Petitioner – empowered this Court to overrule the BPH and order his release.

INSERT C

### Ground 3

THE CALIFORNIA BOARD OF PAROLE HEARINGS VIOLATED
PETITIONER'S STATE AND FEDERAL DUE PROCESS WHEN IT
CONTINUE TO RELY ON THE 30 YEAR OLD COMITTMENT OFFENSE
TO DENY PAROLE, DESPITE PETITIONER'S DISCIPLINARY FREE
RECORD OF OVER 15 YEARS WITH NO RECORD OF VIOLENCE
THROUGHTOUT HIS ENTIRE INCARCERATION.

The commitment offense no longer supplies any evidence that petitioner posed a

danger to public safety. The board failed to articulate a nexus between Petitioner's thirty

(30) year old commitment offense and current dangerousness. Petitioner asserts that the

panel of July 27, 2007, violated his state and federal due process rights by failing: to set

his term in accordance with Penal Code Section 3041, et seq; by engaging in an arbitrary

and unconstitutional determination that his crime was particularly egregious; by failing to

adduce any evidence that was probative of a finding that he is currently dangerous; by

failing to find him suitable for parole in accordance with the Board Regulations set forth

in sections 2280-2343 of the California Code of Regulations; and by violating the due

process requires by applicable case law. Petitioner also maintains that there was **no**

**evidence**, niether "some" or the Board's standard of a "preponderance of the evidence,"

underlying the "reasons" the Board articulated for finding him unsuitable for parole and

more importantly NO EVIDENCE that he is currently dangerous.

The panel's weighty and unreasonable reliance on unalterable factors including

the crime itself violate his due process rights. The Board has in effect resentenced

petitioner from a term of seven (7) years to life, to life without the possibility of parole.

(See Cal. Penal Code section 190.2.)

Petitioner was denied parole, for the sixteenth time, based on the gravity of the

commitment crime, the circumstances of which can never change. Therefore, the Board's

continued sole reliance on the commitment offense will essentially convert petitioner's

INSERT C

sentence of life with the possibility of parole into a sentence of life without the possibility of parole.

"[T]he measure of atrociousness is not general notions of common decency or social norms for by that yardstick all murders are atrocious." In re Lee (2006) 143 Cal. App. 4th 1400, 1401. Viewed under the appropriate guidelines, petitioner's crime does not qualify as unusually calculated, cruel or callous. He did not taunt the victim or gloat over his distress. See People v. Misa (2006) 140 Cal. App.4[th] 937. 842-843.

The California Court of Appeal in In re Elkins (2006) 144 Cal. App. 4th discussed the use of the gravity of the commitment offense to support a denial of parole:

"Scott II summarizes the law in this situation. 'The Governor's assumption that a prisoner may be deemed unsuitable for release on the basis of the commitment offense 'alone' is correct [citation], but the proposition must be properly understood. The commitment offense is one of only two factors indicative of unsuitability a prisoner cannot change (the other being his 'Previous Record of Violence').

Reliance on such an immutable factor 'without regard or consideration of subsequent circumstance' may be unfair [citation], and runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation. [Citation]

The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison. Yet, the predictive value of the commitment offense may be very questionable after a long period of time.

37

Thus, denial of release based solely on the basis of the gravity of the commitment offense

warrants especially close scrutiny." (Scott II, supra, 133 Cal App. 4[th] at pp 594-595, fns.

omitted.)

The Court of Appeal stated "it violates due process to deny parole "where no

circumstances of the offense reasonably could be considered more aggravated or violent

than the minimum necessary to sustain a conviction for that offense." (Scott II, supra, 133

Cal. App 4th at p. 598)..."

The Court of Appeal, in Elkins, also observed: "We also take into account that

whatever facts make a given offense aggravated or mitigated, compared to the

hypothetical average are not overlooked or disregarded when the Board sets a release

date...A release date is set by a calculation under matrixes Section 2403, subds. (b)-(f)

that require the Board to weigh myriad facts of the offense that might be aggravating

(Section 2404) or mitigating (Section 2405), including any factors that would have been

considered by a judge in choosing a determinate sentence...Thus [the Board]...must

remain focused not on circumstances that may be aggravating in the abstract but, rather,

on facts indicating release currently poses "an unreasonable risk of danger to society."

(Section 2402, subd. (a); accord, Pen. Code, Section 3041, subd. (b))."

The Board's reliance on Petitioner's commitment offense, which took place 25

years ago to deny parole, was unreasonable. A plethora of recently issued California state

and federal district court decisions uniformly holds that evidence of even particularly

egregious facts of commitment offenses is not tantamount to evidence of undue current

parole risk absent articulation of a nexus between those entities. Willis v. Kane, 485 F.

Supp. 2d 1126, 1135 (N.D. Cal. 2007) ["Notwithstanding the terrible nature of the crime,

38

INSERT C

the critical question the BPH was supposed to decide at the parole suitability hearing was whether 'consideration of the public safety requires a more lengthy period of incarceration for this individual'...Willis' 1983 crime did not provide sufficient evidence to find him unsuitable for parole in 2003."] Martin v. Marshall, 431 F. Supp. 2d 1038, 1049 (N.D. Cal. 2006);

Blankenship v. Kane, 2007 WL 1113798 at *10 (N.D. Cal. 2007) ["...the California regulations require...some evidence that the prisoner poses a present danger to society...continued reliance over time on an unchanging factor...the commitment offense...does not provide evidence of a present danger to society"]; Thomas v. Brown, 2006 WL 3783535 at *6 (N.D. Cal. 2006]; Rosenkrantz v. Marshall, 444 F. Supp 3d. 1963, 1086 (C.D. Cal. 2006)

The Board's determination that petitioner's crime was especially cruel or egregious is unconstitutionally vague and standard less. See United States v. Doremus (9th Cir. 1989) 888 F. 2d 630, 634.

The Board relies on any fact of the crime to bolster its conclusion that the crime is particularly egregious. The Board makes a determination that virtually ALL life crimes are particularly egregious.

The Board's characterization of petitioner's crime as exceptional was arbitrary since the Board and governor routinely and invariably characterizes all offenses carrying life terms as exceptional. Petitioner asks this Court to take judicial notice of the order in **MIKE NGO On Habeas Corpus [Superior Court of Santa Clara, No. 127611, August 30, 2007]** where the Honorable Linda Condron found comprehensive evidence indicating that the state's Board of parole hearings completely disregards the detailed

39

standards and criteria of the parole release statute, 15 CCR Section 2402 (c) and thereby

denies prisoners' due process rights.

The Honorable Judge Condron found:

> "In summary, when every single inmate is denied parole because his or her crime
> qualifies as a Section 2402(c) (1) exception to the rule that a parole date shall normally be
> set, then the exception has clearly swallowed the rule and the rule is being illegally
> interpreted and applied.
> When every single life crime that the Board examines is "particularly egregious" and
> "especially heinous, atrocious or cruel" it is obvious that the Board is operating without
> any limits and with unfettered discretion."

Based on the arbitrary characterization of every murder as being exceptional, the

Board's decision denying parole for petitioner is per se invalid because he was denied his

constitutional right to be heard by an impartial decision-maker. See <u>Withrow v. Larkin,</u>

421 U.S. 35, 47, 95 S. Ct. 1456, 43 L. Ed. 2d 712 (1975) ("Not only is a biased decision

maker constitutionally unacceptable but "our system of law has always endeavored to

prevent even the probability of unfairness.")

When an inmate is found suitable for parole, the Board does not deem the crime as

particularly egregious. However, the governor when reviewing the Board's determination

may disagree and consider the crime as particularly egregious and deny parole. At a

subsequent hearing the Board may again classify the crime as particularly egregious.

The change in classification of the very same crime from being non-exceptional to

particularly egregious demonstrates the arbitrariness of the classification process itself.

The Board's use of uncharged and unproven elements of his crime to continue

denying parole violates petitioner's constitutional right to a jury trial. See Apprendi v.

New Jersey, 530 U.S. 466, 490.

40

INSERT C

There are no elements of Petitioner's commitment offense that exceed the minimum elements of the crime of first degree murder. (See In re Elkins, 144 Cal.App.4th 475 (2006).) No characteristics of Petitioner's crime indicate that he would pose an unreasonable threat to public safety if he were to be released on parole. No factors relating to Petitioner's prior and post–commitment conduct tend to show that he is not suitable to be released under the supervision of parole. Petitioner's lack of significant criminal history and his institutional behavior are circumstances which tend to show suitability in his particular case.

Murder, by its very nature is heinous, atrocious and cruel. For one to be found to be "especially heinous, atrocious and cruel," it must be presented to a jury (Cal. Penal Code § 190.2 (14) and § 190.4). Any murder is malicious and unlawful and justifies imprisonment and, under current law, sometimes more than imprisonment. However, certain fundamental principles applying to punishment and parole have been written into law and further articulated by the state and federal courts. These principals must be followed by the Board, however unpalatable or inconvenient they may be to the commissioners. As expressed by Justice Richman in In re Barker, 151 Cal.App.4th 346 (Cal. Ct. App. 2007), although murderous conduct cannot be excused or minimized, the system provides for parole in appropriate circumstances. If the prisoner has met the prerequisites for release, the prisoner must be released. Returning to precedent, Justice Richman wrote: "All murders represent the basest form of human behavior. Our laws, however, provide for mechanisms by which even murderers, in limited circumstances, are entitled to be paroled. The judiciary has an obligation to execute those laws. The record established that Lee does not pose an unreasonable risk to public safety. Any contrary conclusion lacks any evidentiary support." Id. at 378 (quoting Lee, 143 Cal.App.4th at 1414) (footnote omitted).

Petitioner's record does not contain the factual basis needed to support an inference that he currently pose a risk to public safety, He must be released.

41

CONCLUSION

Petitioner Lionel Navarro has served a term equivalent to one had he been

Petitioner Lionel Navarro accepts responsibility for his crime and does

not seek to minimize its impact. He choice not to talk about the commitment

offense is based on Cal. Penal § 5011. The Board's decision finding Petitioner

unsuitable for parole is not supported by some evidence and it is arbitrary.

Because the Superior Court's adoption of that decision is contrary to, or

involves an unreasonable application of, clearly established Federal Law, as

determined by the Supreme Court of the United States, or resulted in a decision

that was based on an unreasonable determination of the facts in light of the

evidence presented in the state court proceeding, the Court should grant the

Petition for Review.

Dated: July 12, 2008

Respectfully submitted

*Lionel Navarro*

Lionel Navarro
Petitioner in Pro Se

(b)  At arraignment and plea _____

_____

(c)  At trial _____

_____

(d)  At sentencing _____

_____

(e)  On Appeal _____

_____

(f)  In any post-conviction proceeding   Jennifer M. Sheetz, 38 Miller Ave., Mill Valley,

__CA 94941. This Court appointed Sua sponte.

(g)  On appeal from any adverse ruling in a post-conviction proceeding _____

16.  Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time

Yes [X]  No [ ]

17.  Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack:

Yes [ ]  No [X]

(a)  If so, give name and location of court which imposed sentence to be served in the future: _____

_____

(b)  Give date and length of the above sentence: _____

_____

(c)  Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?

Yes [ ]  No [ ]

Wherefore, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding

_____

Signature of Attorney (if any)

I declare under penalty of perjury that the foregoing is true and correct.  Executed

July 12, 2008
        (date)

_Leonel Navarro_
Signature of Petitioner

(7)

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS


| | |
|---|---|
| In the matter of the Life ) <br> Term Parole Consideration ) <br> Hearing of: ) <br> ) <br> LIONEL NAVARRO ) <br> _____ ) | CDC Number B-91886 |

SAN QUENTIN STATE PRISON

SAN QUENTIN, CALIFORNIA

JULY 24, 2007

8:56 A.M.


PANEL PRESENT:

Sandra Bryson, Presiding Commissioner
Deborah Star, Deputy Commissioner

OTHERS PRESENT:

Mike Gunning, Attorney for Inmate
Afreen Kaelble, Deputy District Attorney
Cynthia Smith, Observer
David Hymas, Observer
R.E. King, Observer
Correctional Officer(s), Unidentified


CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No     See Review of Hearing
_____  Yes    Transcript Memorandum

**GITA SCHMITZ**

**FOOTHILL TRANSCRIPTION COMPANY, INC.**

EXHIBIT A                    INMATE

INDEX

Page

Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Case Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Pre-Commitment Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Post-Commitment Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Parole Plans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Closing Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Recess . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Adjournment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Transcriber Certification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

--oOo--

1

```
 1              P R O C E E D I N G S

 2         PRESIDING COMMISSIONER BRYSON:  This is the 15th

 3    Subsequent Parole Consideration Hearing for Lionel

 4    Navarro, CDC Number B-91886.  Today's date is July 24th,

 5    2007, and the time is 8:56.  We're located at San Quentin

 6    State Prison.  This inmate was received April 6th, 1978 in

 7    Tulare County.  The life term began in April 6th, 1978

 8    with a minimum eligible parole date of May 15th, 1984.

 9    Charging in Case Number 18308, Count One and controlling

10    offense, Penal Code 187, Murder First; with Count Two,

11    Penal Code 664/211, Attempted Robbery, that's Robbery

12    Second (inaudible) the weapon, a metal pipe, for which the

13    inmate received a term of life.  This hearing is being

14    recorded.  For the purpose of voice identification, each

15    of us will state our first and last name, spelling the

16    last name.  When it is your turn, sir, after spelling your

17    last name, please state your CDC number.  I will start and

18    go to my left.  Sandra Bryson, B-R-Y-S-O-N, Commissioner,

19    Board of Parole Hearings.

20         DEPUTY COMMISSIONER STAR:  Debra Star, S-T-A-R,

21    Deputy Commissioner, Board of Parole Hearings.

22         DEPUTY DISTRICT ATTORNEY KAELBLE:  Afreen Kaelble,

23    Deputy District Attorney, K-A-E-L-B-L-E.

24         MS. SMITH:  Cynthia (phonetic) Smith, S-M-I-T-H,

25    viewing.
```

2

1          MR. HYMAS:  David Hymas, I'm an attorney in San

2     Francisco with Morrison and Foerster.   I'm observing.

3          PRESIDING COMMISSIONER BRYSON:   Please spell your

4     last name.

5          MR. HYMAS:  H-Y-M-A-S.

6          MR. KING:   R.E. King, K-I-N-G, I'm observing.

7          PRESIDING COMMISSIONER BRYSON:   Thank you.

8          ATTORNEY GUNNING:   Mike Gunning, G-U-N-N-I-N-G,

9     I'm the attorney for Mr. Navarro.

10          INMATE NAVARRO:   Inmate Navarro,

11     N-A-V-A double-R-O.  B-91886.

12          PRESIDING COMMISSIONER BRYSON:   Thank you.  And I

13     note for the record, we have two correctional peace

14     officers in the room who are here for security purposes.

15     And, sir, would you raise your right; I need to swear you

16     in.  Do you solemnly swear or affirm that the testimony

17     you give at this hearing will be the truth, the whole

18     truth, and nothing but the truth?

19          INMATE NAVARRO:  Yes, I do.

20          ATTORNEY GUNNING:  Can I ask a quick question?

21     What is the purpose of the observers here?

22          PRESIDING COMMISSIONER BRYSON:   They can identify

23     their source individually.

24          MR. HYMAS:  I'm an attorney and I represent

25     several inmates in life terms and so we arrange with

1    Sacramento just to observe lifer hearings.

2         ATTORNEY GUNNING:  Okay, all right.

3         MR. HYMAS:  We're not here on behalf of anybody.

4    These are two colleagues of mine that work with me.

5         ATTORNEY GUNNING:  All right, thank you.

6         PRESIDING COMMISSIONER BRYSON:  And they have been

7    approved through Sacramento.

8         ATTORNEY GUNNING:  Excellent.

9         PRESIDING COMMISSIONER BRYSON:  All right,

10   Commissioner Star, is there any confidential material in

11   the file and, if so, will it be used today?

12        DEPUTY COMMISSIONER STAR:  There is confidential

13   material in the file, however, we will not be using any of

14   it today.

15        PRESIDING COMMISSIONER BRYSON:  Thank you.  And

16   I've passed the Hearing Checklist marked Exhibit 1 to your

17   attorney, sir, and to the District Attorney to be sure

18   that we're all proceeding with the same set of documents

19   and, Mr. Gunning, do you have it all?

20        ATTORNEY GUNNING:  I do, thank you.

21        PRESIDING COMMISSIONER BRYSON:  And, Ms. Kaelble,

22   do you have it all?

23        DEPUTY DISTRICT ATTORNEY KAELBLE:  The only thing

24   I'm not sure about with regards to support letters, I

25   don't have any current letters as to this inmate.

4

1              PRESIDING COMMISSIONER BRYSON:  Thank you, and I

2     do not believe that we have any on file at this point.

3     And are there are any additional documents?

4              ATTORNEY GUNNING:  I just have one.  This is a

5     recent Anger Management chrono.

6              DEPUTY COMMISSIONER STAR:  Okay.  I'll be

7     reviewing that --

8              ATTORNEY GUNNING:  Thank you.

9              DEPUTY COMMISSIONER STAR:  -- at the appropriate

10    time.

11             PRESIDING COMMISSIONER BRYSON:  Sir, please read

12    the document in front of you there aloud.

13             INMATE NAVARRO:  The ADA Statement:

14             "The Americans with Disabilities Act, ADA, is

15             a law to help people with disabilities.

16             Disabilities are problems that can make it

17             harder for some people to see, hear, breathe,

18             talk, walk, for them to think or to take care

19             of themselves than it is for others.  Nobody

20             can be kept out of public places or

21             activities because of a disability.  If you

22             have a disability, you have the right to ask

23             for help to get ready for the BPT Hearings,

24             to get to the hearing, talk, read forms and

25             papers, and understand the hearing process.

1          BPT will look at what you ask for to make

2          sure that you have a disability that is

3          covered by the ADA and that you have asked

4          for the right kind of help.  If you do not

5          get help or you don't think you got the kind

6          of help you need, ask for a BPT 1074

7          Grievance Form.  You can also get help to

8          fill it out."

9          PRESIDING COMMISSIONER BRYSON:  Well, thank you,

10    sir.  Do you understand what you read?

11          INMATE NAVARRO:  Yes.

12          PRESIDING COMMISSIONER BRYSON:  All right.  The

13    record will reflect that, on March 15th, 2007, a signed

14    BPT Form 1073, the Reasonable Accommodation Notice and

15    Request in accordance with the provisions of the Americans

16    with Disabilities Act, disabilities defined under the ADA.

17    This shows you as you having no disabilities identified

18    from the file review.  You have a reading level of 8.5,

19    which is good.  There's no given GPA, but you do have a

20    GED which you apparently achieved on April 14th of 1987;

21    is that correct?

22          INMATE NAVARRO:  Yes.

23          PRESIDING COMMISSIONER BRYSON:  All right.  And

24    you do not wear glasses; is that correct?

25          INMATE NAVARRO:  Yes, I do, but they're near-

6

1    sighted.

2              PRESIDING COMMISSIONER BRYSON:  Oh, I see.  So do

3    you use them for reading then?

4              INMATE NAVARRO:  No.

5              PRESIDING COMMISSIONER BRYSON:  So you use them to

6    see distances?

7              INMATE NAVARRO:  Yes.

8              PRESIDING COMMISSIONER BRYSON:  I understand.  And

9    do they suffice?  Do they accommodate you for seeing?

10             INMATE NAVARRO:  Yes.

11             PRESIDING COMMISSIONER BRYSON:  Okay, thank you.

12   You don't appear to have any hearing difficulties; is that

13   correct?

14             INMATE NAVARRO:  No.

15             PRESIDING COMMISSIONER BRYSON:  Okay, and you

16   didn't appear to have any mobility issues getting into the

17   hearing room; is that correct?

18             INMATE NAVARRO:  No.

19             PRESIDING COMMISSIONER BRYSON:  All right.  Have

20   you ever been involved in Triple CMS or EOP Programs?

21             INMATE NAVARRO:  No.

22             PRESIDING COMMISSIONER BRYSON:  Have you ever been

23   on psychotropic medications, either in prison or in the

24   street?

25             INMATE NAVARRO:  No.

1          PRESIDING COMMISSIONER BRYSON:   All right, do you

2    suffer from any disabilities that might prevent you from

3    participating in today's hearing?

4          INMATE NAVARRO:   No.

5          PRESIDING COMMISSIONER BRYSON:   And, Counsel, do

6    you concur?

7          ATTORNEY GUNNING:   I do, thank you.

8          PRESIDING COMMISSIONER BRYSON:   This hearing is

9    being conducted pursuant to Penal Code Sections 3041 and

10   3042 and the rules and regulations of the Board of Parole

11   Hearings governing parole consideration hearings for life

12   inmates.   The purpose of today's hearing is to consider

13   your suitability for parole.   In doing so, the Panel will

14   consider the number and nature of the crimes for which you

15   were committed, your prior criminal and social history,

16   and your behavior and programming since your commitment.

17   The Panel has had the opportunity to review your Central

18   File.   You will be given the opportunity to correct or

19   clarify the record.   The Panel will consider your progress

20   since your commitment, your counselor's report,

21   psychological report, and any other relevant information.

22   Any change in parole plans should be brought to the

23   Panel's attention.   The Panel will reach a decision today

24   and inform you whether or not it finds you suitable for

25   parole and the reason for its decision.   If you're found

8

1    suitable for parole, the length of your confinement will

2    be explained to you.  Nothing that happens here today will

3    change the findings of the court.  The Panel is not here

4    to retry your case.  The Panel is here for the sole

5    purpose of determining your suitability for parole.  Do

6    you understand?

7            INMATE NAVARRO:  Yes.

8            PRESIDING COMMISSIONER BRYSON:  This hearing will

9    be conducted in three phases.  I will discuss with you the

10   crime for which you were committed, your prior criminal

11   and social history.  Commissioner Star will discuss with

12   you your progress since your commitment, your counselor's

13   report, and your psychological evaluation.  I will then

14   discuss with you your parole plans and any letters in

15   support or opposition that may be in the file.  Once that

16   is concluded, the Panel, and then the District Attorney,

17   and then your attorney will be given the opportunity to

18   ask you questions.  The questions from the District

19   Attorney shall be asked through the Chair and you will

20   direct your answers to the Panel.  Next the District

21   Attorney and then your attorney and then you will be given

22   an opportunity to make a final statement regarding your

23   parole suitability.  Your statement should address why you

24   feel you are suitable for parole.  The Panel will then

25   recess, clear the room, and deliberate.  Once the

9

1   deliberations are completed, the Panel will resume the

2   hearing and announce its decision.  The California Code of

3   Regulations states that regardless of time served, a life

4   inmate shall be found unsuitable for and denied parole if,

5   in the judgment of the Panel, the inmate would pose an

6   unreasonable risk of danger to society if released from

7   prison.  You have certain rights.  Those rights include

8   the right to a timely notice of this hearing.  Were you

9   given timely notice of this hearing?

10          INMATE NAVARRO:  Yes.

11          PRESIDING COMMISSIONER BRYSON:  The right to

12  review your Central File.  I don't see that you did review

13  your Central File recently.  Were you given an opportunity

14  to review it?

15          INMATE NAVARRO:  Yes.

16          PRESIDING COMMISSIONER BRYSON:  And did you

17  decline?

18          INMATE NAVARRO:  Yes.

19          PRESIDING COMMISSIONER BRYSON:  Okay, and why is

20  that?

21          INMATE NAVARRO:  I don't even know what's in

22  there.

23          PRESIDING COMMISSIONER BRYSON:  Okay.  I'll give

24  you the same I give to all the inmates, which is that it's

25  a good thing to do.  Your whole life is in that pile of

10

1    paper and things could get lost and you may have things

2    you want to put in there, so I would recommend it.  You

3    also have the right to be heard by an impartial Panel.  Do

4    you have any evidence that the Panel before you would not

5    be impartial?

6              INMATE NAVARRO:  No.

7              PRESIDING COMMISSIONER BRYSON:  You'll receive a

8    copy of the Panel's written tentative decision today.

9    That decision will become effective within 120 days.  It

10   is also subject to review by the Governor.  The copy of

11   the tentative decision and a copy of the transcript will

12   be sent to you.  The Board has eliminated its appeal

13   process.  If you disagree with anything in today's

14   hearing, you have the right to go directly to the court to

15   complain.  You are not required to admit your offense or

16   discuss your offense if you do not wish to do so.

17   However, this Panel does accept as true the findings of

18   the court and you're invited to discuss the facts and

19   circumstances of the offense.  The Board will review and

20   consider any prior statements you've made regarding the

21   offense in determining your suitability for parole.  So

22   basically, it's very simple, just tell the truth.

23   Counsel, are there any preliminary objections?

24             ATTORNEY GUNNING:  I have none, thanks.

25             PRESIDING COMMISSIONER BRYSON:  Will this inmate

1   be speaking with the Panel?

2          ATTORNEY GUNNING:  He will not be discussing the

3   commitment offense, as far as the facts, nor will he be

4   discussing his prior arrest and/or conviction.

5          PRESIDING COMMISSIONER BRYSON:  I'm going to read

6   into the record the probation officer's report regarding

7   the commitment offense.  And this begins on Page 3 as to

8   circumstances:

9               "The defendant appeared in Tulare County

10              Superior Court on February 28th, 1978, and was

11              found guilty by a jury trial in a felony to

12              (inaudible) 187 of the California Penal Code,

13              Murder Count One in violation of Section

14              664/211.  That's California Penal Code

15              Attempted Robbery Count Two.  At that time,

16              the matter was referred to the Probation

17              Department for report and recommendation.  At

18              that time, the hearing was set for March 20th,

19              1978.  And as to the facts, on November 10th

20              of 1977, Farmersville Police Officer, while

21              on routine patrol was driving southbound on

22              North (inaudible) Avenue when he observed

23              three Mexican male subjects running westbound

24              across a vacant lot.  The officer identified

25              the subjects as being the defendant, Lionel

1        Navarro, and two codefendants, Andy Navarro

2        and Carlos Garcia.  The Farmersville police

3        officers had earlier contact with the subject

4        when they were involved in a disturbance at

5        the Siete De Copas Bar in Farmersville.  The

6        officer looked down the street from which the

7        subjects had run and notice a subject to be

8        lying in the middle of the road rolling on

9        his side.  After dispatching another officer

10       to investigate, the patrolman continued his

11       pursuit of the three possible suspects who

12       had by this time run into the Navarro

13       residence, which is located at 591 North

14       Little Street.  Back-up patrol units arrived

15       at the scene and a search of the area was

16       initiated.  Upon approaching the Navarro

17       residence, an officer observed the suspect,

18       whom he recognized as Andy Navarro, walking

19       along the side of the house approaching the

20       carport area.  It was noted by the officer

21       that Andy Navarro had what appeared to be

22       blood stains on the front of this white T-

23       shirt and was carrying what appeared to be a

24       brown-colored Pendleton shirt in his hands.

25       Upon seeing the officer, the defendant began

1       running to the rear of the yard of the

2       residence.  After several minutes of pursuit,

3       Andy Navarro was taken into custody.  During

4       the search of the area, officers went to the

5       approximate area where Andy Navarro had

6       jumped over the fence while being pursued.

7       At that location, they discovered a brown-

8       colored Pendleton shirt, two brown leather

9       wallets, and a check stub belonging to the

10      victim, later identified as Pasquale

11      Gonzales.  Wrapped inside his shirt was a

12      large hunting knife with a ten-inch blade and

13      bone handle.  Identification belonging to the

14      defendant was found in a second wallet.

15      Further investigation into the matter

16      revealed that the victim, Pasquale Gonzales,

17      had been attacked by the three previously

18      mentioned subjects and was seriously injured.

19      The purpose of the attack was determined to

20      be robbery.  A second robbery is reported to

21      have occurred near the attempted robbery of

22      Pasquale Gonzales.  The second robbery victim

23      being Marcello Silva.  It was later

24      determined that the defendant was not

25      involved in the robbery of Marcello Silva."

14

1    And moving to Page 5, the first full paragraph:

2              "In checking the crime scene, a metal pipe,

3              approximately three feet in length and of

4              small diameter, was found leaning against a

5              tree.  The pipe was confiscated as evidence."

6    I omitted a paragraph that I'm going to go ahead and read

7    on the second robbery:

8              "Later it was determined that while officers

9              were pursuing the suspects, Marcello Silva

10             had gone to the assistance of Pasquale

11             Gonzales who was lying on the ground on the

12             roadway.  Mr. Silva reportedly placed Mr.

13             Gonzales into the rear of his, Silva's,

14             vehicle and traveled to one of the

15             investigating officer's location on North

16             Little street.  Upon their arrival, the

17             officer observed that the victim, Pasquale

18             Gonzales, had partially coagulated blood on

19             the nose and mouth area.  A mucosa substance

20             was running from the corner of his mouth.

21             The victim appeared to be having a difficult

22             time breathing.  The victim's hands were

23             continually moving in a stroking manner from

24             his upper chest to the top of his head and

25             back.  His motions appeared to be out of

1          control.  The officer attempted to talk to
2          the victim, but he could not get a response.
3          While laying the victim down on his back,
4          the officer noted that the victim felt cold
5          to his touch and appeared to be in shock.
6          The left side of his, Pasquale Gonzales',
7          head towards the rear area was greatly
8          swollen as if he had received a blow to the
9          head.  Upon arrival of the ambulance, the
10         victim was transported to the Kaweah Delta
11         Hospital where he died several hours later.
12         A witness to the incident, Alicio Martinez,
13         reported to officers that he had observed
14         the defendant, Carlos Garcia and Andy
15         Navarro, confront the victim, Pasquale
16         Gonzales on the roadway near his home.
17         Mr. Martinez reportedly observed the three
18         subjects to surround the victim.  One of the
19         subjects is reported to have grabbed a hold
20         of the victim at which time it is reported
21         that Carlos Garcia struck the victim on the
22         head with what appeared to the witness to be
23         a stick.  After the victim had fallen to the
24         ground, defendants reported to have stood
25         over the victim.  The other two subjects,

16

1          Andy Navarro and Carlos Garcia are reported

2          to have then approached Marcello Silva and

3          subsequently rob him at knifepoint.  At the

4          culmination of the investigation, it was

5          determined that the defendant, Andy Navarro

6          and Carlos Garcia, were responsible for

7          confronting Pasquale Gonzales for the

8          purpose of robbery and that their attempts

9          to effect said robbery resulted in the death

10         of Pasquale Gonzales.  As a result, all

11         three subjects were arrest and charged with

12         attempted robbery and murder."

13    Now, I noted that in all of the counselors' reports, this

14    inmate has basically refused to discuss the crime.  So

15    I'm going to read the defendant's statement that was in

16    the probation officer's report, which is the most current

17    statement, unless you have something further that you

18    wish to submit.

19         **ATTORNEY GUNNING:**  No, thank you.

20         **PRESIDING COMMISSIONER BRYSON:**  All right.

21         "The defendant was interviewed at the Tulare

22         County Jail on March 10th, 1978.  At the

23         request of the defendant's attorney, James

24         Oliver, the writer did not solicit a

25         statement from the defendant regarding the

1      incident offense.  The writer did advise the

2      defendant that Mr. Oliver did not want the

3      defendant to make a statement regarding the

4      incident offense and the defendant indicated

5      to the writer that he had nothing to say

6      anyway."

7  And through all the hearings that I was able to review,

8  the defendant, you, sir, have not talked about the crime,

9  which is your right.  I would like to ask you a question

10 and you also have a right not to answer this question, so

11 that will be up to you and your attorney.  Why have you

12 not spoken about this, sir?

13      INMATE NAVARRO:  I just prefer not to talk about

14 it.

15      PRESIDING COMMISSIONER BRYSON:  All right, sir.

16 And as to this inmate's history, his juvenile record, I

17 will just note this for the record by reading the

18 counselor's report, the most current comprehensive Board

19 Report that we do have, that is of January 2005, prepared

20 by M. Garcia, common spelling, Correctional Counselor I,

21 we note that Navarro's juvenile arrest history began in

22 May 1969 at the age of 15 for burglary.  He was made a

23 ward of the court as a result of the burglary charge.  Two

24 years later, he was placed on probation after an arrest

25 for public intoxication.  During the same year, Navarro

18

1    was arrested for failure to disperse, which placed him as

2    a ward of the court again.  As to adult convictions and

3    arrests, in 1972, Navarro was arrested and convicted for

4    possession of a switchblade.  Navarro was arrested twice

5    for public intoxication and drunk driving.  He served 25

6    days in jail on each occasion.  Navarro was also convicted

7    of assault with a deadly weapon where he served 240 days

8    in jail and was placed on two years' probation.  Navarro

9    was arrested in 1975 for possession of an open container

10   and being in a place where unlawful activity was

11   occurring.  He has no prior prison term.  As to personal

12   factors, Mr. Navarro, you were 23-years old at the time of

13   the crime and you are now 53; is that correct?

14           INMATE NAVARRO:  Yes.

15           PRESIDING COMMISSIONER BRYSON:  Okay.  Having

16   been born on January 28th of 1954, Tulare, California, to

17   Jose Navarro and Esperanza Navarro.  Your father's

18   whereabouts are unknown; is that true today?

19           INMATE NAVARRO:  He's deceased.

20           PRESIDING COMMISSIONER BRYSON:  He's deceased,

21   okay.  And your mother was left to raise ten children on

22   welfare, ages ranging from 14 to 30 years old.  You

23   received your GED, we've already mentioned.  You were not

24   in military and the POR indicates that prior to your

25   arrest, you were employed by Atlas, Incorporated Laundry

19

1    Services from January to April of 1977; is that correct?

2              INMATE NAVARRO:  Yes.

3              PRESIDING COMMISSIONER BRYSON:  Okay.  So did you

4    have a job at the time of the commitment offense?

5              INMATE NAVARRO:  No, ma'am.

6              PRESIDING COMMISSIONER BRYSON:  Why is that?

7              INMATE NAVARRO:  I was out running around using

8    drugs.

9              PRESIDING COMMISSIONER BRYSON:  I see.  When did

10   you start using drugs?

11             INMATE NAVARRO:  An early age.

12             PRESIDING COMMISSIONER BRYSON:  About how old?

13             INMATE NAVARRO:  About 13.

14             PRESIDING COMMISSIONER BRYSON:  How did you get

15   introduced to them?

16             INMATE NAVARRO:  I saw some guys using it and

17   tried it and like it.

18             PRESIDING COMMISSIONER BRYSON:  Were you involved

19   with any gangs as a youngster?

20             INMATE NAVARRO:  No, ma'am.

21             PRESIDING COMMISSIONER BRYSON:  Okay.  What

22   specific drugs were your favorites?

23             INMATE NAVARRO:  Heroin.

24             PRESIDING COMMISSIONER BRYSON:  Okay.  Any

25   others?

20

1          INMATE NAVARRO:  No, basically Heroin.

2          PRESIDING COMMISSIONER BRYSON:  Okay.  So over

3    the years, then, were you involved -- and up until the

4    commitment offense, did you traffic in Heroin as well as

5    use it?

6          INMATE NAVARRO:  Well, I sold and I, you know,

7    cleaned up once in a while.  And then I would work a

8    little bit and that's about it.

9          PRESIDING COMMISSIONER BRYSON:  You're a very

10   lucky man, you know, to be alive today.

11         INMATE NAVARRO:  I know.

12         PRESIDING COMMISSIONER BRYSON:  It's amazing.

13   Okay.  It says you're in good physical condition, no

14   medical problems.  That's really wonderful.  And it says

15   that you drank alcohol at the age of 18.  So did alcohol

16   then become also a factor?

17         INMATE NAVARRO:  Well, I would drink a beer here

18   and there when I was a kid to cover my drug use.

19         PRESIDING COMMISSIONER BRYSON:  I see.

20         INMATE NAVARRO:  So, you know, but I drank a

21   little, but not that much.

22         PRESIDING COMMISSIONER BRYSON:  So, do you

23   consider yourself an addict?

24         INMATE NAVARRO:  Yeah, I'm a recovering addict.

25         PRESIDING COMMISSIONER BRYSON:  Okay.  How about

21

1    an alcoholic?

2              INMATE NAVARRO:  Not really.

3              PRESIDING COMMISSIONER BRYSON:  I will ask you

4    this question and you can elect to answer it or not, but

5    had you gone under the influence immediately prior to this

6    crime?

7              INMATE NAVARRO:  Yes, well, I was -- I needed

8    money.

9              PRESIDING COMMISSIONER BRYSON:  I see, for the

10   drug habit is --

11             INMATE NAVARRO:  Yes, ma'am.

12             PRESIDING COMMISSIONER BRYSON:  Okay.  So we

13   don't have much more on you.  In fact, nothing more, sir.

14   And I'd like to ask you, it must have been difficult for

15   your mother raising -- trying to raise children all by

16   herself; is that correct?

17             INMATE NAVARRO:  Yes.

18             PRESIDING COMMISSIONER BRYSON:  Did you have a

19   stepfather at any point?

20             INMATE NAVARRO:  No.

21             PRESIDING COMMISSIONER BRYSON:  So how would you

22   characterize your upbringing?  Did you get taught right

23   from wrong --

24             INMATE NAVARRO:  Yes, I was taught right from

25   wrong, I just chose wrong.

22

1          PRESIDING COMMISSIONER BRYSON:  I see.  Do you

2     keep in touch with your brothers and sisters?

3          INMATE NAVARRO:  Yes, I call them, I write.

4          PRESIDING COMMISSIONER BRYSON:  Okay.  Do they

5     come and visit you ever?

6          INMATE NAVARRO:  Once in a while.  I let them

7     bring my mom.

8          PRESIDING COMMISSIONER BRYSON:  How is she doing?

9          INMATE NAVARRO:  She's getting old.  I don't like

10    them to come and visit me here in prison too much.

11         PRESIDING COMMISSIONER BRYSON:  Well, sometimes

12    it helps them to be able to do something like this with

13    you.

14         INMATE NAVARRO:  Yeah.

15         PRESIDING COMMISSIONER BRYSON:  So maybe that's a

16    good thing.  Okay, well, if you'll turn attention now to

17    Commissioner Star, she'll talk about your post-conviction

18    factors.

19         DEPUTY COMMISSIONER STAR:  Okay, good morning,

20    Mr. Navarro.  Today I'll be referring to the correctional

21    counselor's report, as well as your Central File in

22    addressing your post-conviction factors.  I will be

23    focusing on your programming and activities since your

24    last hearing, which was held on June 30th of 2005, where

25    you received a two-year denial.  The Board Members at that

1    time recommended that you remain disciplinary free, that

2    you participate in self-help, and earn positive chronos,

3    so I'll also be looking at whether you met those

4    recommendations.  Starting with your disciplinary -- your

5    classification score and your disciplinary record; your

6    classification score is 19, which is the mandatory minimum

7    for lifers, and your custody level is currently Medium-A.

8    Since your last hearing in 2005, there has been no CDC

9    115s and no 128-As.  Your record of 115s is a total of

10   four, with the last one being in 1990.  All four occurred

11   between 1982 and 1990.  They were disobeying an order,

12   stimulant and sedative use, possession of alcohol, and an

13   inmate in the cell.  So I don't see any violence in those

14   115s.  So you've been disciplinary free since 1990.  You

15   have no 128As or counseling chronos in your entire life

16   term.  Vocationally I've reviewed your file.  I see a

17   number of -- a couple of vocational certifications, as

18   well as considerable work experience.  First of all,

19   there's a vocational Dry Cleaning chrono saying that you

20   participated between 1993 and 1998 and you completed that

21   program; is that accurate?

22          INMATE NAVARRO:  Yes.

23          DEPUTY COMMISSIONER STAR:  Okay.  Also, there is

24   a certification in vocational Baking, but I couldn't find

25   the date of when you did that.  Do you recall when you did

23

1    time recommended that you remain disciplinary free, that

2    you participate in self-help, and earn positive chronos,

3    so I'll also be looking at whether you met those

4    recommendations.  Starting with your disciplinary -- your

5    classification score and your disciplinary record; your

6    classification score is 19, which is the mandatory minimum

7    for lifers, and your custody level is currently Medium-A.

8    Since your last hearing in 2005, there has been no CDC

9    115s and no 128-As.  Your record of 115s is a total of

10   four, with the last one being in 1990.  All four occurred

11   between 1982 and 1990.  They were disobeying an order,

12   stimulant and sedative use, possession of alcohol, and an

13   inmate in the cell.  So I don't see any violence in those

14   115s.  So you've been disciplinary free since 1990.  You

15   have no 128As or counseling chronos in your entire life

16   term.  Vocationally I've reviewed your file.  I see a

17   number of -- a couple of vocational certifications, as

18   well as considerable work experience.  First of all,

19   there's a vocational Dry Cleaning chrono saying that you

20   participated between 1993 and 1998 and you completed that

21   program; is that accurate?

22            INMATE NAVARRO:  Yes.

23            DEPUTY COMMISSIONER STAR:  Okay.  Also, there is

24   a certification in vocational Baking, but I couldn't find

25   the date of when you did that.  Do you recall when you did

24

1    that, sir?

2            INMATE NAVARRO:  That was in 1984.

3            DEPUTY COMMISSIONER STAR:  Was it a program or

4    just a course.

5            INMATE NAVARRO:  It was a vocational program.

6            DEPUTY COMMISSIONER STAR:  And do you remember

7    how many it was that you completed?

8            INMATE NAVARRO:  When I completed the program, it

9    was over 2,000 hours.

10           DEPUTY COMMISSIONER STAR:  Two thousand hours.

11           INMATE NAVARRO:  I was in CTA, I think.

12           DEPUTY COMMISSIONER STAR:  Thank you.  I did see

13   the certificate in there.  It wasn't dated and didn't show

14   the hours.  And then I see considerable recent experience

15   in Prison Industries, Mill and Cabinet program, including

16   your current assignment, which I'll go over in a second.

17   And it looks like about eight years in that program?

18           INMATE NAVARRO:  Yes.

19           DEPUTY COMMISSIONER STAR:  Okay.  So you appeared

20   to have developed considerable vocational skills and work

21   experiences that appear to be marketable.  Anything I

22   missed in the vocational area?

23           INMATE NAVARRO:  No, ma'am.

24           DEPUTY COMMISSIONER STAR:  Okay.  Let's move onto

25   your education and Commissioner Bryson has already covered

25

1    some of this.  You have pre-prison experience, work

2    experience, in the laundry field.  And you got a GED in

3    1998.  Where you at, at that time?

4              INMATE NAVARRO:  In 1987, in Vacaville.

5              DEPUTY COMMISSIONER STAR:  Was it?  At Vacaville?

6    Okay.

7              INMATE NAVARRO:  I was doing CAT-T Program

8    (phonetic).

9              DEPUTY COMMISSIONER STAR:  Were you?  I saw your

10   GED in here.  Let me just take a quick look at it.  Okay,

11   1987.  And your current work assignment is a PIA Machinist

12   in Mill and Cabinet, which you've been doing in different

13   assignments for the last eight years, right?

14             INMATE NAVARRO:  Yes.

15             DEPUTY COMMISSIONER STAR:  But not necessarily

16   the Machinist.  There is a current, fairly recent, work

17   supervisor's chrono called a CC-101 which rates you.  It's

18   dated April 2nd, 2007, and it says you are performing

19   above average to exceptional work in that assignment, so

20   congratulations.  You are to be commended on that, sir.

21   Okay, now in terms of your self-help group participation,

22   I'm referring to the counselor's report and your Central

23   File.  There is well-documented participation with

24   quarterly chronos that you're participating in Narcotics

25   Anonymous and apparently you've been a long-term

26

1    participant of that.  You've been participating

2    continuously since the last hearing, from what I can see,

3    and you've been a long-term participant.  Do you remember

4    the year you started, Mr. Navarro?

5              INMATE NAVARRO:  Oh, way back, when they started

6    NA.  At first, they only had AA in the beginning.

7              DEPUTY COMMISSIONER STAR:  Yeah, and did you go

8    to that AA before the NA?

9              INMATE NAVARRO:  Yes, ma'am.  I've done a few

10   years of AA and then when they started NA, I started going

11   to NA.

12             DEPUTY COMMISSIONER STAR:  Okay.  Do you practice

13   the 12 Steps, sir?

14             INMATE NAVARRO:  Well, not really, but I always

15   go.

16             DEPUTY COMMISSIONER STAR:  You go?

17             INMATE NAVARRO:  Yeah.

18             DEPUTY COMMISSIONER STAR:  What do you feel you

19   get out of it?

20             INMATE NAVARRO:  I get a lot, not using drugs.

21             DEPUTY COMMISSIONER STAR:  Okay.  So if I asked

22   you what the 9th Step was, would you be familiar with it,

23   sir?

24             INMATE NAVARRO:  No, ma'am.

25             DEPUTY COMMISSIONER STAR:  Okay.  They don't go

1    over them at the meetings?

2            INMATE NAVARRO:  No, they go over them, I just

3    don't learn them.

4            DEPUTY COMMISSIONER STAR:  Okay.  How do you

5    practice it, then?

6            INMATE NAVARRO:  Just stay away from drugs.

7            DEPUTY COMMISSIONER STAR:  Okay.

8            INMATE NAVARRO:  I learn by listening to people.

9            DEPUTY COMMISSIONER STAR:  Okay.  And then also

10   your counselor has provided me a more recent chrono of

11   June 10th, 2007.  It says you have participated in Anger

12   Management at San Quentin, having completed eight of eight

13   sessions between September of 2006 and December of 2006.

14   What led you to participate in this and what did you get

15   out of it, sir?

16           INMATE NAVARRO:  Just being aware to manage my

17   anger a little, try and manage it.

18           DEPUTY COMMISSIONER STAR:  Okay.

19           INMATE NAVARRO:  I was an angry person.

20           DEPUTY COMMISSIONER STAR:  Okay.  Did something

21   recent happen or you just -- did it just become available

22   to you?

23           INMATE NAVARRO:  I wanted to just try it out and

24   see what I could get out of it.  I try things.

25           DEPUTY COMMISSIONER STAR:  Okay.  Did you gain

28

1       any insight from that that you'd like to share?

2               INMATE NAVARRO:  No, not really.  I know I don't

3       get angry.

4               DEPUTY COMMISSIONER STAR:  Yeah.  You feel you've

5       had an anger problem while you've been incarcerated?

6               INMATE NAVARRO:  No.

7               DEPUTY COMMISSIONER STAR:  Okay.  I don't see any

8       disciplinaries since 1990, so I'm just asking what led you

9       to get involved at this stage.

10              INMATE NAVARRO:  Just to try it out and see what

11      it was about.

12              DEPUTY COMMISSIONER STAR:  Do you feel anger was

13      a factor -- and again, as Ms. Bryson says, you don't have

14      to answer this, but do you feel it was a factor in your

15      commitment offense?

16              INMATE NAVARRO:  A lot has to do with it, being

17      angry.

18              DEPUTY COMMISSIONER STAR:  And what were you

19      angry at?

20              INMATE NAVARRO:  Just angry.

21              DEPUTY COMMISSIONER STAR:  Okay, were you angry

22      at your family or did you feel life had given you a raw

23      deal or --

24              INMATE NAVARRO:  No, just -- I guess the drugs

25      had a lot to do with it.

29

1          DEPUTY COMMISSIONER STAR:  Okay.  Any other

2    programs, Mr. Navarro, that you've participated in?

3          INMATE NAVARRO:  No, ma'am.

4          DEPUTY COMMISSIONER STAR:  All right.  Let's

5    delve into your most recent psychiatric report.  I'm going

6    to be referring to a report by a Dr. Starrett,

7    S-T-A-R-R-E-T-T, who completed a report for today's

8    hearing.  The report is dated March 22nd, 2007.  Starting

9    with a mental health diagnosis, he reviewed the prior

10   psych reports, reviewed your file, and he gave a

11   diagnosis, which I'm going to read onto the record here,

12   referring to Page 4 of his report, "His diagnostic

13   impression is Axis I, a Polysubstance Dependent in

14   Remission and Treatment."  And let me pause there because

15   I heard you tell Commissioner Bryson that you don't think

16   you have an alcohol problem, but when I read the probation

17   officer's report, sir, it refers to long-term drinking.

18   That never got in the way for you?

19         INMATE NAVARRO:  No, ma'am.

20         DEPUTY COMMISSIONER STAR:  Okay, you never felt

21   your mental state was altered by alcohol?

22         INMATE NAVARRO:  No, ma'am.  I mean, I drank, but

23   I wasn't a heavy drinker.  I drank a beer.

24         DEPUTY COMMISSIONER STAR:  Okay.  Did you not

25   have public intoxication arrests as an adult.

1           INMATE NAVARRO:  Yes, ma'am.  A lot of times I

2    would drink a beer to cover my drug addictions.  I would

3    rather get arrested for public intoxication instead of

4    drugs.

5           DEPUTY COMMISSIONER STAR:  Okay.

6           INMATE NAVARRO:  Being under the influence -- I

7    used alcohol.

8           DEPUTY COMMISSIONER STAR:  Okay, so are you

9    saying that when they arrested you for public

10   intoxication, you really were a danger to others and

11   couldn't care for yourself because of the underlying

12   Heroin use or because of the alcohol?

13          INMATE NAVARRO:  No, I was just saying I would

14   cover my being under the influence of Heroin with alcohol.

15          DEPUTY COMMISSIONER STAR:  When they arrested you

16   for public intoxication, did they tell you were a danger

17   or you couldn't care for yourself?

18          INMATE NAVARRO:  No, no, ma'am.

19          DEPUTY COMMISSIONER STAR:  All right.  The reason

20   I went over that, Mr. Navarro, is obviously the doctor's

21   diagnosis is showing Polysubstance Abuse, so they're

22   referring to multiple items here and not just Heroin,

23   although I clearly hear that you feel that you have a

24   Heroin problem only.  Axis II, going back to his report,

25   is Antisocial Personality Currently in Remission, Axis III

31

1    is No Diagnosis, Axis IV is the Incarceration for the Life

2    Term, and Axis V is his functioning score which is GAF

3    score of 80.  Now the doctor does a risk assessment and

4    I'm going to refer to his risk assessment, which is

5    derived from Page 7 of his report and he does three

6    assessments, including an overall assessment.  First of

7    all, under what we call an Historical Assessment, and he

8    states that you are in the moderate range for propensity

9    of violence and he bases this on your age, your criminal

10   record, your unstable relationships, that you didn't have

11   a career, that you were a substance abuser, and you had

12   early adjustment problems and you had failed prior

13   supervisions.  Then he goes and does a second rating based

14   on a clinical rating and your insight into your behavior.

15   There he rates you low, but he -- low range and his

16   propensity for future violence, however, he makes a

17   statement that he feels there's a certain level of

18   unpredictability on this factor based on the fact that the

19   inmate refused to discuss the crime.  And then the third

20   rating is risk management.  He gives you a low range on

21   this and states that he does feel you need to develop

22   community aspects of parole plans more thoroughly than

23   what he saw.  And his overall rating was a low range when

24   compared to similar inmates.  And his overall risk

25   assessment is also -- he concludes that you've moved from

32

```
 1    the moderate range to the low range when compared to

 2    certain inmates.  There is a -- again, qualifying that by

 3    saying there is a certain amount of unpredictability in

 4    this rating due to the fact that the inmate continues to

 5    refuse to discuss his case.  And because of -- we don't

 6    have a prisoner's version, I do think it's important that

 7    I refer to Page 4 of the doctor's report where he did try

 8    to review with you the crime and I'm going to quote from

 9    the middle of Page 4:

10              "When asking the inmate why he participated

11               or got involved in this crime, the inmate

12               states he does not like to talk about it.

13               He says he was convicted.  The inmate states

14               he refuses to think about it.  He said,

15               quote, it happened, everyone got hurt, end

16               of quote.  He did not want to talk about it.

17               The inmate states that he feels bad about

18               what happened.  He cannot change it.  He

19               said, quote, it's been a long time, I don't

20               like to talk about it, end of quote.  When

21               asking the inmate what has changed about him

22               so something like this would not happen

23               again, he says, quote, I'm getting old, I'm

24               wiser, I realize my mistakes.  Most of my

25               problems were drugs and alcohol.  I don't
```

33

```
 1              use anymore, end of quote.  When asking the

 2              inmate why he had problems acting out as a

 3              juvenile young man, the inmate states he

 4              liked the lifestyle at the time, he was

 5    .         attracted to the drugs.  He says he was

 6              hanging out with the crowd."

 7    All right, have you reviewed this report, Mr. Navarro?

 8              INMATE NAVARRO:  Yes, ma'am.

 9              DEPUTY COMMISSIONER STAR:  Do you agree with the

10    doctor's conclusion?

11              INMATE NAVARRO:  Some of it.

12              DEPUTY COMMISSIONER STAR:  Okay, what do you

13    disagree with?  Is there something you would like to

14    comment on or do you feel you misinterpreted --

15              INMATE NAVARRO:  No, not really.

16              DEPUTY COMMISSIONER STAR:  Okay.  You understand

17    the doctor has qualified his assessment of you because you

18    haven't talked and he can't assess your insight into the

19    crime?  You understand that?

20              INMATE NAVARRO:  Yes.

21              DEPUTY COMMISSIONER STAR:  Okay.  How do you feel

22    about the victim today, Mr. Navarro?

23              INMATE NAVARRO:  I feel bad for him and for his

24    family.

25              DEPUTY COMMISSIONER STAR:  Okay.
```

34

1        INMATE NAVARRO:  That's all I can say.

2        DEPUTY COMMISSIONER STAR:  The 12 Steps addresses

3  making amends.  Have you thought about that as it pertains

4  to this victim and his family?

5        INMATE NAVARRO:  No, not really.  I don't even

6  know where his family lives.

7        DEPUTY COMMISSIONER STAR:  Okay.  Do you feel you

8  owe amends to anyone, other than the victim?

9        INMATE NAVARRO:  There are a lot of people.

10       DEPUTY COMMISSIONER STAR:  And have you made any

11  efforts in following and practicing the 12 Steps?

12       INMATE NAVARRO:  No.

13       DEPUTY COMMISSIONER STAR:  Okay, and why would

14  that be?

15       INMATE NAVARRO:  Because I haven't done it.

16       DEPUTY COMMISSIONER STAR:  I did take a look at

17  the prior two psych evaluations.  There was one in 2004 by

18  Dr. Bencich, B-E-N-C-I-C-H, who didn't give any ratings on

19  you and Dr. Starrett also reviewed it and his review he

20  indicated no ratings and didn't really -- it wasn't risk

21  assessments, weren't utilized in dangerousness was not

22  discussed.  And I wanted to take a look at his statements

23  regarding your insight into the commitment offense and he

24  states -- and now I'm reading from the top of Page 3:

25        "The inmate reports his addictive behavior

```
 1              has been a life-long problem.  He realizes
 2              it was a major contributing factor to his
 3              criminal behavior as a young man and
 4              culminating in his controlling case.  The
 5              inmate has insight into discussing the
 6              reasons for his criminal behavior as a
 7              youth.  The inmate was very insightful in
 8              discussing his addictive behavior and its
 9              impact on his life.  The inmate understands
10              the need for long-term treatment.  The
11              inmate continues to refuse to discuss his
12              crime.  He does not really want to talk
13              about the reason why he's refusing to talk
14              about this crime.  The inmate states it
15              happened, everyone got hurt behind it, I
16              don't want to talk about it.  The inmate has
17              participated in substance abuse for over 20
18              years.  And the inmate at one time was very
19              active in therapeutic treatment while at
20              CMC.  All this is to the inmate's credit."
21    Okay, any other -- anything else about the doctor's report
22    that you'd like to talk about?
23              INMATE NAVARRO:   No.
24              DEPUTY COMMISSIONER STAR:   Okay.  I'm going to
25    ask you to turn your attention to Commissioner Bryson.
```

36

1      PRESIDING COMMISSIONER BRYSON:  What would be

2  your residence plans if you were to parole?

3      INMATE NAVARRO:  Well, I was going to parole back

4  to my mom's house at (inaudible).

5      PRESIDING COMMISSIONER BRYSON:  Do you have any

6  documentation to support that she would welcome you into

7  the home?

8      INMATE NAVARRO:  Well, I was going to go with my

9  old letters because everything's the same.  The job offer,

10 my brothers, everything's the same.  Nothing's changed.

11     PRESIDING COMMISSIONER BRYSON:  Okay.  But you

12 must understand because you've been through a number of

13 Parole Consideration Hearings, that the documentation is

14 pretty important and even a year can change everybody's

15 perspective and their desires, so it's important to have

16 current material.  Counsel, do you have something that you

17 want to add?

18     ATTORNEY GUNNING:  I would like him to explain to

19 why, in a little more detail, as to why he didn't get

20 these -- he does have these old letters here.  There's a

21 reason he felt that he wasn't going to make contact with

22 his family recently.

23     PRESIDING COMMISSIONER BRYSON:  Why is that, sir?

24     INMATE NAVARRO:  No, I'm all right, I don't want

25 to talk about that.

37

1           ATTORNEY GUNNING:  Then I'll tell them.  Someone

2     in the inmate's family died recently and he didn't want to

3     trouble his family at that particular time when they were

4     grieving, so I understand his point, it's not for lack of

5     contact.  I think he just didn't want to bother his

6     family.

7           PRESIDING COMMISSIONER BRYSON:  And this job that

8     you're referring to would be with your brother, Raymond

9     Navarro, apparently the director of this maintenance

10    operation and transportation facility in Farmersville

11    Unified School District in Exeter, California.  Was he

12    offering you a job?

13          INMATE NAVARRO:  Yes, ma'am.

14          PRESIDING COMMISSIONER BRYSON:  And what would

15    you do?

16          INMATE NAVARRO:  Well, I would be maintenance.

17          PRESIDING COMMISSIONER BRYSON:  It also mentions

18    that you've been given the opportunity to work as a

19    professional landscaper for Mr. Alfredo Munoz; is that

20    still available?

21          INMATE NAVARRO:  Yes, ma'am.

22          PRESIDING COMMISSIONER BRYSON:  Now it says you

23    were in the process of obtaining a support letter; did

24    that letter ever come forward?

25          INMATE NAVARRO:  No, ma'am.

38

1          PRESIDING COMMISSIONER BRYSON:  Okay.  All right,

2     Counsel, is there anything else that I've missed?

3          ATTORNEY GUNNING:  No, ma'am, nothing.

4          PRESIDING COMMISSIONER BRYSON:  All right.  We

5     sent out 3042 Notices.  These notices go out to agencies

6     having a direct interest in your case.  We have a

7     representative from the Tulare County District Attorney's

8     Office present who will have the opportunity to make a

9     statement regarding parole suitability prior to the

10    conclusion of this hearing.  And Commissioner Star, is

11    there any issue that needs to be discussed at this time?

12         DEPUTY COMMISSIONER STAR:  No, there's nothing at

13    this time.

14         PRESIDING COMMISSIONER BRYSON:  All right.  Does

15    the District Attorney have questions of this inmate?

16         DEPUTY DISTRICT ATTORNEY KAELBLE:  Yes, I do.

17    One of the questions that I wanted to find out if you

18    could ask the inmate, with regards to working for a school

19    district, does he have any information as to whether

20    having felonies on his record would affect their ability

21    to hire him?

22         ATTORNEY GUNNING:  Do you understand the

23    question?

24         INMATE NAVARRO:  Yeah.

25         ATTORNEY GUNNING:  She said if you're going to

39

1   work for a school district --

2           INMATE NAVARRO:  Yeah, they would probably check.

3   I mean, that's not the only job.  I can get different

4   jobs.

5           PRESIDING COMMISSIONER BRYSON:  But the question

6   is, did you check --

7           INMATE NAVARRO:  Yeah.

8           PRESIDING COMMISSIONER BRYSON:  -- did you check

9   into that, though (overlapping).

10          INMATE NAVARRO:  Yes, they probably wouldn't hire

11  me.

12          PRESIDING COMMISSIONER BRYSON:  Okay, thank you.

13          DEPUTY DISTRICT ATTORNEY KAELBLE:  Another

14  question I wanted to find out about was what's going to

15  stop this inmate from using drugs again once he is back in

16  the community and back around the influences that

17  surrounded him previously when all this happened?

18          INMATE NAVARRO:  Well, I know for myself, I'm not

19  using drugs.  I'm done with them.

20          DEPUTY DISTRICT ATTORNEY KAELBLE:  And another

21  question I had, in the 2000 psychological report, the

22  inmate had made some reference to not wanting to be

23  paroled to Tulare County because of the bad influences

24  there.  What has changed between 2000 and now to make him

25  believe that those bad influences are no longer there?

40

1          INMATE NAVARRO:  I don't recall ever saying that

2     statement, but I guess it's there.

3          DEPUTY DISTRICT ATTORNEY KAELBLE:  And back at

4     the time when -- prior to this incident, when you were

5     using drugs, where did this inmate get this money for the

6     drugs since he wasn't actually employed most of the time?

7     He had some seasonal employment and temporary employment.

8          ATTORNEY GUNNING:  Can I have one second?

9          PRESIDING COMMISSIONER BRYSON:  Go ahead.

10          ATTORNEY GUNNING:  With all due respect, I've

11     indicated to my client that I don't think he should answer

12     that question, so he's not going to.

13          PRESIDING COMMISSIONER BRYSON:  All right.

14          DEPUTY DISTRICT ATTORNEY KAELBLE:  One other

15     question.  I just wanted to find out whether the inmate

16     was currently or previous associated with a Northern gang

17     called Varrio Farmas Catorce based on the tattoo that he

18     has on his forehead, which is consistent with the tattoos

19     that gang members in Farmersville who belong to that gang

20     do have.

21          PRESIDING COMMISSIONER BRYSON:  I believe, sir,

22     you do have a tattoo on your forehead.

23          ATTORNEY GUNNING:  Okay, just for the record,

24     he's already asked -- he's been asked that question and

25     he's answered it.  He is not involved in a gang.

41

1            DEPUTY DISTRICT ATTORNEY KAELBLE:   And just on

2     that -- in that same area, whether or not -- I saw some

3     reference in some of the materials in the file that there

4     have been discussion about whether or not he was going to

5     have that tattoo removed and if he's made any decisions

6     with regards to that.

7            INMATE NAVARRO:   Yes, if I ever get out, I'm

8     going to have it removed.

9            DEPUTY DISTRICT ATTORNEY KAELBLE:   I don't have

10    any other questions.

11           PRESIDING COMMISSIONER BRYSON:   All right.

12    Counsel, do you have any questions at this time?

13           ATTORNEY GUNNING:   I don't, thank you.

14           PRESIDING COMMISSIONER BRYSON:   So, what's the

15    tattoo on your forehead for, then?

16           INMATE NAVARRO:   Just dumb.

17           PRESIDING COMMISSIONER BRYSON:   Okay.   Have you

18    heard the saying, once a doper, always a doper?

19           INMATE NAVARRO:   Yes.

20           PRESIDING COMMISSIONER BRYSON:   Heroin is a

21    terrible drug.

22           INMATE NAVARRO:   I know it is.

23           PRESIDING COMMISSIONER BRYSON:   It's incredibly

24    (inaudible).   Do you think that you have the tools to go

25    out there and not use again?

42

1          INMATE NAVARRO:  I know -- I know I have for

2    myself.

3          PRESIDING COMMISSIONER BRYSON:  All right.  I'd

4    like to provide the District Attorney to make a closing

5    statement.

6          DEPUTY DISTRICT ATTORNEY KAELBLE:  With regards

7    to the facts the Board has already gone over the general

8    facts relating to this case.  This was a very cruel and

9    callous crime.  There was planning involved in the crime.

10   Since this inmate and two other participants had to get

11   together and come up with this plan, they had to obtain

12   the weapons that were used in both this attack on the

13   victim who later passes away, which was the pipe, and they

14   also -- the other codefendants also obtained a knife which

15   was later used against the second victim in the attempted

16   robbery.  In this case, the reason for the attack was

17   relatively trivial.  Basically the inmate and the

18   codefendants needed more money because they wanted to get

19   more Heroin, and as a result, an innocent person was

20   killed.  This was a cruel and callous crime based on the

21   fact that there were three defendants against just one

22   innocent victim on the street and the victim had to suffer

23   blunt force trauma to the head significant enough to

24   render -- to result in his death.  He didn't die

25   immediately.  It appears from the officer's description

43

1    that he went into shock and was making involuntary

2    movements as he lay on the street.  This was a calculated

3    dispassionate crime.  This was not just and impulsive

4    decision where the defendant got -- where the inmate got

5    involved in a confrontation with somebody and then that

6    resulted in a fight.  This was a planned act where they

7    were going to commit a robbery and if the victim put up a

8    fight, they were going to use force in order to get what

9    they wanted.  He presents a significant danger to society

10   and he should remain in custody.  With regards to his

11   history, that the Board has gone over his history, his

12   criminal history from the time he was 15 until the time he

13   was 23 at the time of the murder, and he's had numerous --

14   there were numerous attempts to rehabilitate him.  He was

15   put on probation a number of times, both as a juvenile and

16   as an adult.  He has violent assaultive behavior in his

17   past with the 245 that he had committed as an adult.  With

18   regards to his work history, we don't really have any

19   solid work history on him and either that indicates that

20   he was getting money from some other illegal sources

21   during that time in order to pay for his drug habit or his

22   family was enabling him by proving him money that allowed

23   him to go on and use drugs, even though they knew he had

24   this history that he'd been getting arrested numerous

25   times and this is the same family he wants to go back and

44

1    live with when he is paroled.  Furthermore, I know that

2    earlier the Board indicated that we didn't have a

3    prisoner's version of the events.  There was a 1987 report

4    and on Page 1 of that report, there was mention that the

5    prison indicated that the victim had been murdered because

6    he started to struggle with and resist their attempts to

7    rob him.  Basically, he was blaming the victim at that

8    time and we don't have anything more current to indicate

9    what he feels now.  He indicates that he feels remorse,

10   but he doesn't really elaborate on that, so we don't

11   really know what he means by that statement.  With regards

12   to the psychological report from 2007, there are some

13   statements which the doctor uses in that report that are

14   not actually based in fact.  He indicates in his report

15   that the inmate's been involved in NA for 26 years.  If

16   you look through some of the other reports, in 1987, that

17   was when the Board told him to start attending NA meetings

18   and in the current lifer prison evaluation report, it

19   indicates on the bottom of Page 2 that he actually started

20   attending NA in July of 1991.  That would actually make it

21   16 years.  Furthermore, in a 1998 report, it indicates

22   that the Board realized that from January of '98 to July

23   of '98, he stopped attending meetings and the Board told

24   him he needs to go back.  He hasn't been taking these NA

25   meetings and AA meetings very seriously.  He's been

1     attending all these years and, as he even stated today, he

2     really doesn't know what the 12 Steps are and he doesn't

3     really do anything to follow-up with them.  He just

4     attends those meetings basically and that's basically a

5     way to spend his time.  That's not really something that

6     he's taking to heart and that he's gaining any insight

7     from.  Furthermore, the psychological report, as the

8     examiner explains, he can't really draw any conclusions

9     with regards to the inmate's insight because the inmate

10    doesn't want to discuss the facts and doesn't want to

11    discuss how this has changed him.  We don't have any idea

12    about whether he's internalized the things he's learned,

13    whether he's learned anything at all.  And if he hasn't

14    really learned anything, he would be a danger to society

15    because these same things that happened back in 1997 could

16    happen again.  Basically the doctor states that he is a

17    low risk because he's been attending these classes, but

18    he's basically going to speculation and making assumptions

19    to draw that conclusion.  There are no facts in the report

20    to indicate that the inmate himself can provide

21    information to say that he has the insight that he takes

22    responsibility, that he's not putting the blame on the

23    codefendants or putting the blame on the victim, or just

24    trying to blame drugs and alcohol in general.  He needs to

25    understand what he needs to do to become a responsible

46

1   citizen to avoid this situation in the future.

2   Furthermore, the doctor indicates in the report that in

3   order remain free from violence, he needs to stay away

4   from drugs and he needs support from the community.  We

5   don't have letters from his family, from friends, from any

6   organization to say that they're going to support him and

7   they're going to help him and that they're going to be

8   there for him either socially or even financially.  We

9   don't really know how he's going to be able to get on when

10  he -- if he was to be released and we don't really have

11  any details about a parole plan.  Even the doctor's report

12  indicates that he needs more details in his parole plan

13  and he needs some sort of community support.  And if you

14  look back at the 2004 report, the inmate specifically told

15  the examiner at that time that self-help groups are not

16  for him and that he feels that he doesn't need them.  So

17  it seems that that's in direct contradiction of what this

18  doctor is saying this inmate would need in order to

19  succeed if he was to be released.  With regards to the

20  tattoo, the inmate's denying any association with a gang,

21  however, there's really no other logical explanation for

22  why he has a tattoo for Farmas, which is consistent with a

23  gang that has existed in the Farmersville area for the

24  past 30 years and where gang members do have that same

25  tattoo for Varrio Farmas Catorce.  There are a lot of

47

1    southern gang members in the (inaudible) area in

2    Farmersville as well and that would lead to significant

3    problems.  There's a lot of gang activity in the city of

4    Farmersville.  If he was to be released, there is an

5    unreasonable risk of danger and there is a danger -- a

6    risk of harm to society.  The final thing I wanted to talk

7    about was the parole plan.  We don't have any letters to

8    support anything.  We don't know who else lives in this

9    residence with the mother.  We don't know if any of these

10   people are in any way involved with drugs or have any sort

11   of -- if there are any sort of financial issues that may

12   come up if he was to live there.  We don't have any

13   letters to verify any job offers.  We don't know if he's

14   going to have access to a vehicle to get to a job.  We

15   don't know how much he's going to be getting paid, whether

16   that's going to be enough money to help him to pay the

17   bills at the residence with his elderly mother.  And we

18   also don't know anything about what sort of employment

19   this would be, whether it would be part-time, full-time,

20   and what sort of hours and whether he would be able to

21   attend NA meetings, AA meetings in the area based on that.

22   He has mentioned in a few of the reports that he has

23   alternative occupations that he may be able to get

24   involved with, such as dry cleaning.  Farmersville is a

25   very small community.  There are no dry cleaning stores in

48

1    the city of Farmersville.  He'd need transportation to get

2    to a larger city, like Visalia, which is approximately

3    eight miles away.  And we don't have any indication about

4    whether he'd be able to do that.  He hasn't really done

5    the research to find out whether somebody would really

6    give him a job based on his criminal history and based on

7    everything else that has been going on.  Finally, we're

8    just asking that the Board keep this inmate in custody

9    based on the fact that he does not have an adequate parole

10   plan, based on the facts of the crime, based on his

11   criminal history, and the fact that he is a risk to the

12   public.  And we are asking that he be denied parole for at

13   least a few more years.

14          PRESIDING COMMISSIONER BRYSON:  Counselor, I'd to

15   invite you to make a closing statement.

16          ATTORNEY GUNNING:  Thank you.  As already

17   indicated, this is Mr. Navarro's 16th overall hearing and

18   the last time he did receive a two-year denial, as already

19   noted.  His MEP for this offense was the 15th of May of

20   1984.  He is presently 53 years old and from the

21   standpoint of recidivism, that's important to keep in

22   mind.  He did commit his offense when he was 23, over 30

23   years ago.  As to the commitment offense itself, as

24   already indicated, this occurred in 1977 when he was 23

25   years old.  The facts are that he and his brother and Mr.

49

1     Garcia accosted and ended up killing Mr. Gonzales.   The

2     facts are also clear that the intent was to rob and that

3     it was Mr. Garcia who elected to pick up a pipe and strike

4     Mr. Gonzales with that pipe and that's based on testimony

5     by, apparently, a witness.   So this is a felony murder.

6     That's important from the standpoint of whether or not

7     Mr. Navarro's conduct at the time of the commitment

8     offense exceeded the minimum necessary for first degree

9     murder and the elements contained therein.   Now the answer

10    is, I don't think it does.   Does that indicate that other

11    than accosting Mr. Gonzales, holding him down, anything

12    other than that, we understand his intent was to rob.

13    He's admitted that.   He had a drug problem and he wanted

14    money.   But again, this is a felony murder and the case

15    law is pretty clear on this in this regard.   When you're

16    looking at somebody who has been incarcerated for, in this

17    case, 28 years plus for this offense, again, if you were

18    to conclude that his conduct seemed (inaudible), I don't

19    think it did, the next step is to determine whether or not

20    Mr. Navarro is presently a reasonable risk to society as

21    he sits in front of you today and I would submit he is

22    not.   That is for you to conclude, but when you look at

23    his record in total, he is not a violent individual.   He

24    is a drug addict and he may have an alcohol problem in the

25    past, but he is not a violent person.   Pre-conviction

50

1     factors have already been addressed.  The alcohol issue,

2     drug issue, I'm not going to go through that again.  You

3     have a criminal history.  There was one incident of

4     violence, that was back in 1972.  That would be 35 years

5     ago -- 35-plus years ago.  That's the only reference in

6     his record that I could see of any kind of violence

7     outside of the commitment offense.  Again, he was not the

8     individual who actually struck Mr. Gonzales at the time of

9     the offense.  He has a -- from a post-conviction

10    standpoint, he has an excellent work history.  He's

11    developed marketable skills that he didn't have

12    beforehand.  He has apparently a very good work ethic and

13    that will bode well for him upon release.  And as the

14    Board is well-aware, you don't need letters of support.

15    There's nothing in Title 15 that indicates that.  I

16    understand the Boards asks that, but there's nothing in

17    Title 15 to require that.  He has marketable skills,

18    they're viable, he does have old letters of support from

19    his family.  There's nothing to indicate that they have --

20    based on what I've seen or heard, that they are no longer

21    in support, so I would submit that the same support that

22    they've been providing him since 1983 are still in place.

23    The only reason he didn't go and request new ones was

24    because of the fact he lost someone in the family and he

25    did want to bother his family.  He has participated in NA

51

1    for an extensive period of time.  And, granted, he not

2    know them verbatim, but I do think he walks that walk.

3    You don't see any write-ups from the standpoint of

4    disciplinaries since 1990.  That is 16, 17 years now,

5    approximately, without a write-up, so I do think that he

6    understands the importance of staying away from narcotics.

7    They are accessible to him in here and he's decided not to

8    take advantage of that.  I do think he takes his problems

9    with narcotics seriously.  I would note for the record

10   that again, as far as the insight, the doctor did point

11   out -- as Dr. Starrett did point out from the standpoint

12   of insight that -- and I quote on Page 3:

13            "The inmate has insight into discussing the

14            reasons for his criminal behavior as a

15            youth.  The inmate is very insightful in

16            discussing his addictive behavior and its

17            impact on his life.  The inmate understands

18            the life-long need for treatment, unquote."

19   So I think based on the doctor's opinion -- professional,

20   he does understand the dynamics of drug addiction and its

21   role -- the role it played in his criminal activity and

22   the commitment offense.  He has his education, he has his

23   vocation skills, he has participated in self-help.  He has

24   marketable skills in a variety of areas, so I think in

25   total, he meets an awful lot of criteria for suitability.

52

1    That being said, I'm go ahead and submit.

2              PRESIDING COMMISSIONER BRYSON:   Thank you.   Sir,

3    are you suitable for parole?

4              INMATE NAVARRO:   Yes, ma'am.

5              PRESIDING COMMISSIONER BRYSON:   Why?

6              INMATE NAVARRO:   I'm ready to go home.

7              PRESIDING COMMISSIONER BRYSON:   Thank you.   Thank

8    you for your remarks.   We'll now recess for deliberation.

9    The time is 9:57.

10                        R E C E S S

11                        --o0o--

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              CALIFORNIA BOARD OF PAROLE HEARINGS

 2                     D E C I S I O N

 3         PRESIDING COMMISSIONER BRYSON:  Thank you, the

 4    time is now 10:36.  All parties have returned to the room

 5    for the decision in the matter of Lionel Navarro.  Sir,

 6    the Panel reviewed all information received from the

 7    public and from you and relied on the following

 8    circumstances in concluding that you are not yet suitable

 9    for parole and would pose an unreasonable risk of danger

10    to society and threaten public safety if released from

11    prison.  This offense, sir, was carried out in an

12    especially cruel and callous manner.  On November 10th of

13    1977, a Farmersville Police patrol officer recognized the

14    inmate, Andy Navarro, and Carlos Garcia running across a

15    vacant lot.  Looking in the direction they were from, he

16    saw a body lying in the middle of the road.  Dispatching

17    another officer to investigate patrol and pursuit, the

18    suspect entered the Navarro residence.  Multiple victims

19    are attacked or killed in the same incident.  At the

20    Navarro residence, an officer saw Andy Navarro walking

21    alongside the home with bloodstains on his shirt,

22    carrying a brown Pendleton shirt wrapped around a hunting

23    knife with a ten-inch blade and bone handle.  Found at

24    the location were two brown leather wallets, one was the

25    NAVARRO, LIONEL   B-91886   DECISION PAGE 1  07/24/07
```

54

1    victim's, one was Andy Navarro's, and there was

2    identification of a check stub belonging to the victim.

3    This offense was carried in a dispassionate and

4    calculated manner.  This victim was attacked by three men

5    for the purpose of robbery.  The victim was hit on the

6    head with a metal pipe approximately three feet long,

7    which was found at the scene.  He was transported to

8    Delta Hospital and died several hours later.  Sir, this

9    Panel, contrary to your attorney, does believe in the

10   fact that you do have a violent history.  First of all,

11   you have a juvenile history of burglary, an adult history

12   of public intoxication, possession of a switchblade,

13   assault with a deadly weapon.  You do have a history of

14   prior criminality that shows an escalating pattern of

15   criminal conduct.  You also were very frank with this

16   Panel and you are commended for that in that you do have

17   a drug abuse history, and by your own testimony, starting

18   at the age of 13, involving both Heroin and alcohol

19   (inaudible) probation and adult probation and then

20   spending time in jail, as far as -- including a couple of

21   commitments to a juvenile ward, you were declared a ward

22   of the court as a juvenile a couple of times.  So you do

23   have a significant criminal history and you really

24   haven't discussed very much about that criminal history

25   **NAVARRO, LIONEL    B-91886    DECISION PAGE 2   07/24/07**

1    today but it's clear on the face of it.  As to your

2    institutional behavior, you have worked well and you are

3    to be commended for that.  Most recently in PIA in Mill

4    and Cabinet where you've been approximately eight years.

5    That seems to be a good match for you.  Currently you're

6    a Machinist there and you've received above-average to

7    exceptional work reports, so obviously they count on you

8    in that job.  As to your education, you received your GED

9    in 1987.  There has been vocational upgrading since that

10   time.  As to vocations, you have two vocational

11   certifications; one in Dry Cleaning, in which you were

12   involved from 1993 to 1998, and Baking, you achieved your

13   Baking certification in 1984.  As to your self-help, this

14   is where you've been very limited in your programming.

15   You have attended first AA and then NA fairly

16   continuously.  I would say almost continuously up until

17   the present time.  What's unclear is that you've really

18   derived very little from it.  You haven't internalized

19   the steps.  You have been really unable to discuss what

20   you've learned, if anything, and your whole answer to how

21   you're going to stay away from drugs is "I won't use

22   drugs."  You did take an Anger Management course in 2006

23   and were involved in the CAT-T Program (phonetic).  The

24   Anger Management, sir, we would say is very long in

25   NAVARRO, LIONEL   B-91886   DECISION PAGE 3   07/24/07

1    coming and it's good that you tried it, but that really

2    constitutes the bulk of your self-help.  Basically being

3    in some sort of attendance in NA and not absorbing very

4    much from it, apparently.  As to your 115s, you have

5    four, to your credit with no violence, and the most

6    recent was in 1990, and no 128As, so you've had a

7    significant period of time in which you continue to

8    display positive change as regards disciplinaries.  As to

9    the psychological report dated March 22nd of 2007 by

10   Dr. Richard Starrett, Dr. Starrett is not totally

11   supportive of your parole.  Basically, Dr. Starrett, this

12   Panel feels, failed to address contradictions between

13   prior statements and other records and statements that

14   he, himself has made.  We are, in fact, going to submit a

15   request for a new psychological evaluation.  Basically,

16   you are denying the alcohol involvement as basically

17   saying you're saying that was only a cover for your

18   Heroin addiction.  And we don't feel you're an alcoholic,

19   but you're an addict, a recovering addict at that.  But

20   he does not reconcile that with the need for a structured

21   drug treatment program and you've made no plans for a

22   drug treatment program.  Also seemingly contradicted is

23   his feeling that you in fact have insight and remorse and

24   basically, we have no evidence of that.  We don't

25   NAVARRO, LIONEL   B-91886   DECISION PAGE 4  07/24/07

57

1  evidence of that in the file, sir, and we certainly

2  didn't have any evidence of your insight or remorse for

3  today.  As to parole plans, you presented no documents

4  for current parole plans and you don't appear to have

5  realistic parole plans.  Paroling back to an area that is

6  still rife with gangs and drugs, so you may feel that

7  you're too old to be a gang member, still the drugs are

8  rife in that area and it's not clear that that would be

9  the best plan for you and basically you don't have any

10  documentation to support that.  You do appear to have

11  marketable skills as a machinist and your present work in

12  Mill and Cabinet seem to be a very marketable skill.

13  It's questionable that your Dry Cleaning or Baking would

14  be reliable skills that you could fall back on just

15  because you have been so long and they have not been

16  upgraded.  As to Penal Code 3042 responses, responses

17  indicate opposition to finding a parole suitability

18  specifically by the District Attorney of Tulare County.

19  In a separate decision the Hearing Panel finds it is not

20  reasonable to expect a parole be granted at a hearing

21  during the following three years.  This Panel feels, sir,

22  that you are going backwards, not forwards.  And that's

23  why we're calling it out three years.  It's going to take

24  you, if you start today, it's going to take you three

25  **NAVARRO, LIONEL    B-91886    DECISION PAGE 5   07/24/07**

58

1    years of hard work.  Let me explain.  This offense was

2    carried in an especially cruel and callous manner.  On

3    November 10th of 1977, Farmersville Police patrol officer

4    recognized you, Andy Navarro, and Carlos Garcia running

5    across a vacation lot.  Looking in the direction they had

6    come, the patrol officer saw a body lying in the road.

7    He dispatched another officer to investigate.  Meanwhile,

8    he pursued the suspects, that was you, sir, to the

9    Navarro residence.  Multiple victims were attacked,

10   injured or killed in the same incident.  At the

11   residence, an officer saw Andy Navarro, your brother,

12   walking alongside the home with bloodstains on his shirt

13   carrying a brown Pendleton shirt wrapped around a hunting

14   knife, as it turned out, with a ten-inch blade and bone

15   handle.  Found at the location were two brown leather

16   wallets; one of them with the victim's identification and

17   the other with Andy Navarro's identification, and a check

18   stub belonging to the victim.  This offense was carried

19   in a dispassionate and calculated manner.  It was a

20   planned offense.  This gentleman was attacked by three

21   men, and one of them was you, sir, for the purpose of

22   robbery.  The victim was hit on the head with a metal

23   pipe, approximately three feet long and found at the

24   scene.  He was transported to Delta Hospital.  He died

25   **NAVARRO, LIONEL    B-91886    DECISION PAGE 6  07/24/07**

59

1    several hours later.  This victim was abused during this

2    offense.  The officer observed that the victim, Pasquale

3    Gonzales, had partially coagulated blood on his nose and

4    mouth area and mucosa running from the corner of his

5    mouth.  He had a difficult time breathing, so he was

6    alive for a significant period of time after he was

7    beaten.  His hands were continually moving in a stroking

8    manner from his upper chest to the top of his head and

9    back.  These motions were out of control.  He was in the

10   process of dying, sir.  The officer tried to talk with

11   him, but he could not get a response.  The victim felt

12   cold to the touch and appeared to be in shock.  His head

13   was greatly swollen, reflective of the blows to the head

14   from the attack.  This offense was carried out in a

15   manner demonstrating exceptionally callous disregard for

16   human suffering.  You had clear opportunity to cease your

17   participation and the second victim, Marcello Silva,

18   subsequently was robbed at knifepoint.  The motive for

19   this series of crimes was very trivial in relation to the

20   offense.  These were vicious attacks for robbery.  You

21   wanted money for Heroin and you ganged up, basically, a

22   three-to-one ratio, as far as attackers to victims.  You

23   have continued to refuse to discuss the details of the

24   commitment offense and that's your right, sir, but we

25   **NAVARRO, LIONEL    B-91886    DECISION PAGE 7  07/24/07**

1    have no evidence that you take responsibility for this

2    offense and you presented here today with a fairly

3    defiant attitude about the whole situation. What's

4    clear, sir, is that although you're doing well in some of

5    the programming work-wise, and your engaging with that,

6    there's no evidence that you're engaging in self-help

7    that is really the basis for rehabilitation that would

8    give this Panel assurity that in fact not only have you

9    aged, but that you've matured. It is your

10   responsibility, sir, to convince this Panel that you in

11   fact would not just be la, la, going out there again and

12   just jumping into drugs again, but that in fact you do

13   have the tools such that when, not if, but when you were

14   tempted to engage in taking Heroin again that you would

15   have some tools to fall back on. We don't have any

16   evidence of that and you haven't taken responsibility for

17   that. You haven't internalized the Steps and you also

18   haven't developed documented realistic parole plans. We

19   also, sir, have seen no remorse. In fact, it's not clear

20   from any of the paper that in fact you understand the

21   nature and magnitude of the crime you have committed.

22   That brings into question a very logical question of

23   whether you truly do understand. We are in fact going to

24   request a new psychological evaluation. We feel that the

25   **NAVARRO, LIONEL    B-91886    DECISION PAGE 8   07/24/07**

61

1    2007 psychological evaluation fails to address the

2    contradictions between prior statements and the records.

3    You're denying the alcohol and the need for structured

4    drug treatment program, plus your insight and remorse are

5    unknown.  We felt that the doctor in saying you have

6    insight and remorse -- we don't know where he got that

7    because you certainly really didn't discuss it in any

8    detail with him.  You haven't internalized AA/NA steps

9    despite years of attendance.  And overall you continue to

10   have a defiant attitude about making a true

11   rehabilitative effort.  Again, sir, a sign of maturity is

12   taking responsibility for your entire parole effort and

13   you need to do that.  And in denying you parole for three

14   years, we're placing you on the 2010 calendar for your

15   next subsequent hearing.  We recommend no more 115s, that

16   you embrace self-help in a way that will in fact show --

17   that you'll be able to show the Panel the fact you have

18   learned and made strides and that you earn positive

19   chronos.  Again, we're ordering a new psychological

20   evaluation for (inaudible).  Commissioner Star, do have

21   anything?

22            DEPUTY COMMISSIONER STAR:  I'm going to reaffirm

23   the Commissioner's statements regarding the self-help

24   efforts.  The Board views it as limited and empty and

25   NAVARRO, LIONEL    B-91886    DECISION PAGE 9  07/24/07

62

1    there's no insight in either the NA attendance or the

2    Anger Management that you have gained from this.  And, in

3    fact, Mr. Navarro, a further review of the psych reports

4    show indications of nonacceptance of the NA Steps.   The

5    first Step, nonacceptance for the need for ongoing

6    continued treatment in regard to critical elements of

7    following a substance abuse program.  Your statements

8    were not only contradictory, they were -- as the

9    Commissioner says, somewhat defiant and certainly no

10   insight provided.

11                    A D J O U R N M E N T

12                        --oOo--

13

14

15

16

17

18

19

20

21   PAROLE DENIED THREE YEARS            NOV 2 1 2007

22   THIS DECISION WILL BE FINAL ON:_____

23   YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

24   DATE, THE DECISION IS MODIFIED.

25   NAVARRO, LIONEL   B-91886   DECISION PAGE 10  07/24/07

63

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, Gita Schmitz, a duly designated transcriber, FOOTHILL
TRANSCRIPTION COMPANY, INC., do hereby declare and
certify under penalty of perjury that I have transcribed
the audio recording which covers a total of pages
numbered 1 - 62, and which recording was duly recorded at
SAN QUENTIN STATE PRISON, SAN QUENTIN, CALIFORNIA, in the
matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of
LIONEL NAVARRO, CDC NUMBER B-91886, on JULY 24, 2007, and
that the foregoing pages constitute a true, complete, and
accurate transcription of the aforementioned audio
recording to the best of my ability.

I hereby certify that I am a disinterested party in the
above-captioned matter and have no interest in the
outcome of the hearing.

Dated August 24, 2007 at Placer County, California.


_____
Gita Schmitz
Transcriber
**Foothill Transcription Company, Inc.**

LIONEL NAVARRO
B-91886, 5N-100 LOW
SAN QUENTIN STATE PRISON
SAN QUENTIN, CA 94974

**FILED**

JUL 1 8 2008

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY
                DEPUTY CLERK

UNITED STATES DISTRICT COURT

IN AND FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LIONEL NAVARRO, ) | No. 2: 08 cv 1659 CGH |
| Petitioner, ) | NOTICE AND MOTION OF RELATED CASES |
| V. ) | |
| ROBERT AYERS, JR., Warden, ) | |
| Respondent. ) | |

Petitioner Lionel Navarro, ("Navarro"), respectfully files this Notice
and Motion of Related Cases and requests that the Court appoint Jennifer Sheetz
as counsel. Jennifer Sheetz is appointed counsel sua sponte in the related case
now pending before the Court, Case No. C-06-1531 KKK-CMK-P.

Dated: July 14, 2008

Respectfully submitted,

*Lionel Navarro*

Lionel Navarro
Petitioner in Pro Se

1

**UNITED STATES DISTRICT COURT**
EASTERN DISTRICT OF CALIFORNIA
Office of the Clerk
501 "I" Street
Sacramento, CA 95814

Victoria C. Minor
Clerk of Court

Divisional Office
2500 Tulare Street
Fresno, CA 93721

July 23, 2008

Case Number:    2:08–CV–01659–GGH

Case Title:    LIONEL NAVARRO,        vs.   ROBERT AYERS JR.,

Dear Litigant,

You are hereby notified that the above case number has been assigned to your action. You are to include the complete case number on all documents sent to the court for filing in this case. Failure to do so results in delayed processing of your documents.

All matters in this action shall be sent to the following address until further notice:

Office of the Clerk
United States District Court
Eastern District of California
501 "I" Street , Suite 4–200
Sacramento, CA 95814

For timely processing of your pleadings or correspondence, please comply with our Local Rules of Court, in particular:

**Local Rule 5–133**  The court requires an original plus one copy of each document sent for filing. If you desire to receive a conformed copy for your records, you must send an original and two copies of your document and a pre–addressed postage–paid envelope for us to return your copy to you.

**Local Rule 5–135**  Once the defendant(s) have served a responsive pleading, you are under an ongoing duty to serve them with copies of all documents you submit to the court. A proof of service shall be attached to the original of any document lodged or filed with the court, showing the date, manner and place of service. A sample proof of service is attached.

**Local Rule 7–130**  Documents submitted to the court must be legible, on 8–½ " x 11" paper, with writing on one (1) side of the page only. Each separate document must be stapled at the top left corner and pre–punched with two (2) holes centered 2–¾" apart, ½" from the top edge of the page. Each page should be numbered consecutively at the bottom.

**Local Rule 7–132**  Every document submitted to the court must include your name, address and prisoner identification number in the upper left hand corner of the first page. The caption on the first page must include the title of this court, the title of the action, the case number assigned to this action (including all initials and letters that follow the number), and the title of your document. If you are pursuing more than one action in this court, you must submit a separate original document and the appropriate number of copies for each action in which you want the document filed.

**Local Rule 6-142**  A request for extension of time must state the reason an extension is needed. A request for extension of time should be filed before the deadline in question.

**Local Rules 30-250, 33-250, 34-250 and 36-250**  Discovery requests or responses should not be submitted to the court unless they are relevant and necessary to support or oppose a motion at issue before the court.

**Local Rule 83-182**  Each party appearing in propria persona is under a continuing duty to notify the Clerk and all other parties of any change of address.

**Other Provisions:**

**Request for Case Status**  The court will notify you as soon as any action is taken in your case. Due to the large number of civil actions pending before the court, THE CLERK IS UNABLE TO RESPOND IN WRITING TO INDIVIDUAL INQUIRES REGARDING THE STATUS OF YOUR CASE. As long as you keep the court apprised of your current address, you will receive all court decisions which might affect the status of your case.

**Copy Work**  The Clerk's Office does not provide copies of documents to parties. Copies of documents may be obtained from Attorney's Diversified Service (ADS) by writing to them at: 1424 21st Street, Sacramento, CA 95814, or by phoning 916-441-4396 or 916-441-4466. The court will provide copies of docket sheets at $0.50 per page. **Note: In Forma Pauperis** status does not include the cost of copies.

                    Victoria C. Minor
                    Clerk of Court
                    United States District Court

          by: /s/ K. Carlos
                    Deputy Clerk

The following is a sample Proof of Service.  Pursuant to Rule 5 of the F.R.Cv.P. and Local Rule 5−135, each document filed after the court orders service in your case shall be served on opposing counsel and a proof of service attached to your document filed with the court.

---

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

(Case Title) _____

_____ Plaintiff or Petitioner

V.                                                    Case Number: 2:99−CV−99999 ABC DFG
                                                      (example case no.)

_____

_____ Defendant or Respondent

                                                      **SAMPLE PROOF OF SERVICE**

_____ /

I hereby certify that on    (Date) _____, I served a copy

of the attached    (Title of Document Served and Filed) _____,

by placing a copy in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said

enevelope in the United States Mail at    (Location of Mailing) _____:

**(List Name and Address of Each Defendant or Attorney Served)**

I declare under penalty of perjury that the foregoing is true and correct.

_____
(Name of Person Completing Service)

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

LIONEL NAVARRO,

Plaintiff(s)/Petitioner(s),

Case No.  2:08-CV-01659-GGH

ORDER RE CONSENT

vs.

OR REQUEST FOR REASSIGNMENT

ROBERT AYERS JR.,

Defendant(s)/Respondents(s).

This case was randomly assigned to Magistrate Judge Gregory G. Hollows. Without the written consent of the parties presently appearing pursuant to 28 U.S.C Sec. 636(c), a magistrate judge cannot conduct all proceedings and enter judgment in this case with direct review by the Ninth Circuit Court of Appeals, in the event an appeal is filed. If a party declines to consent and the case is assigned to a district judge, the assigned magistrate judge shall continue to perform all duties as required by Eastern District Local Rule 72-302.

Accordingly, within 30 days, the parties shall complete and return this form to the court.

IT IS SO ORDERED.

Dated:            7/23/08                        /s/  -  Gregory G. Hollows

United States Magistrate Judge

---

**IMPORTANT**: You must check and sign only one section of this form and return it to the Clerk's Office within 30 days. The complaint/petition will not be reviewed by the court until plaintiff/petitioner has signed and returned this form. Note: This form must be completed and returned regardless of the choice exercised by any other party.

---

☐    *CONSENT* TO JURISDICTION OF UNITED STATES MAGISTRATE JUDGE

The undersigned hereby voluntarily consents to have a United States Magistrate Judge conduct all further proceedings in this case.

Date: _____        Signature: _____

Print Name: _____

( ) Plaintiff/Petitioner ( ) Defendant/Respondent ( ) Counsel for *

---

☐    *DECLINE* OF JURISDICTION OF UNITED STATES MAGISTRATE JUDGE AND

REQUEST FOR REASSIGNMENT TO UNITED STATES DISTRICT JUDGE

The undersigned declines to consent to the United States Magistrate Judge assigned to this case and requests random assignment to a United States District Judge.

Date: _____        Signature: _____

Print Name: _____

( ) Plaintiff/Petitioner  ( ) Defendant/Respondent ( ) Counsel for *

---

*If counsel of record, list name of each party responding: _____
_____

E-filing

CV 08 · 3928

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

**MMC**

LIONEL NAVARRO,

        Petitioner,               No. CIV S-08-1659 GGH P

vs.

ROBERT AYERS, et al.,

        Respondents.          ORDER

_____/

        Petitioner, a state prisoner proceeding pro se, has filed an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

        Petitioner is presently incarcerated at San Quentin State Prison. Petitioner challenges the 2007 decision by the Board of Parole Hearings (BPH) finding him unsuitable for parole.

        It is established that a petitioner for habeas corpus relief under 28 U.S.C. § 2254 must name "the state officer having custody of him or her as the respondent to the petition." Stanley v. Cal. Supreme Court, 21 F.3d 359, 360 (9th Cir.1994). The U.S.Supreme Court recently reiterated that with certain infrequent exceptions not applicable here:

> The federal habeas statute straightforwardly provides that the proper respondent to a habeas petition is "the person who has custody over [the petitioner]." 28 U.S.C. § 2242; see also § 2243

1

1  ("The writ, or order to show cause shall be directed to the person having custody of the person detained"). The consistent use of the
2  definite article in reference to the custodian indicates that there is generally only one proper respondent to a given prisoner's habeas
3  petition. This custodian, moreover, is "the person" with the ability to produce the prisoner's body before the habeas court. *Ibid.* We
4  summed up the plain language of the habeas statute over 100 years ago in this way: "[T]hese provisions contemplate a proceeding
5  against some person who has the immediate custody of the party detained, with the power to produce the body of such party before
6  the court or judge, that he may be liberated if no sufficient reason is shown to the contrary." *Wales v. Whitney,* 114 U.S. 564, 574, 5
7  S.Ct. 1050, 29 L.Ed. 277 (1885) (emphasis added); see also *Braden v. 30th Judicial Circuit Court of Ky.,* 410 U.S. 484, 494-495, 93
8  S.Ct. 1123, 35 L.Ed.2d 443 (1973) ("The writ of habeas corpus" acts upon "the person who holds [the detainee] in what is alleged
9  to be unlawful custody," citing *Wales,* supra, at 574, 5 S.Ct. 1050); *Braden,* supra, at 495, 93 S.Ct. 1123 ("'[T]his writ ... is directed to
10  ... [the] jailer,'" quoting In the *Matter of Jackson,* 15 Mich. 417, 439- 440 (1867)). In accord with the statutory language and
11  *Wales'* immediate custodian rule, longstanding practice confirms that in habeas challenges to present physical confinement–"core
12  challenges"--the default rule is that the proper respondent is the warden of the facility where the prisoner is being held, *not the*
13  *Attorney General or some other remote supervisory official.*

14  Rumsfeld v. Padilla, 542 U.S. 426, 434-435, 124 S.Ct. 2711, 2717-2718 (2004) (emphasis

15  added) (refusing to recognize the Secretary of Defense as the custodian of military detainees, and

16  finding that the commander of the brig where Padilla was being held is the proper custodian).

17        See also Brittingham v. United States, 982 F.2d 378, 379 (9th Cir. 1992) ("A

18  custodian 'is the person having a day-to-day control over the prisoner. That person is the only

19  one who can produce 'the body' of the petitioner." Guerra v. Meese, 786 F.2d 414, 416

20  (D.C.Cir.1986) (Parole Commission is not custodian despite its power to release petitioner). But

21  see Ortiz-Zandoval v. Gomez, 81 F.3d 891 (9th Cir. 1996) permitting the head of California

22  Corrections to be the proper custodian, but this case is in doubt after Padilla which held that a

23  remote supervisory official was not to be the custodian).

24        Thus, the proper custodian is the warden or sheriff in charge of the facility where

25  the prisoner is confined.

26  /////

2

1          Any warden or sheriff in California is amenable to personal jurisdiction in the

2  Eastern District in cases alleging that the BPH improperly found a prisoner unsuitable for parole

3  because personal jurisdiction is a state-wide, not individual district, concept. However, venue

4  concepts are oriented to individual districts. In habeas corpus cases, venue is proper: (1) in the

5  district of confinement, or (2) in the district of "conviction and sentencing." 28 U.S.C. §

6  2241(d). Because it is difficult to stretch "conviction and sentencing" into a decision revoking

7  parole, only the first venue option is appropriate. Moreover, since prisoners are not normally

8  transferred about for parole eligibility or revocation hearings, the district of confinement would

9  normally be the district of "conviction and sentencing" anyway even if that rubric were utilized

10  in the parole eligibility setting.[1]

11          Thus, the court should not maintain this case in this district.[2]

12  /////

13  /////

14  /////

15  /////

16  /////

17

---

18     [1] If the literal interpretation of "conviction and sentencing" were to be employed, i.e., the

19  district where petitioner suffered his underlying conviction, maintaining the action in that place
in parole suitability situations would not be as appropriate as having it in the place of

20  confinement. First, in the logistical sense, the issue of parole suitability has little to do with the
place of conviction – the court will not be concerned with the ease of mustering witnesses and

21  evidence. Secondly, even though the local government officials at the place of conviction may
retain an interest in having parole denied, habeas cases are handled by the state Attorney

22  General's Office, and local officials are not involved in the federal court litigation regarding
review of the parole eligibility decision. The issues involved in the federal court review will not

23  center about the opinions of local officials, and even if it did, those opinions will be of record
already.

24     [2] The opposite policy is in effect for the "usual" habeas cases involving attack upon a

25  conviction or sentence. In those cases there is an advantage to transferring to the district of
conviction because evidence and witnesses for any evidentiary hearing are more likely to be

26  located there. The California federal district courts have long employed a blanket transfer policy
to the district of conviction for "conviction" habeas cases.

1          Accordingly, in the furtherance of justice, IT IS HEREBY ORDERED that this

2   matter is transferred to the United States District Court for the Northern District of California.

3   28 U.S.C. § 2241(d).

4   DATED: 08/08/08

                                    /s/ Gregory G. Hollows
5                                   _____
                                    GREGORY G. HOLLOWS
6                                   UNITED STATES MAGISTRATE JUDGE

7   nav1659.tra

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA



**FILED**

LIONEL NAVARRO,

Plaintiff(s)/Petitioner(s),

Case No.   2:08–CV–01659–GGH

AUG – 7 2008

CLERK, U.S. DISTRICT COURT
ORDER RE CONSENT EASTERN DISTRICT OF CALIFORNIA
OR REQUEST FOR REASSIGNMENT

vs.

DEPUTY CLERK

ROBERT AYERS JR.,

Defendant(s)/Respondents(s).

     This case was randomly assigned to Magistrate Judge Gregory G. Hollows. Without the written consent of the parties presently appearing pursuant to 28 U.S.C Sec. 636(c), a magistrate judge cannot conduct all proceedings and enter judgment in this case with direct review by the Ninth Circuit Court of Appeals, in the event an appeal is filed. If a party declines to consent and the case is assigned to a district judge, the assigned magistrate judge shall continue to perform all duties as required by Eastern District Local Rule 72–302.

     Accordingly, within 30 days, the parties shall complete and return this form to the court.

IT IS SO ORDERED.

Dated: _____7/23/08_____          _____/s/ – Gregory G. Hollows_____
                                                                          United States Magistrate Judge

> **IMPORTANT:** You must check and sign only one section of this form and return it to the Clerk's Office within 30 days. The complaint/petition will not be reviewed by the court until plaintiff/petitioner has signed and returned this form. Note: This form must be completed and returned regardless of the choice exercised by any other party.

---

☒       _CONSENT_ TO JURISDICTION OF UNITED STATES MAGISTRATE JUDGE

The undersigned hereby voluntarily consents to have a United States Magistrate Judge conduct all further proceedings in this case.

Date: **7-25-08**                    Signature: *Lionel Navarro*

Print Name: L i o n e l   N a v a r r o

( ) Plaintiff/Petitioner  ( ) Defendant/Respondent ( ) Counsel for *

---

☐       _DECLINE_ OF JURISDICTION OF UNITED STATES MAGISTRATE JUDGE AND

     REQUEST FOR REASSIGNMENT TO UNITED STATES DISTRICT JUDGE

The undersigned declines to consent to the United States Magistrate Judge assigned to this case and requests random assignment to a United States District Judge.

Date: _____          Signature: _____

Print Name: _____
( ) Plaintiff/Petitioner  ( ) Defendant/Respondent ( ) Counsel for *

---

*If counsel of record, list name of each party responding: _____
_____

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

LIONEL NAVARRO,

                         Petitioner,

                                        Case Number: 2:08-CV-01659-GGH

V.

                                        PROOF OF SERVICE BY MAIL

ROBERT AYERS JR.,

                         Respondent.

_____/

I, **Lionel Navarro**, hereby certify that, I am the Petitioner in above entitled matter and that on August 3, 2008, I served a copy of the attached document(s): ORDER RE CONSENT OR REQUEST FOR REASSIGNMENT, by placing a copy in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the United States Mail at San Quentin State Prison, San Quentin, CA 94974

        EDMUND G. BROWN JR.
        ATTORNEY GENERAL OF THE STATE OF CALIFORNIA
        1300 "I" STREET, SUITE 125
        SAN P.O. BOX 944255
        SACRAMENTO, CA 94244-2550

I declare under penalty of perjury that the foregoing is true and correct.

*Lionel Navarro*

Lionel Navarro
Declarant

| SCANNED | Initials | |
|---|---|---|
| | Doc # | |
| | Folder | |
| | Docket Init | |

CLOSED, HABEAS, N

## U.S. District Court
## Eastern District of California - Live System (Sacramento)
## CIVIL DOCKET FOR CASE #: 2:08-cv-01659-GGH
## Internal Use Only

(HC) Navarro et al v. Ayers
Assigned to: Magistrate Judge Gregory G. Hollows
Cause: 28:2254 Petition for Writ of Habeas Corpus (State)

Date Filed: 07/18/2008
Date Terminated: 08/08/2008
Jury Demand: None
Nature of Suit: 530 Habeas Corpus
(General)
Jurisdiction: Federal Question

**Petitioner**

**Lionel Navarro**                  represented by  **Lionel Navarro**
B-91886
San Quentin State Prison
San Quentin, CA 94974
PRO SE

V.

**Respondent**

**Robert Ayers, Jr.**

| Date Filed | # | Docket Text |
|---|---|---|
| 07/18/2008 | ◑ 1 | PETITION for WRIT of HABEAS CORPUS by Lionel Navarro.(Carlos, K) (Entered: 07/22/2008) |
| 07/18/2008 | ◑ 2 | NOTICE of RELATED CASE 2:06-cv-1531 by Lionel Navarro (Carlos, K) (Entered: 07/22/2008) |
| 07/23/2008 | ◑ 3 | PRISONER NEW CASE DOCUMENTS ISSUED (Attachments: # 1 Order re Consent) (Carlos, K) (Entered: 07/23/2008) |
| 07/23/2008 | ◑ | SERVICE BY MAIL: 3 Prisoner New Case Documents for Magistrate Judge as Presider served on Lionel Navarro (Carlos, K) (Entered: 07/23/2008) |
| 08/08/2008 | ◑ 4 | TRANSFER ORDER signed by Magistrate Judge Gregory G. Hollows on 8/8/8, CASE TRANSFERRED to USDC - Northern District of CA. Original file, certified copy of transfer order, and docket sheet sent. CASE CLOSED, (Becknal, R) (Entered: 08/08/2008) |
| 08/08/2008 | ◑ | SERVICE BY MAIL: 4 Case Transferred Out to Another District, Order |

| | | served on Lionel Navarro (Becknal, R) (Entered: 08/08/2008) |

**UNITED STATES COURTS**
OFFICE OF THE CLERK, UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA 501 I ST., STE. 4-200
SACRAMENTO, CALIFORNIA 95814-2322

OFFICIAL BUSINESS

prose

9410283489  CC04

U.S. DISTRICT COURT
450 GOLDEN GATE BLVD.
16th FLOOR, ROOM 1111
SAN FRANCISCO, CA 94102



049J82023891
$ 00.590
08/11/2008
Mailed From  95814
US POSTAGE

2:08 cv 1659 EGH

# United States District Court

District _____ EASTERN

| Name | Prisoner No. | Case No. |
|---|---|---|
| LIONEL NAVARRO | B-91886 | |

Place of Confinement

SAN QUENTIN STATE PRISON, SAN QUENTIN, CA 94974

Name of Petitioner (Include name under which conviction     Name of Respondent (authorized person having custody of petitioner)

LIONEL NAVARRO                    ROBERT AYERS, JR., Warden, et al

V.

The Attorney General of the State of: CALIFORNIA

## PETITION

1. Name and location of court which entered judgment of conviction under attack ___ Tulare County Superior Court

2. Date of judgment of conviction ___ November 10, 1977

3. Length of sentence ___ Seven years-to-life with possibility of parole on or after May 15, 1984.

4. Nature of offense involved (all counts) ___ First degree murder and attempted robbery with use of a weapon, a metal pipe.

5. What was your plea? (Check one)

   (a) Not guilty ☒
   (b) Guilty ☐
   (c) Nolo contendere ☐
   If you entered a guilty plea to one court or indictment, and a not guilty plea to another court or indictment, give details:

6. If you plead not guilty, what kind of trial did you have?  (Check one)

   (a) Jury ☒
   (b) Judge only ☐

7. Did you testify at the trial? ___ No

# FILED

JUL 1 8 2008

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

(2)

Yes ☐  No ☒

8.  Did you appeal from the judgment of conviction?

Yes ☒  No ☐

9.  If you did appeal, answer the following

(a)  Name of court _____ California Court of Appeal, Fifth Appellate District. _____

(b)  Result ___ Denied _____

(c)  Date of result and citation, if known ___ Unknown _____

(d)  Grounds raised _____

_____

(e)  If you sought further review of the decision on appeal by a higher state court, please answer the following:

(1)  Name of court _____

(2)  Result _____

_____

(3)  Date of result and citation, if known _____

(4)  Grounds raised _____

_____

10.  Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions,. applications, or motions with respect to this judgment in any court, state or federal

Yes ☒  No ☐

11.  If your answer to 10 was "yes" give the following information:

(a)  (1)  Name of court ___ Tulare County Superior Court _____

(2)  Nature of proceeding ___ Habeas Corpus Petition _____

_____

(3)  Grounds raised ____ Same as in instant petition. _____

_____

(4) Did you receive an evidentiary hearing on your petition, application or motion?

Yes ☐   No ☒

(5) Result _____ Denied _____

(6) Date of result _____ Feb 29, 2008 _____

(b)   As to second petition, application or motion give the same information:

(1) Name of court   California Court of Appeal, Fifth Appellate District

(2) Nature of proceeding _____ Habeas Corpus Petition _____

(3)   Grounds raised _____ Same as in instant petition _____

(4) Did you receive an evidentiary hearing on your petition, application or motion?

Yes ☐   No ☒

(5) Result _____ Denied _____

(6) Date of result _____ April 25, 2008 _____

(c) Did you appeal to the highest state court having jurisdiction the result of action taken on any petition, application or motion?

(1)  First petition, etc.    Yes ☒ No ☐

(2)  Second petition,       Yes ☒ No ☐

(d) If you did not appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

_____

_____

_____

12.    State *concisely* every ground on which you claim that you ae being held unlawfully. Summarize *briefly* the facts supporting each ground. If necessary, you may attach pages stating additional grounds and *facts* supporting same. CAUTION: In order to proceed in the federal court, you must ordinarily first exhaust your available state court

remedies as to each ground on which you request action by the federal court. If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds at a later date,

For your information, the following is a list of the most frequently raised grounds for relief in habeas corpus proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you may have other than those listed if you have exhausted your state court remedies with respect to them. However, *you should raise in this petition all available grounds* (relating to this conviction) on which you base you allegations that you are being held in custody unlawfully.

Do not check any of these listed grounds. If you select one or more of these grounds for relief, you must allege facts. The petition will be returned to you if you merely check (a) through (j) or any one of these grounds

(a) Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea

(b) Conviction obtained by use of coerced confession.

(c) Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

(d) Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.

(e) Conviction obtained by a violation of the privilege against self-incrimination.

(f) Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

(g) Conviction obtained by a violation of the protection against double jeopardy.

(h) Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.

(i) Denial of effective assistance of counsel

(j) Denial of right of appeal.

A. Ground one:    See Attached "INSERT A," Ground 1, pages 1 through 31

Supporting FACTS (state *briefly* without citing cases or law):

B. Ground two:    See Attached "INSERT B," Ground 2, pages 32 through 35

Supporting FACTS (state *briefly* without citing cases or law):

C. Ground three:   See Attached "INSERT C," Ground 3, pages 36 through 42

Supporting FACTS (state *briefly* without citing cases or law): _____

_____

_____

_____

_____

_____

_____

D. Ground four: _____

Supporting FACTS (state *briefly* without citing cases or law): _____

_____

_____

_____

_____

_____

_____

13. If any of the grounds listed in 12A, B, C, and D were not previously presented in any other court, state or federal, state *briefly* what grounds were not so presented, and give you reason for not presenting them: _____

_____

_____

_____

14. Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?

Yes [X]  No [ ]

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

(a)  At preliminary hearing _____

(6)

INSERT A

### Ground 1

THE BOARD OF PAROLE HEARINGS VIOLATED PETITIONER'S STATE AND
FEDERAL DUE PROCESS WHEN IT DID NOT APPLY THE PROPER CRITERIA
AND ITS DECISION DENYING PETITIONER PAROLE WAS NOT SUPPORTED
BY "PREPONDERANCE OF THE EVIDENCE" (Cal. Regs. Tit. 15 § 2000
subd. (50)), OR NOT EVEN "SOME EVIDENCE," THAT HE POSES A
CURRENT UNREASONABLE THREAT TO THE PUBLIC.

This petition addresses violations of petitioner Lionel Navarro
("Petitioner") state and federal due process rights at his fifteenth (15th)
subsequent hearing for parole before the Board of Parole Hearings ("Board"),
wherein he received a three year denial.

Petitioner was convicted of first degree murder and attempted robbery
with use of a weapon, a metal pipe, in Tulare County [Case Number 18308]
and sentenced to a term of seven years to life. Despite being disciplinary
free since 1990, Petitioner has been denied parole sixteen times and received
a three year denial at his 15 subsequent hearing again based on the commitment
offense being carried out in an "especially cruel and callous manner."
(Exhibit 1, Hearing Transcript ("TR") at 53.)

Petitioner asserts that the 2007 Board panel violated his state and
federal due process rights by failing to set his term in accordance with
Penal Code Section 3041, et. seq.: by engaging in an arbitrary and
unconstitutional determination that his crime was particularly egregious;
by failing to adduce any evidence that was probative of a finding that he
is currently dangerous; by failing to find him suitable for parole in
accordance with the Board's Regulations set forth in section 2280-2343 of
the Title 15, California Code of Regulations ("15-CCR"); and by violating
the due process requirements by applicable case law. Petitioner also maintains
that there was no evidence underlying the "reason" the Board articulated
for finding him unsuitable for parole and more importantly NO NOTICE that
he is currently dangerous.

The 2007 Board panel also cited other factors for denying parole. The

1.

INSERT A

Board stated:

1.    Multiple victims were attacked or killed in the same incident.

2.    The victim was hit on the head with a metal pipe approximately
      three feet long, which was found at the scene. He was
      transported to Delta Hospital and died several hours later.

3.    [Y]ou have a juvenile history of burglary, an adult history
      of public intoxication, possession of a switchblade, assault
      with a deadly weapon. You do have a history of prior criminality
      that shows an escalating pattern of criminal conduct.

4.    And we don't feel you're an alcoholic, but you're an addict,
      a recovering addict at that. But he does not reconcile that
      with the need for a structured drug treatment program and you've
      made no plans for a drug treatment program.

5.    Also seemingly contradicted is his feeling that you in fact
      have insight and remorse and basically, we have no evidence
      of that.

6.    As to parole plans, you presented no documents for current
      parole plans and you don't appear to have realistic parole
      plans. Paroling back to an area that is still rife with gangs
      and drugs, so you may feel that you're to old to be a gang
      member, still the drugs are rife in that area and it's not
      clear that that would be the best plan for you and basically
      you don't have any documentation to support that.

(TR 53-57.)

     The 2007 Board denied Petitioner parole for three years, during which

time he completed another two years of disciplinary free period, Anger

Management, Narcotic Anonymous (NA), Prison Industry Authority (PIA) and

recent psychologist evaluation supporting a finding of parole suitability.

     Petitioner contends that the Board's conclusion that he is unsuitable

for parole and its failure to set a term despite his accomplishments and

despite having served over 30 years (with good time credit, over 45 years)

on a sentence of 7 years to life, twice the maximum in the Matrix guideline

(15 CCR § 2282) for first degree murder, is clearly erroneous, arbitrary

and capricious.

2.

INSERT A

## PETITIONER'S CONTENTIONS

1. The Board failed to apply the statutory requirements of Penal Code section 3041.

2. Petitioner's Due Process rights were violated by the Board's failure to find him suitable for parole and set his term within the first degree murder Matrix Guidelines, between 8 to 22 years. (15 CCR § 2282 (A)(1)-(D)(IV).)

3. The Board improperly and arbitrarily characterized Petitioner's crime as being exceptionally egregious.

4. There was no reliable evidence before the Board that provides a nexus to Petitioner's November 10, 1977 crime and him being currently dangerous.

5. There was no evidence with any indicia of reliability underlying the reasons the Board gave for finding Petitioner unsuitable for parole.

6. The Board's decision was arbitrary and capricious and ignored or minimized Petitioner's rehabilitative efforts and gains. The Board's recommendations are vague and provide no information on what is needed for Petitioner to become suitable for parole, other than boilerplate language used in every hearing, and illegally requiring him to discuss the commitment offense.

7. The Board's weighty and unreasonable reliance on unalterable factors including the crime itself violates his Due Process rights. The Board has in effect resentenced Petitioner from a term of seven years to life, to life without the possibility of parole. (See Cal. Penal Code Section 190.2 (a)(14); and Section 190.4.)

8. The Board arbitrarily denied parole for THREE years despite the lack of any adverse factors in his programming since 1990. A three year denial was arbitrary and violated Petitioner's Due Process rights. (See Ground 2, INSERT B of petition.)

9. At this point, the CDC-115's (disciplinary reports) are no longer evidence of unsuitability. They have been used to punish Petitioner already once and the records shows that Petitioner has overcome his disciplinary issues through the significant programming and working in NA, anger management, CAT T program, and PIA.

**A. Petitioner Has a Federally Protected Liberty Interest In Parole And A Right To A Parole Hearing That Complies With Due Process.**

A California prisoner with a sentence of a term-to-life with the

possibility of parole has a protected liberty interest in parole therefore

INSERT A

a right to due process in the parole suitability proceedings. See <u>Sass v.</u>
<u>California Board of Prison Terms ("Sass")</u>, 461 F.3d at 1127-28 (9th Cir.
2006||; <u>Greenholtz v. Inmates of Nebraska Penal Corr. Complex ("Greenholtz")</u>,
442 U.S. 1, 7 (1979); <u>Board of Pardons v. Allen ("Allen")</u>, 482 U.S. 369,
373 (1987); Cal. Penal Code § 3041 (b).

   B.   The California Parole Scheme Requires That Parole Shall Normally
Be Granted At The Initial Parole Consideration Hearing To Be Held 13 Months
Prior To Inmates' Minimum Eligible Parole Dates.

   The California Legislature has clearly expressed its intent that when
murderers — who are the great majority of inmates serving indeterminate
sentences — approach their minimum eligible parole date, the Board "shall
normally set a parole release date." (Pen. Code § 3041, subd.(a).) The Board's
authority to make an exception based on the gravity of a life term inmate's
current or past offense should no operate so as to swallow the rule that
parole is "normally to be granted." <u>In re Rosenkrantz</u>, <u>supra</u>, Cal.4th at
p. 683, 128 Cal.Rptr.2d 104, 59 P.3d 174.

   The Board denies due process and fails to act impartially by denying
parole to approximately 95 percent of the inmate it reviews for parole
suitability

   Petitioner contends that a as matter of law and logic, a parole granting
rate of five percent by the Board fails to comply with the mandates of Penal
Code § 3041(a) which requires that parole is normally to be granted.
Petitioner maintains that applying the exception of Section 3041(b) to well
over ninety percent of the applicants considered by the Board violates due
process.

   C.   The Matrix Is Designed To Quantify The Factors Present In Murders
Considered By The Board. The Board Violates Due Process In Denying Parole
Based On A Crime Being "Exceptional" When The Matrix Already Takes Those
Factors Into Account.

   The Board ignores the existence and purpose of the matrix when

                                    4.

INSERT A

considering whether a crime is "exceptionally, heinous, atrocious or cruel."

Such a position is untenable. "It is well-established rule of statutory

construction that when a word of phrase as been given a particular scope

or meaning in one part or portion of a law it should be given the same scope

and meaning in other parts or portion of the law." People v. DeGuzman (2003)

113 Cal.App.4th 538, 547-548, citing People v. Mckay (2002) 267 267 Ca.4th

601, 621. The Board copied the language from Cal. Penal Code § 190.2, a

"Special circumstance" applicable only to particularly egregious first degree

murders punishable by the "death penalty or life imprisonment without parole."

Subsection (a)(14) of the special circumstances statute. Cal. Penal Code

§ 190.2, reads, "the murder was especially heinous, atrocious, or cruel"

which, the statute explains, means "manifesting exceptional depravity ...

a conscious or pitiless crime that is unnecessarily tortuous to the victim."

This element, according to Cal. Penal Code § 190.4, must be found true by

a jury. Accordingly, the Board deemed Petitioner a current unreasonable risk

to public safety by arbitrarily characterizing his commitment offense as

a special circumstance first-degree murder. Because, despite its egregious,

Petitioner's offense was clearly not in that category, the decision on that

basis abrogated due process.

Since it is clear within one part of the statutory scheme governing

parole that there is a mandatory framework for quantifying the severity of

any given instance of murder, it seems equally clear that the Board is

precluded from adopting contrary standards for similar and related parts

of the same scheme.

Federal case law explains that the Board's decision to deny parole in

this case based on a finding that the crime was exceptional masks an

underlying decision that the crime is "more serious than the 'ordinary'

INSERT A

[murder] contemplated by the published guidelines. There is no basis in law
for such a distinction. The guidelines clearly indicate the class of offense
severity into which a case falls, based on the act committed..." As explained
in Little v. Hadden, 504 F.Supp. 583, 564 (1980), "... It is unreasonable
and impermissible for the [Board] to base a decision to continue beyond the
guidelines on the same factors that went into formulating the guidelines
in the first place. No one disputes that this was a serious crime, but the
factors of seriousness indicated by this record are included in the guidelines
themselves. Thus, something more must be stated. The [Board] however, has
failed to state any other basis that is supported by any evidence."

D. The "Some Evidence" Standard Requires That There Be Some Evidence
That Is Probative Of Current Dangerous.

Due Process requires that "some evidence" support the parole board's
determination and that the evidence relied upon must possess "some evidence
of reliability." Caswell v. Calderon, 353 F.3d 832, 839 (9th Cir. 2004).
See Cass v. Woodford, 2006 WL 1304953 at *9 (S.D. Cal. 2006).

It is not enough that there is some evidence to support the factors
cited for denial of parole; the evidence must also rationally support the
core determination required by the statute before parole can be denied, i.e.,
that a prisoner's release will unreasonably endanger public safety. In re
Lee (2006) 143 Cal.App.4th 1400, 1408. Because the overarching consideration
is public safety, the test in reviewing the Board's decision denying parole
"is not whether some evidence supports the reasons [the Board] cites for
denying parole but whether some evidence indicates a parolee's release
unreasonably endangers public safety." In re Barker (2007) 151 Cal.App.4th
346, 366 (italic omitted).

The Federal "Some Evidence" standard as applied in Rosenkrantz v.
Marshall (C.D. Cal. 2006) 444 F.Supp.2d 1063 and Martin v. Marshall (N.D.

6.

INSERT A

Cal. 2006|| 431 F.Supp.2d 1038 finds that an aging commitment offense falls short of providing "some evidence" sufficient to justify a denial of parole. See also. Willis v. Kane (N.D. Cal. 2007) 485 F. Supp.2d 1126.

The "some evidence" standard is not appropriate at the fact finding level but only suitable use by an appellate court in the context of reviewing lower court decisions. The Supreme Court recently explained in a plurality opinion that it has utilized the "some evidence" standard not as a standard of proof, but rather as a standard of review when examining an administrative record developed in an adversarial proceeding. Hamdi v. Rumsfield, 542 U.S. 5507, 124 S.Ct. 2633, 2651, 159 L.Ed.2d 578 (2004), n. 8.

E.  The Board's Reliance On The Commitment Offense And Immutable Pre-Conviction Factors To Deny Parole Violates Petitioner's Due Process Rights.

In Biggs v. Terhune (9th Cir. 2003) 334 F.3d 910, the Ninth Circuit cautioned that continued reliance on the circumstances of the offense could result in a due process violation if the prisoner continually demonstrates exemplary behavior and evidence of rehabilitation. The Board's decision to deny parole in this case relied on the commitment offense and petitioner's conduct prior to the commitment offense.

The Board's characterization of Petitioner's crime as exceptional was arbitrary since the Board routinely and invariably characterizes all first and second degree murders as exceptional. (The Court is requested to take judicial notice of the pleadings and records in the matter of In re Morris Bragg, on Habeas Corpus, Case No. 108543; In re Jameison, on Habeas Corpus, Case No. 71194; In re Criscione, on Habeas Corpus, Case No. 71614, where Santa Clara County Superior Court, the Honorable Linda Condron, found comprehensive evidence indicating that the state's Board of Parole Hearings completely disregards the detailed standards and criteria of the parole release statute, 15 CCR § 2402(c.), and thereby denies prisoners' due process

7.

INSERT A

rights; and Stephen Liebb v. Jill Brown, Case No. 04-4213 CW (JL), Northern District of California, where Honorable District Judge Claudia Wilkins found that Liebb has good cause for determining whether the Board routinely categorizes convicted life-term murders as exceptional in order to deny parole and whether such a policy is in violation of a prisoner's due process rights. It is clear that in the case of 15 CCR § 2280, subds, (c.)(1)(A)-(E), and § 2402, subd. (c)(1)(A)-(E). the guideline fails to adequately inform the Board how to determine crime factors to render the crime "exceptional."

The California Court of Appeal in In re Elkins (2006) 144 Cal.App.4th discussed the use of the gravity of the commitment offense to support a denial of parole: "Scott II summarizes the law in this situation. 'The Governor's assumption that a prisoner may be deemed unsuitable for release on the basis on the commitment offense 'alone' is correct [citation], but the proposition must be properly understood. The commitment offense is one of only two factors indicative of unsuitability a prisoner cannot change (the other being his 'Previous Record of Violence')."

"The Commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison." In re Tripp (2007.) 150 Cal.App.4th 306. 319..

In the case In re Dannenberg (2005) 34 Cal.4th 1061 (Dannenberg II), the California Supreme Court addressed what standard was valid for not finding the prisoner suitable for parole. In that case, Dannenberg was convicted of a second degree murder when he got into a fight with his wife, repeatedly beat her on the side of her head with a pipe wrench rendering her unconscious, and then Dannenberg drowned her in their bathtub. (Id. at p. 1073.) The parole board fond the primary reason for not granting parole was the especially

INSERT A

cruel manner in which the murder was carried out. (Id. p. 1074.) Dannenberg claimed his wife must have lost consciousness from hitting her head on the bathtub spout and not from the blows he rendered with the pipe wrench. (Id. at p. 1073.) The jury did not believe Dannenberg, and neither did the parole board. The parole board found Dannenberg did not take responsibility for his crime, and therefore continued to be unpredictable and remained a threat to others if released. (Id. at pp. 1075, 1095.) The Supreme Court found, in a three to four decision, that there was "some evidence" the crime was "especially callous and cruel" and there was little doubt the crime went beyond the minimum elements of a second degree murder, a requirement that must be shown in order to deny parole solely based upon the commitment offense. (Id. at p. 1095.)

Recently, Dannenberg II was published. The Sixth Appellate District held the Governor's reversal of a BPH finding of suitability was not supported by some evidence and cannot be upheld. Because the evidence did not support the Governor's reversal, it would be futile to remand the matter to the Governor. (In re Dannenberg, supra, ____ Cal.App.4th at p. 9.) "While Dannenberg's commitment offense was grave, the record that was before the Governor lacks any evidence that now, more than two decades after his offense, the nature of Dannenberg's offense alone continues to support a conclusion that he poses an unreasonable risk to society if released. (Ibid). The test is not whether some evidence indicates a parolee's release unreasonably endangers the public, but whether some evidence exists that support's the Governor's conclusion that release of the inmate would pose an unreasonable risk to the public. (Id. at p. 8.)

Irons v. Carey (9th Cir. 2007) 479 F.3d 658 ("Irons") is the Ninth Circuit's third in a line of cases that includes Biggs v. Terhune (9th Cir.

9.

INSERT A

2003) 334 F.3d 910 ("Biggs"), and Sass v. California Board of Prison Terms
(9th Cir. 2006) 461 F.3d 1123 ("Sass"), looked at the continued use of the
commitment offense to justify a denial of parole.

    F.  The Board's Determination That A Crime Is Particularly Cruel Or
Egregious Is Made In An Arbitrary And Unconstitutional Manner.

    The Board's determination that a murder is especially cruel or egregious
is unconstitutionally vague and standardless. See United States v. Doremus
(9th Cir. 1989) 888 F.2d 630, 634.

    The Board relies on any fact of the crime to bolster its conclusion
that the crime is particularly egregious. The Board makes a determination
that virtually All murders are particularly egregious.

    The Board's use of unchanged and unproven elements of Petitioner's crime
to continue denying parole violates his constitutional right to a jury trial.
See Aprendi v. New Jersey, 530 U.S. 466, 490; and Cal. Penal Code § 190.4.

    G. The Board's Finding That Petitioner Needed Show Insight And Remorse
Lacks Evidentiary Support And Are Not Evidence Of Unsuitability.

    The Board stated: "We felt that the doctor in saying you have insight
and remorse –– we don't know where he got that because you certainly really
didn't discuss it in any detail with him. You haven't internalized AA/NA
steps despite years of attendance." (TR 61.) This conclusion is refuted by
three decades of vocational training and positive programming within prison
as is documented in the Board Report. Compliance with the Board's
recommendations is a factor to be considered in favor of suitability and
release no matter how long-standing or recent it is. See In re Lee (2006)
143 Cal.App.4th 1404, 49 Cal.Rptr.3d 931; also see In re Elkins (2006) 144
Cal.App.4th 475.

INSERT A

15 CCR § 2236 is unequivocal in its demands that when a prisoner
"refuse[s] to discuss the facts of the crime in which instance a decision
shall be made based on the other information available and the refusal shall
not be held against the prisoner...." In the instance case, it is clear that
Petitioner's refusal to talk about the crime was held against him. Although
the Board recognized that Petitioner has "worked well" and should "be
commended for that[,]" it stated that "seemingly contradicted is [his] feeling
that you in fact have insight and remorse and basically, we have no evidence
of that." (TR 55, 56.) Had the Board reviewed Petitioner's entire
incarceration history it would have found that he had shown insight and
remorse through his programming and psychological evaluations. 15 CCR §
2281(d)(3) states: "(3) Signs of Remorse. The prisoner performed acts which
tend to indicate the presence of remorse, such as attempting to repair the
damage, seeking help for or relieving suffering of the victim, or the prisoner
has given indications that he understands the nature and magnitude of the
offense. Petitioner's behavior had been exemplary. The Board did not consider
it, if it had, the result would have been different. Petitioner's Central
file reveals that Petitioner has met the requirements to be found suitable. .

1.  Petitioner's Programming

Petitioner had been free of discipline since 1990, a period of over
17 years. During the course of his 30 years (at the time of the 2007 hearing)
in custody, Petitioner received four CDC—115 violations, all for non—violent
violations. In addition, Petitioner has maintained the lowest possible
classification score since January 3, 1992.

2. Work, Education, and Self—help Therapy

a.  Work

Petitioner has an excellent work record while in custody. He has

11.

INSERT A

completed two vocational certificates, receiving one in Dry Cleaning and one in Bakery. In addition to his vocational accomplishments, Petitioner has been involved in Prison Industry Authority (PIA), Joint Venture and Mill and Cabinet where he regularly received exceptional work chronos. While working in Joint Venture, Petitioner saved approximately $1,700, paid restitution and provided regular support payments to his mother.

Throughout his period of custody, Petitioner has consistently been lauded as an "excellent" and "outstanding" worker who gets along with staff and inmates. With respect to his work skills, Petitioner has been described as a "quick learner," "consistent," "dependable," "cooperative," and "an asset." In sum, Petitioner's work history is beyond repute.

    b.  Education

Petitioner received his GED in 1987, and has continued to educate himself by reading in his spare time.

    c.  Self-help and Therapy

Though Petitioner has never been diagnosed with mental illness, he has participated in self-help and therapy programs throughout his entire term in custody. Petitioner was involved in both group and individual therapy. Petitioner completed a year of group therapy in 1988. He was also in the CAT T program at CMF, and prior to that he had approximately three years of individual psychotherapy, ending in 1985.

Since then, Petitioner has focused upon his past problems with substance abuse. In this respect, Petitioner began participating in Alcoholics Anonymous (AA) in 1987 and Narcotics Anonymous (NA) in 1988. He has continued his involvement with NA during the course of his time in custody and plans to remain in NA upon his release.

    3.  Psychological Evaluations

12.

INSERT A

Petitioner has obtained positive and supportive psychological evaluations for over 22 years, the great majority of which have been consistently supportive of parole. Beginning in 1986, for a period of approximately 22 years at the time of the 2007 hearing, Petitioner began receiving positive psychological evaluations.

a. 1986 Psychological Evaluation

Dr. Philip Hicks, M.D., analyzed Petitioner on May 30, 1986, in preparation for Petitioner's parole consideration hearing. Dr. Hicks had evaluated Petitioner the prior year, and his fellow-up evaluation noted significant improvement. In particular, Dr. Hicks found:

> The aspects of his personality described a year ago principally as antisocial orientation appears to be modified somewhat in a positive direction. He seems to be more comfortable with himself, has less of a "chip on his shoulder" attitude and is somewhat more thoughtful about himself in relationship to others.... He appears to be maturing somewhat during the past year and no longer demonstrates active antisocial attitudes or behavior. He has remained disciplinary free, he has, however, avoided involvement with A.A. and this is recommended. No psychiatric treatment per se is indicated and his prognosis has improved over the last report.

b. 1987 Psychological Evaluation

On June 29, 1987, Dr. F.H. Ernst, M.D., evaluated Petitioner, noting a generally positive view of petitioner. Dr. Ernst described petitioner, stating:

> He is forthright in talking about himself, including admitting the demonstrated problem of talking about his offense. He describes other offenses clearly. He describes his past use of narcotics. He is open about his previously getting tattooed and his decision some years back to discontinue any more tattoos. He admits being a past drug user. He is clear about his lack of commitment during his use to any working activity; this was prior to coming to CDC. He is clear about the use of alcohol in his youth. He tells of having a quick temper in the past. Apparently that is not as much of a problem now as it used to be. This is especially borne out by the lack of disciplinaries.... Violence potential of the crime for which subject is committed is very high. This potential is estimated to have subsided and now be in the range of normal for the

13.

INSERT A

institutional population.

Dr. Ernst concluded the evaluation with praise for petitioner, stating, "If not paroled, continued present program. Subject is to be commended for his work on himself, improving himself and his self-controls, plus also commended for his contributions to the institution."

c.   1988 Psychological Evaluation.

Dr. Issac Slaughter, M.D., evaluated Petitioner on July 27, 1988, and gave a very positive review of petitioner. Dr. Slaughter based his evaluation upon a year-long relationship with Petitioner as a member of his group therapy. Initially, Dr. Slaughter described Petitioner, stating:

> In all my contact with Mr. Navarro he has been found to be alert, cooperative, and in good control with his environs. He is always neat, prompt and courteous. He does not exhibit any overt thought disorder, delusion, hallucinations, or paranoid ideations.... His grasp, comprehension, and mental ability are above average. His judgment and insight are good.

In evaluating Petitioner's violence potential, Dr. Slaughter found, "While his commitment offense is one of ultimate violence, his violence potential at this time is assessed at a level lower than average for this population." Finally, Dr. Slaughter concluded, "It is my opinion that he has maximized the psychological gains available to his therapy and that there are no psychological contraindications to his being paroled. Any future decision made to not parole him must be based on other than psychological reasons."

d.   1989 Psychological Evaluation

On May 18, 1989, Dr. Bramley Benton, M.D., evaluated Petitioner and gave a very positive review of petitioner, stating, "In his incarceration, Navarro has improved considerably. He is able to socialize well and apparently has the respect of both, other inmates and custody. His violence potential is estimated not to exceed that of the average inmate. If paroled his violence

14.

INSERT A

potential would probably not be greater than it presently is." Dr. Benton concluded, "While incarcerated, further psychiatric intervention will probably not be required."

    e.  1990 Psychological Evaluation

On May 31, 1990, Dr. Clyde Martin, M.D., interviewed Petitioner and gave him a very positive review, finding that, "He seems to understand the causative factors of his crime. He has good self-understanding, positive attitudes, good motivation for change and seemed sincere in his rehabilitation." Dr. Martin also noted that, "In a less controlled setting, such as a return to the community, the inmate is considered likely to hold his present gains unless he returns to his drug and alcohol use." In conclusion, Dr. Martin found Petitioner's "violence potential outside a controlled setting in the past is considered to have been about the same as the average inmate. It is currently decreased."

    f.  1992 Psychological Evaluation

On June 22, 1992, Dr. Sophia Konstantinou, Ph.D. interviewed Petitioner and provided a psychological evaluation. Dr. Konstantinou noted that, "Based on history only, violence potential outside a controlled setting in the past is considered to have been average. At present, inmate Navarro is programming well vocationally and through weekly participation in Narcotics Anonymous meetings."

    g.  1994 Psychological Evaluation

On June 16, 1994, Dr. M.E. Roudebush, M.D., interviewed petitioner for approximately one half-hour. After the brief interview, Dr. Roudebush found, "While inmate Navarro is making a good institutional adjustment, he provides no basis for predicting that he would be able to make an acceptable adjustment in the free world."

INSERT A

 h. 1995 Psychological Evaluation

 On December 31, 1995, Dr. J. Temkova, Ph.D., interviewed Petitioner
for approximately one half-hour and provided a limited analysis of petitioner.
Dr. Temkova found that while petitioner was "polite," he was "quite guarded
and provided very little if any information about himself and his behavior."
Based upon the foregoing, Dr. Temkova was "unable to formulate any specific
opinion."

 i. 1998 Psychological Evaluation

 On March 25, 1998, Dr. Les Carr met with Petitioner and conducted an
in-depth clinical interview combined with psychological testing. Dr. Carr's
findings were very supportive of release. Dr. Carr found petitioner to be
"friendly and cooperative throughout the psychological examination." Based
upon his in-depth analysis of petitioner, Dr. Carr found, "By history, Mr.
Navarro can be classified as an antisocial personality. However, he has
continued to make progress in developing goals and values more in line with
being a responsible member of society. His acquisition of skills while
incarcerated has been a significant factor contributing to his positive
development and maturity." In conclusion, Dr. Carr recommended that "Mr.
Navarro's release date can be based on other than psychiatric considerations."

 j. 2000 Psychological Evaluation

 On November 20, 2000, Dr. Susan Buchan, Ph.D. interviewed Petitioner
and provided an extensive psychological analysis. Dr. Buchan's evaluation
was extremely positive, finding Petitioner's prognosis to be "excellent,"
further stating that "[h]e has never had any symptoms of mental illness and
he is a very strong minded person." In addressing Petitioner's conscious
choice not to talk about the specific details of the commitment offense,
Dr. Buchan noted that this is "surely not motivated by self-interest."

16.

INSERT A

Further, with respect to the commitment offense, Dr. Buchan found that

Petitioner "has sufficient insight into the behavior that led to his crime.

He acknowledges that he was a drug addict since his early teenage years and

was leading a crime-ridden life, without much constructive activity." Based

upon this factor, Dr. Buchan declared, "It is very clear to me that he takes

full responsibility for his crime and has deep remorse about participating.

He particularly regrets the impact on the victim's family."

Dr. Buchan also addressed Petitioner's acknowledged past substance abuse

problems, finding that, "Mr. Navarro's present lifestyle and persona are

antithetical to drug and alcohol use. He is quite invested in his health

and physical fitness. His major hobby is 'working out.' He runs for hours

each day and he does a variety of strength training exercises. He does not

seem at this time to be driven by impulse. Rather he is very self-

disciplined."

Dr. Buchan assessed Petitioner's potential dangerousness as follows:

A. Within a controlled setting: For many years now the subject
has felt that he had moderated his temper and is no longer
reactive in his behavior. This change is certainly underscored
by his conduct in prison. He is consistently noted to be
cooperative and constructive in occupational settings. Mr.
Navarro has not had a CDC-115 for over a decade and he has
not behaved violently in prison. He has had zero classification
points since 1/2/92.

B. If released to the outside community: Mr. Navarro is not
considered as potentially dangerous if released to the outside
community. Mr. Navarro's criminal behavior is related to
substance use. He was intoxicated at the time of his life crime
and he had for years been a heroin addict who ran the streets.
He has consistently attended 12-step programs for the past
14 years. He knows the cost of drug and alcohol use. Of his
past associates, most are dead or in prison. Mr. Navarro has
lost several brothers to heroin addiction and crime associated
with it. He knows better than to seek out this lifestyle. He
wants to avoid the Central Valley, in order to stay away from
influences that led him to prison. If forced to go there because
of parole, he knows to stick to himself and to family. This
is a very practical and strong-minded man. I am confident that
he will do what it takes to stay out of prison.

17.

INSERT A

> Significant risk factors/precursors to violence: As long as
> Mr. Navarro stays away from heroin and other drugs, which he
> is likely to do, there are no risk factors in this case.

In her summary, Dr. Buchan described Petitioner as "a moral person of
good conduct" who is "honest and straightforward in his assertion that he
would rather die in prison than speak of his crime. . . . He asks only to
be judged for his current conduct, for the person who he now." Dr. Buchan
ended her evaluation by concluding, "There is no psychological barriers to
the immediate parole of Lionel Navarro."

### k. 2004 Psychological Evaluation

On November 16, 2004, Dr. E. Zak Bencich, Ph.D., interviewed Petitioner
for approximately one hour. Dr. Bencich noted that Petitioner did express
remorse for his role in the commitment offense, specifically he felt empathy
towards the family members of the victim. In addition to expressions of
remorse, Dr. Bencich also commended Petitioner for his disciplinary free
behavior since 1990. In the end, Dr. Bencich's report was brief, and he did
not feel as though he had enough information from Petitioner in order to
provide a detailed analysis.

### l. 2007 Psychological Evaluation

On March 22, 2007, Dr. Starett, Ph.D., interviewed Petitioner and
evaluated his future propensity for violence to be in the low range. Dr.
Starrett rated Petitioner's overall risk assessment to be in the low range
compared to similar inmates. Dr. Starrett stated that "When asking the inmate
why he  participated or got involved in this crime, the inmate states he
does not like to talk about it. He says he was convicted. The inmate states
he refuses to think about it. He said, quote, it happened, everyone got hurt,
end of quote. He did not want to talk about it. The inmate states that he
feels bad about what happened. He cannot change it. He said, quote, it's

INSERT A

been a long time, I don't like to talk about it, end of quote." (TR. 31-33.)

4. Parole Plans

At the 2007 hearing, Petitioner explained to the Board that his parole

plans have not changed since his previous hearings and that due to the death

of his brother, did not receive any updated letters of support. Mike Gunning,

Petitioner's Board appointed attorney explained as followed:

> He's developed marketable skills that he didn't have beforehand.
> He has apparently a very good work ethic and that will bode
> well for him upon release. And as the Board is well-aware,
> you don't need letters of support. There's nothing in Tittle
> 15 that indicates that. I understand the Boards asks that,
> but there's nothing in Title 15 to require that. He has
> marketable skills, they're viable, he does have old letters
> of support from his family. There's nothing to indicate that
> they have -- based on what I've seen or heard, that they are
> no longer in support, so I would submit that the same support
> that they've been providing him since 1983 are still in place.
> The only reason he didn't go and request new ones was because
> of the fact he lost someone in the family and he did [not]
> want to bother his family."

(TR 50.)

At the previous hearing, in 2005, Petitioner presented realistic parole

plans based upon his extensive familial support in the community. When

released, Petitioner plans to live in Famerville, Tulare County, California,

with his mother. He has also made alternative arrangements with his brother,

Raymond, who lives in Exeter, California. With regard to employment,

Petitioner has offers of employment from Alfred Munoz who owns a landscaping

business and his brother Hector. In addition, Petitioner is skilled in dry

cleaning, woodworking, and he has expressed interest in pursuing one of these

possible areas of employment.

D.  Parole Suitability Proceedings

I.  Initial Parole Consideration Hearing - August 9, 1983

On August 9, 1983, Petitioner attended his initial parole consideration

hearing. During the hearing, petitioner presented evidence of his

INSERT A

participation in AA, his good work reports, and his disciplinary-free behavior. After hearing the evidence of suitability, the Board denied parole based upon the following factors: (1) The commitment offense; (2) Prior criminal history; (3) Psychiatric factors; and (4) Institutional adjustment.

The Board denied parole for two years and recommended that Petitioner: (1) Remain disciplinary free; (2) Upgrade academically; and (3) Participate in self-help programs which will assist him in understanding the social factors of society.

2. First Subsequent Parole Consideration Hearing – August 29, 1985

After considering Petitioner's record, the Board denied parole based upon the following factors: (1)The commitment offense; (2) Previous record; (3) Institutional behavior; (4) Psychiatric factors. The Board noted that petitioner had received a 115 disciplinary for possessing approximately 3 gallons of prison-made alcohol. In its conclusion, the Board recommended that Petitioner: (1) Be disciplinary-free; (2) Work towards reducing his custodial level so that program opportunities will become more available; (3) participate in a substance abuse program, such as AA; (4) Upgrade vocationally and educational.

3. Second Subsequent Parole Consideration Hearing – August 27, 1986

Petitioner attended his third parole hearing and presented the Board with his disciplinary-free behavior. After the presentation of evidence, the Board denied parole for one year. In its decision, the Board cited the following factors: (1) Commitment offense; (2) Previous record; (3) Institutional behavior; and (4) Psychiatric factors. In its conclusion, the Board recommended that he: (1) Remain disciplinary free; (2) Continue to upgrade vocationally and educationally; and (3) Participate in self-help and/or therapy programming.

20.

INSERT A

4.   Third Subsequent Parole Consideration Hearing – August 28, 1987

At his fourth hearing overall, Petitioner presented the Board with evidence of compliance with previous Board recommendations – disciplinary-free behavior, educational upgrading and completion of his GED, and positive work reports. After reviewing the evidence, the Board commended him "for his work performance and his overall positive institutional adjustment."

Following the presentation of Petitioner's positive programming, the Board denied parole for one year. In its decision, the Board relied upon the following factors for its denial: (1) Commitment offense; (2) Previous record; (3) Psychiatric factors. In conclusion, the Board recommended that Petitioner: (1) Remain disciplinary free; (2) Upgrade vocationally and/or educationally; (3) Participate in self-help and/or therapy programming to address his past history of drug and alcohol dependence.

5.   Fourth Subsequent Parole Consideration Hearing – August 24, 1988

At Petitioner's fifth overall hearing, the Board denied parole for one year. In its decision denying parole, the Board relied upon the following factors: (1) Commitment offense; (2) Previous record; and (3) Psychiatric factors.

The Board noted that Petitioner had received a 115 on October 10, 1987, for possession of marijuana. Further, the Board commended Petitioner for obtaining his GED and for his excellent work record. In conclusion, the Board recommended that Petitioner: (1) Become disciplinary free; (2) Upgrade vocationally in an area that is of interest to the prisoner; (3) upgrade educationally; (4) Participate in self-help and/or therapy programming; (5) Remove tattoo if possible.

6.   Fifth Subsequent Parole Consideration Hearing – September 15, 1989

On September 15, 1989, Petitioner attended his sixth parole hearing.

21.

INSERT A

Following the hearing, the board denied parole for one year. Again, the Board cited the following factors in denying parole: (1) Commitment offense; (2) Previous record; (3) Institutional behavior; and Psychiatric factors.

The Board noted that Petitioner had received a 115 on August 23, 1989, for possession of a banned substance. In conclusion, the Board recommended that Petitioner: (1) Become disciplinary free; (2) Upgrade vocationally; (3) Participate in self-help and/or therapy programs.

7.  Sixth Subsequent Parole Consideration Hearing - August 13, 1990

At his seventh overall hearing, Petitioner presented evidence of his parole suitability, including his discipline free behavior, participation in NA and overall self-improvement.

Despite the evidence of suitability, the Board denied parole for seventh time. In its two-year denial, the Board specifically identified following grounds: (1) Commitment offense; (2) Previous record; (3) Institutional behavior; and (4) Psychiatric factors.

In conclusion, the Board recommended that Petitioner: (1) Remain disciplinary free; (2) Upgrade vocationally and/or educationally; (3) Participate in self-help and/or therapy programming.

8.  Seventh Subsequent Parole Consideration Hearing - September 30, 1992

Petitioner attended his eighth parole hearing before the Board and presented significant evidence of suitability, including: exceptional work reports, committed participated in NA and vocational accomplishments. The Board wrote the first full decision of its findings, denying parole for two years. In the decision, the Board explained the reason for denying parole, stating, "Basically, it's because of the commitment offense itself. In which you and two other crime partners engaged in a murder of one, Mr. Gonzales over money." The Board also cited an escalating pattern of criminal conduct

22.

INSERT A

and violence, lack of programming, and the negative psychological evaluation.

The Board recommended that Petitioner "remain disciplinary-free, that you continue in metal fab, that you continue your NA, that you attend Breaking Barriers, that you attend a board group, that you attend vital issues and [inaudible]."

9. Eighth Subsequent Parole Consideration Hearing —August 16, 1994

At his ninth hearing, Petitioner presented the Board with evidence of his exceptional programming and suitability, as well as his vocational upgrading and commitment to NA — in substantial compliance with the past Board recommendations.

With the overwhelming evidence of suitability, the Board nonetheless denied parole for the ninth time based primarily upon the commitment offense. In its decision, the Board found:

> The offense was carried out in a manner which exhibits a callous disregard for the life and suffering of another. The offense was carried out in a dispassionate and calculated manner.... Previous record: You have a record of violence or assaultive behavior, an escalating pattern of criminal conduct and/or violence, a persistent pattern of tumultuous relationships and criminal behavior which commenced at an early age,,,, Institutional behavior: You've programmed in a limited manner while incarcerated.... The psychiatric factors: The psychological report dated 6/16/94, authored by Dr. M.E. Roudebush — and briefly, in this report Dr. Roudebush says under conclusions, "While inmate Navarro is making a good institutional adjustment, he provides no basis for predicting that he would be able to make an acceptable adjustment in the free world."

Following its denial, the Board recommended that Petitioner: (1) Remain disciplinary free; (2) Upgrade vocationally and educationally; and (3) Participate in self-help and therapy programming.

In closing, Commissioner Guaderrama remarked upon Petitioner's silence in response to questions regarding his commitment offense, stating:

> You know, I'm just a little at loss to understand why your attitude is like it is here today. You don't sound like a man

INSERT A

> that wants to get out of prison. I'm not sure that's because
> you feel comfortable here or you like prison. But like your
> attorney said, you're going to have to convince the panel one
> of these days that you're ready to go, get out on the outside
> and be a free person. But until you start really become
> convincing that that's what you want to do, it's not going
> to happen. Because you've got to remember that you're a life
> prisoner and you could stay here until you die. You know that's
> a long time.

10.  Ninth Subsequent Parole Consideration Hearing – March 28, 1996

At Petitioner's tenth overall hearing, the Board had before it evidence

of his exceptional work reports, his participation in AA and NA, and his

disciplinary free behavior. Despite Petitioner's showing, the board denied

parole, stating:

> The reasons are, number one, the very violent type of crime
> committed, a crime committed during the course of an attempted
> robbery, His prior criminal record began at an early age....
> The third reason insufficient programming in the institution.
> We commend the prisoner for upgrading in the vocational area.
> We note that he has had six 115's since he's been incarcerated,
> the last being on 11/30/90 for disobeying orders. We also note
> that he has upgraded in the self-help area and participated
> in the self-help arena, particularly AA. And his work reports
> are good. The board report by CCI Jeppeson, dated March of
> 1995 states the prisoner would pose a moderate degree of threat
> to society if released.

In closing, Presiding Commissioner Koenig warned Petitioner about

asserting his right to remain silent on the issue of his commitment offense,

declaring:

> Just one word, I know you did the same thing last time, but
> we could conduct hearings without the prisoner simply by going
> through the records in the file, but society feels it's
> important that the panel meet with the prisoner and talk with
> the prisoner and get his feelings about the crime and remorse
> ad et cetera, that's how we come to a conclusion. It's too
> bad that you don't participate in the hearings. I just want
> to advise you that that's your right, also you don't have to
> come to a hearing period, you don't have to come here and sit
> if you don't want to. I would advise you in the future that
> you do participate in the hearing, but I know other panels
> have advised you of this also. So you're really only hurting
> yourself. Okay.

24.

INSERT A

11. Tenth Subsequent Parole Consideration Hearing — June 17, 1998

Petitioner attended his eleventh hearing on June 17, 1998. At the hearing, Petitioner presented the Board with eight years of disciplinary-free behavior and exceptional work reports and self-help programming.

After considering the overwhelming evidence of suitability, the Board denied parole. In its decision, the Board stated:

> The first reason is the commitment offense which was carried out in a manner that shows no regard for the suffering of other people.... We find our second reason is your previous history. You had a very unstable social history and an early involvement with drugs.... We find our third reason is in prison you've been (sic) some things real well. You've been disciplinary-free for the past eight years, you've upgraded vocationally, and you've, but you've done something that has not been good and that's that you've gotten out of NA, and you've just got to make that a life time commitment to follow through with that and learn the 12 steps.

At the conclusion of the hearing, the Board recommended that Petitioner, "remain disciplinary free, that [he] continue upgrading as you can vocationally and educationally, that [he] participate in self-help and any available therapy. Presiding Commissioner Bently ended the hearing by stating, "I'd really like to encourage you to consider for your next hearing, is to talk to us about the crime. Tell us what your role was in it, because it's not clearly not clear to us in the reports and it will help us understand you a little bit better in determining whether you've got, gained any insight."

12. Eleventh Subsequent Parole Consideration Hearing — February 27, 2001

On February 27, 2001, Petitioner attended his twelfth hearing. At the hearing, the Board considered Petitioner's disciplinary free behavior for over a decade, his completion of two vocations, his exceptional work reports, and laudatory chronos for his NA participation. In denying parole for one year, the Board listed its reasons, stating:

INSERT A

Many factors were considered. First and foremost was the
commitment offense itself. This offense was carried out in a
cruel manner, a manner -- a manner which demonstrates a callous
disregard for human suffering. And it was also carried out in
a calculated manner, a vicious and violent manner.... Regarding
the inmate's criminal history, the prisoner has, on previous
occasions, inflicted or attempted to inflict serious injury
on a victim.... He was -- he has a history of unstable and
tumultuous relationships. I'm referring to his emerging in the
drug lifestyle and his relationships with his -- with what I
would consider gangs, his peers in his neighborhood. He denies
there was a gang relationship. I disagree.... In regards to
his institutional behavior, the inmate has programmed fairly
well, but this Panel feels he has not sufficiently participated
in beneficial self-help and therapy programming.... And as far
as the psychiatric factors go... [the most recent report] is
not totally supportive.

The Board recommended that Petitioner, "remain disciplinary-free and

when available, participate in any and all self-help therapy," for his future

parole suitability.

### 13. Twelfth Subsequent Parole Consideration Hearing - April 24, 2002

Petitioner, again, substantially complied with the Board's

recommendations - remaining disciplinary-free and attending his NA meetings

regularly. Despite the showing of compliance at his thirteenth hearing, the

Board, again, found him unsuitable for parole, finding that he would "pose

and unreasonable risk of danger to society or a threat to public safety if

released from prison." In its decision, the Board again relied primarily

upon the commitment offense, explaining:

Number one, the committing offense, The offense was carried
out in an especially cruel and callous manner. The offense
was carried out in [a] manner which demonstrates an
exceptionally callous disregard for human suffering.

The Board cited additional factors of unsuitability in support of its

decision, including: previous record, institutional behavior, and insufficient

parole plans. Further, the Board suggested:

That the prisoner still needs therapy in order to face, discuss,
understand, and cope with stress in a nondestructive manner.
Until then -- The prisoner can (indiscernible) understand the

26.

INSERT A

> causative factors of why the prisoner is here today. Until
> progress is made the prisoner continues to be unpredictable
> and a threat to others. Therapy in a controlled setting is
> needed but motivation or amenability are questionable.

The Board made the following recommendations: (1) Remain disciplinary

free; (2) If available, participate in beneficial self-help and therapy

programming; and (3) Verify parole plans.

In closing, Presiding Commissioner Moore admonished Petitioner, warning:

> The other point to you, Mr. Navarro, is that don't waste your
> time or mine. If [you] know that you are not ready because
> you haven't done the work, then don't waste people's time.
> Don't waste your time, don't waste your counselor's time, don't
> waste the Board's time.

The Board denied parole for two years.

14. Thirteenth Subsequent Parole Consideration Hearing - August 24, 2004

At his fourteenth hearing, the Board requested a one-year postponement

in order to obtain an updated psyche report for petitioner.

15. Fourteenth Subsequent Parole Consideration Hearing - June 30, 2005

On June 30 2005, Petitioner attended his fifteenth parole consideration

hearing. At the very beginning of the hearing, Presiding Commissioner Lee

admonished petitioner about exerting his right to remain silent regarding

the commitment offense, stating:

> Alright. Mr. Navarro, the law says very clearly you are not
> required to admit the crime. Do you understand that and I
> understand that.... However, I will indicate to you that you
> know in the Board packet there is evidence against you and
> you have no version every (sic) you were originally arrest[ed]
> you have never indicated your version of the story. My personal
> belief having been a prosecutor as well as sitting on the
> bench and being a defense counsel it looks like you're covering
> somebody and it's probably your brother who was found with
> the knife and (indiscernible). And that you feel a
> responsibility toward him and that over these years you have
> kept that responsibility and you don't want to lay it off
> on him. Something of that nature. Having said that, I will
> indicate to you that that will be problematic, that there
> is only one version and that version puts you in a very poor
> light. So having said that are we ready to proceed?.... Are
> you sure you don't want me to recuse myself right now?

27.

INSERT A

Petitioner declined Presiding Commissioner Lee's offer to recuse himself, and the Board proceeded with the hearing. During the course of the hearing, the Board considered Petitioner's disciplinary free behavior for a period of over 15 years, his exceptional work report, his positive psychological evaluation and counselor reports, his vocational and educational upgrading, and his ongoing participation in NA. In sum the Board considered the overwhelming evidence of suitability, but chose to deny parole once again. In its decision the Board found:

> The offense was carried out in a cruel and callous manner, (indiscernible) inexplicable and very trivial in relationship to the offense. It is very clear that the facts of the case the inmate was involved in a robbery of an individual who ended up dying (indiscernible) is because of that particular case, that robbery is a dangerous enterprise and that individuals do get injured or killed ant that no one is excused from their activities even though they were not the actual (indiscernible) did not intend to kill someone. However, I will note the following. Mr. Navarro, (indiscernible) to pay attention to me. I went over the facts of this case. The facts of the case are very unique. The witnesses there were [two] individuals who approached the victim. One individual who approached the victim. One individual had a knife, the other individual later struck the person in the head. Neither of those individuals was you. Also, immediately after the offense they went and attempted to rob another individual by the name of Mr. Silva. That individual identified two individuals that was not you. The other reason for the denial, and maybe the District Attorneys in the past review factual, actual scenarios and actually look into the case. How your brother, Andy, got a second degree murder I do not know in light of the individual with the pipe and you ended up with a first degree murder.

The Board, secondarily, cited the other factors of Petitioner's previous record, and the Tulare County District Attorney and Farmersville police department opposition.

In closing, Presiding Commissioner Lee explained the multiple year denial, stating:

> In a separate decision, this Panel finds that it is not reasonable to expect parole would be granted in the next two years. Most of your denials have been two years. There's no difference in this Board, this time. One year would give you

INSERT A

> false hope.... The reason for the two year denial is the
> multiple victims were attacked (indiscernible) defense though
> as I indicated it appears that you were not involved in it
> in some way....

The Board close the hearing, recommending that Petitioner, "remain[]
disciplinary free, continue to upgrade vocationally and educationally if
possible, participate in self-help and therapy programming (indiscernible).

16. Fifteenth Subsequent Parole Consideration Hearing – July 24, 2007

On July 24, 2007, Petitioner attended his sixteenth parole consideration
hearing. Despite the evidence of complying with the Board's recommendations
when he received a two year denial in 2005, the Board denied petitioner
parole for three years. There is no evidence that indicates that Petitioner
needs to show insight and remorse in order to be found suitable. Petitioner's
psychological evaluations do not support the Board's conclusion.

All the above information was available in Petitioner's Central-File
and before the Board in 2007, but the Board ignored it.

H.   The Board's Use Of The District Attorney's Opposition Of Parole
As Evidence To Deny Parole Violates Due Process.

In Hayward v. Marshall, (2008) DJDAR 93, the Ninth Circuit Court of
Appeal stated that "Even though the district attorney is permitted to attend
parole hearings and express an opinion on the prisoner's suitability for
parole, see Cal. Penal Code § 3041.7 (providing that prosecutor may be
present at a parole hearing 'to represent the interest of the people'),
the district attorney's opinion, without more, cannot be considered 'some
evidence' under Hill that supports the Governor's reversal of parole.
Rosenkrantz v. Marshall, 44 F. Supp.2d 1063, 1080 n. 14 (C.D. Cal. 2006).
(Id. at n. 9.)

I. There Is No Evidence Of A Previous Record Of Violence And The Board's
Reliance On Pre-Commitment Behavior To Deny Parole Violates The State And
Federal Constitution Due Process Clauses.

INSERT A

In its decision, the Board also cited Petitioner's "previous record," as a factor of unsuitability supporting denial of parole. Under the regulations, the fact that a prisoner has a previous record of violence, or that "[t]he prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated assaultive behavior at an early age," tends to indicate that he is unsuitable for parole. 15-CCR § 2281(c)(2). Accordingly, evidence that a prisoner "lacks any significant history of violent crime" tends to indicate suitability. 15-CCR § 2281(d)(6). The Board does not use the precise phrasing of the regulations, but it clearly uses the general language of the regulations to indicate a factor of unsuitability. There is simply no evidence to support the Board's finding.

While Petitioner has a prior record of convictions, only one of the convictions involved violence (assault with a deadly weapon), and one of the convictions constituted serious offenses. The Board emphasized the assault with a deadly weapon charge from 1972, as it was the only prior conviction involving violence, however Petitioner did not receive any prison time for this offense. Indeed, Petitioner was granted probation based on the assault offense, indicating that it was not particularly serious. Moreover, it is unreasonable to conclude that Petitioner's criminal history sets forth an "escalating pattern of criminal conduct," as the last five offenses leading up to the commitment offense were petty offense, the most recent conviction being possession of an open container (in an automobile).

Thus, in asserting future dangerousness, Petitioner's convictions related to his substance abuse provide no reasonable relationship to the commitment offense such that they indicate an "escalating pattern" of violence. Common sense and professional opinion in the record contradict the Board's finding.

30.

INSERT A

The Board's reliance on Petitioner's past offense as escalating a pattern
of significant violence and a factor of unsuitability is unreasonable.

Denial of parole where there are no circumstances that could be
considered more violent or aggravated than the minimum necessary to sustain
a conviction for that offense "would be inconsistent with the statutory
requirement that a parole date normally shall be set 'in a manner that will
provide uniform terms for offenses of similar gravity and magnitude in
respect to their threat to the public....' (Pen. Code, § 3041, subd. (a).)
'The Board's [and the Governor's] authority to make an exception [to the
requirement of setting a parole date] based on the gravity of a life term
inmate's current or past offenses should not operate so as to swallow the
rule that parole is "normally" to be granted.'" (In re Rosenkrantz, supra,
29 Cal.4th 616, 683.)

In this instance, the Board has denied parole sixteen times based upon
the same reasoning and unchangeable factors. To remand for reconsideration
to the Board would "amount to an idle act." (In re Scott, supra, 133
Cal.App.4th 573, 603; see also In re Smith (2003) 109 Cal.App.4th 489, 507.

For the foregoing reasons, the Court should reverse the Board's decision
and order that the Board release petitioner immediately and discharged from
parole. 15 CCR § 2345.

INSERT B

### Ground 2

THE BOARD OF PAROLE HEARING'S THREE-YEAR DENIAL WAS NOT WARRANTED
OR SUPPORTED BY "SOME EVIDENCE" AND THEREFORE ARBITRARY AND
CAPRICIOUS IN VIOLATION OF STATE AND FEDERAL DUE PROCESS.

On July 27, 2007, the Board of Parole Hearings issued a three-year denial
of parole to Lionel Navarro ("Petitioner"). To do so was arbitrary. Generally,
if the Board finds an inmate unsuitable for parole it must conduct subsequent
parole consideration hearings annually. See Penal Code § 3041.5(b)(2). One
exception relevant here is that if an inmate has been convicted of murder,
the hearing may be deferred for "up to five years" if the Board "finds that
it is not reasonable that parole would be granted at a hearing during th[ose]
years." See Penal Code § 3041.5(b)(2)(B). The Board's decision to defer the
annual hearing is guided by the same criteria used to determine parole
suitability. See 15 CCR § 2270(d), citing 15 CCR § 2402.

In an unpublished decision (referred to herein because of its unique
relevance to the instant Petition) the Court of Appeals held that an inmate
should not receive a multi-year denial when the grounds for unsuitability —
namely, limited insight into the instant offense — could not be cured within
one year. See  In re Lozano 2007 WL 117709. As applied to Petitioner, any
alleged defects in his parole suitability — such as needing additional time
for therapy or rehabilitative programming — could be easily accomplished via
additional insight within one year. For Petitioner in the instant case, a three
year denial by the Board was arbitrary and capricious given that: (a) Courts
have previously reasoned that the recent timing of additional insight should
not be of relevance in determining parole suitability (In re Lee, supra.);
(b) the prison psychologist did not suggest the need for additional therapy
as being pivotal to Petitioner's risk to society; and (3) Petitioner's
in-custody history does not demonstrate impulse control issues, assaultive
behavior, or other criminal proclivities which would indicate a need for long—

32.

INSERT B

term therapy.

California case law provides that the decision to defer a parole hearing longer than one year "may involved some of the same facts on which the unsuitability determination is based. What is required ... is an identification of reasons which justify the postponement," and a recognition that the Board is making a separate decision. In re Jackson (1983) 39 Cal.3d 464, 479; see also People v. Belmontes (1983) 34 Cal.3d 335, 347-348.

The Board not only erred in denying parole but in issuing a multi-year denial of three years because Petitioner's case for parole (from his previous hearing of 2003 and 2005) had improved, not worsened, despite the Board's issuance of a three year denial. In fact, since his previous parole denials of two years in 2005 and one years in 2004, two years in 2002, one year in 2001, two years in 1998, two year in 1996, two year denial in 1994, two years in 1992, two years in 1990, one year in 1989, one year in 1988, one year in 1987, one year in 1986, one year in 1985, and two years in 1983, the initial parole consideration hearing. Petitioner had continued to remain disciplinary free since 1990; had maintained his classification score to 19 (the established minimum); had participated in additional self-help programs including: Necrotic Anonymous issued a three-year denial while failing to discuss why a longer period of denial was warranted.

California courts have recently scrutinized the practice of issuing multi-year denials after single year denials when inmates' parole have improved as indicative of pro forma consideration meant to address the Board's large backlog problem by reducing the number of annual hearings rather than giving the required individualized consideration required at such hearings. In re Rutherford, Case No. SC135399, CAL. No. A114357 (Marin County Superior Court)(pending appeal). In In re Rutherford, which is styled as a class action,

33.

INSERT B

the Marin County Superior Court prescribed remedies and scheduling requirements to eliminate the 3,000 plus cases of late parole hearings by setting limits on the circumstances under which a panel could issue a multi-year denial. (See Exhibit 2, attached hereto, wherein the Marin County Court observed, "Respondents are ordered not to deny further parole consideration for more than one year in the case of prisoners who have formally denied for one year, in the absence of a significant change in circumstances, which must be stated on the record.")Given this strong directive of the Marin County Superior Court in a class action and the above authorities, it is notably suspect that Petitioner was given a multi-year denial after without explanation as to any alleged changed in circumstances.

As previously pointed out, the Board must do more than merely commend Petitioner for his programmatic achievements while in prison. They must actually consider these factors "as circumstances tending to show suitability for parole." Ramirez, (2001) 94 Cal.App.4th 571-72.

Furthermore, there is nothing in the entire record of numerous psychological evaluations to suggest that Petitioner needs additional time for self-help or therapy. To the contrary, Petitioner's most recent psychiatric evaluation found that, his "propensity for future violence" is in the "low range." (TR 31.) Under California law, Ramirez, supra, at 571-572  the Board cannot ask for anger management when this requirement or suggestion is not supported by the psychiatric reports. Ramirez found, "The Board's readiness to make a finding so at odds with the record supports Ramirez's claim that his parole hearing was a sham. It is not surprising that the trial court regarded the Board's finding with deep suspicion." The same may be said in Petitioner's case when the Board calls for three years of additional self-help when none is mandated by the person's own psychiatrist or evidence by

34.

INSERT B

Petitioner's in-custody history.

It should be noted that just last month, it was made public that Robert "Bobby" Rodriguez, a veteran employee of the BPH who supervises more than 100 deputy commissioners who make decisions on tens of thousands of parole revocation cases every year, was arrested for driving under the influence at twice the legal limit. In the state owned vehicle with Mr. Rodriguez, was John Monday, the executive director of the parole board, who was a passenger was believed to also have been intoxicated. (http://www.latimes.com/news/local/la-me-parole8dec08,15986773.story?coll=la-headlines-california&ctrack=1&cset=true.) While Mr. Monday and Mr. Rodriguez were fortunate nobody was hurt or killed as their car veered into the incoming traffic lane, it puts into perspective how dangerous alcohol abuse can be and how wrong choices can be made by even those who condemn such behavior as reason to deny parole, but how one can still overcome that problem, bad choices, and function in society without an unreasonable risk to public safety. Mr. Monday and Mr. Rodriguez are still on the job overseeing the parole process today, without the safeguards the parole board places on Petitioner, or others similarly situated. It is hoped Mr. Rodriguez and Mr. Monday will rise to their alcohol problem in a positive manner as demonstrated by Petitioner.

In conclusion, this Court should order Petitioner released from prison. Petitioner is a reformed man who has addressed the issues that resulted in his incarceration, with an impeccable record of prison behavior who has much to contribute to society. He has now been in prison for over twenty-three years longer than his minimum eligible release date of May 15, 1984. The BPH's abuse of discretion, which it committed by failing to consider all of the evidence in support of paroling Petitioner — empowered this Court to overrule the BPH and order his release.

INSERT C

Ground 3

THE CALIFORNIA BOARD OF PAROLE HEARINGS VIOLATED
PETITIONER'S STATE AND FEDERAL DUE PROCESS WHEN IT
CONTINUE TO RELY ON THE 30 YEAR OLD COMITTMENT OFFENSE
TO DENY PAROLE, DESPITE PETITIONER'S DISCIPLINARY FREE
RECORD OF OVER 15 YEARS WITH NO RECORD OF VIOLENCE
THROUGHTOUT HIS ENTIRE INCARCERATION.

The commitment offense no longer supplies any evidence that petitioner posed a

danger to public safety. The board failed to articulate a nexus between Petitioner's thirty

(30) year old commitment offense and current dangerousness. Petitioner asserts that the

panel of July 27, 2007, violated his state and federal due process rights by failing: to set

his term in accordance with Penal Code Section 3041, et seq; by engaging in an arbitrary

and unconstitutional determination that his crime was particularly egregious; by failing to

adduce any evidence that was probative of a finding that he is currently dangerous; by

failing to find him suitable for parole in accordance with the Board Regulations set forth

in sections 2280-2343 of the California Code of Regulations; and by violating the due

process requires by applicable case law. Petitioner also maintains that there was **no**

**evidence**, niether "some" or the Board's standard of a "preponderance of the evidence,"

underlying the "reasons" the Board articulated for finding him unsuitable for parole and

more importantly NO EVIDENCE that he is currently dangerous.

The panel's weighty and unreasonable reliance on unalterable factors including

the crime itself violate his due process rights. The Board has in effect resentenced

petitioner from a term of seven (7) years to life, to life without the possibility of parole.

(See Cal. Penal Code section 190.2.)

Petitioner was denied parole, for the sixteenth time, based on the gravity of the

commitment crime, the circumstances of which can never change. Therefore, the Board's

continued sole reliance on the commitment offense will essentially convert petitioner's

INSERT C

sentence of life with the possibility of parole into a sentence of life without the possibility of parole.

"[T]he measure of atrociousness is not general notions of common decency or social norms for by that yardstick all murders are atrocious." In re Lee (2006) 143 Cal. App. 4th 1400, 1401. Viewed under the appropriate guidelines, petitioner's crime does not qualify as unusually calculated, cruel or callous. He did not taunt the victim or gloat over his distress. See People v. Misa (2006) 140 Cal. App.4th 937. 842-843.

The California Court of Appeal in In re Elkins (2006) 144 Cal. App. 4th discussed the use of the gravity of the commitment offense to support a denial of parole:

"Scott II summarizes the law in this situation. 'The Governor's assumption that a prisoner may be deemed unsuitable for release on the basis of the commitment offense 'alone' is correct [citation], but the proposition must be properly understood. The commitment offense is one of only two factors indicative of unsuitability a prisoner cannot change (the other being his 'Previous Record of Violence').

Reliance on such an immutable factor 'without regard or consideration of subsequent circumstance' may be unfair [citation], and runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation. [Citation]

The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison. Yet, the predictive value of the commitment offense may be very questionable after a long period of time.

37

INSERT C

Thus, denial of release based solely on the basis of the gravity of the commitment offense warrants especially close scrutiny." (Scott II, supra, 133 Cal App. 4[th] at pp 594-595, fns. omitted.)

The Court of Appeal stated "it violates due process to deny parole "where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense." (Scott II, supra, 133 Cal. App 4[th] at p. 598)..."

The Court of Appeal, in Elkins, also observed: "We also take into account that whatever facts make a given offense aggravated or mitigated, compared to the hypothetical average are not overlooked or disregarded when the Board sets a release date...A release date is set by a calculation under matrixes Section 2403, subds. (b)-(f) that require the Board to weigh myriad facts of the offense that might be aggravating (Section 2404) or mitigating (Section 2405), including any factors that would have been considered by a judge in choosing a determinate sentence...Thus [the Board]...must remain focused not on circumstances that may be aggravating in the abstract but, rather, on facts indicating release currently poses "an unreasonable risk of danger to society." (Section 2402, subd. (a); accord, Pen. Code, Section 3041, subd. (b))."

The Board's reliance on Petitioner's commitment offense, which took place 25 years ago to deny parole, was unreasonable. A plethora of recently issued California state and federal district court decisions uniformly holds that evidence of even particularly egregious facts of commitment offenses is not tantamount to evidence of undue current parole risk absent articulation of a nexus between those entities. Willis v. Kane, 485 F. Supp. 2d 1126, 1135 (N.D. Cal. 2007) ["Notwithstanding the terrible nature of the crime,

INSERT C

the critical question the BPH was supposed to decide at the parole suitability hearing was

whether 'consideration of the public safety requires a more lengthy period of

incarceration for this individual'...Willis' 1983 crime did not provide sufficient evidence

to find him unsuitable for parole in 2003."] Martin v. Marshall, 431 F. Supp. 2d 1038,

1049 (N.D. Cal. 2006);

Blankenship v. Kane, 2007 WL 1113798 at *10 (N.D. Cal. 2007) ["...the California

regulations require...some evidence that the prisoner poses a present danger to

society...continued reliance over time on an unchanging factor...the commitment

offense...does not provide evidence of a present danger to society"]; Thomas v. Brown,

2006 WL 3783535 at *6 (N.D. Cal. 2006]; Rosenkrantz v. Marshall, 444 F. Supp 3d.

1963, 1086 (C.D. Cal. 2006)

The Board's determination that petitioner's crime was especially cruel or egregious is

unconstitutionally vague and standard less. See United States v. Doremus (9th Cir. 1989)

888 F. 2d 630, 634.

The Board relies on any fact of the crime to bolster its conclusion that the crime is

particularly egregious. The Board makes a determination that virtually ALL life crimes

are particularly egregious.

The Board's characterization of petitioner's crime as exceptional was arbitrary since

the Board and governor routinely and invariably characterizes all offenses carrying life

terms as exceptional. Petitioner asks this Court to take judicial notice of the order in

**MIKE NGO On Habeas Corpus [Superior Court of Santa Clara, No. 127611,**

**August 30, 2007]** where the Honorable Linda Condron found comprehensive evidence

indicating that the state's Board of parole hearings completely disregards the detailed

INSERT C

standards and criteria of the parole release statute, 15 CCR Section 2402 (c) and thereby

denies prisoners' due process rights.

The Honorable Judge Condron found:

> "In summary, when every single inmate is denied parole because his or her crime
> qualifies as a Section 2402(c) (1) exception to the rule that a parole date shall normally be
> set, then the exception has clearly swallowed the rule and the rule is being illegally
> interpreted and applied.
> When every single life crime that the Board examines is "particularly egregious" and
> "especially heinous, atrocious or cruel" it is obvious that the Board is operating without
> any limits and with unfettered discretion."

Based on the arbitrary characterization of every murder as being exceptional, the

Board's decision denying parole for petitioner is per se invalid because he was denied his

constitutional right to be heard by an impartial decision-maker. See Withrow v. Larkin,

421 U.S. 35, 47, 95 S. Ct. 1456, 43 L. Ed. 2d 712 (1975) ("Not only is a biased decision

maker constitutionally unacceptable but "our system of law has always endeavored to

prevent even the probability of unfairness.")

When an inmate is found suitable for parole, the Board does not deem the crime as

particularly egregious. However, the governor when reviewing the Board's determination

may disagree and consider the crime as particularly egregious and deny parole. At a

subsequent hearing the Board may again classify the crime as particularly egregious.

The change in classification of the very same crime from being non-exceptional to

particularly egregious demonstrates the arbitrariness of the classification process itself.

The Board's use of uncharged and unproven elements of his crime to continue

denying parole violates petitioner's constitutional right to a jury trial. See Apprendi v.

New Jersey, 530 U.S. 466, 490.

INSERT C

There are no elements of Petitioner's commitment offense that exceed the minimum elements of the crime of first degree murder. (See In re Elkins, 144 Cal.App.4th 475 (2006).) No characteristics of Petitioner's crime indicate that he would pose an unreasonable threat to public safety if he were to be released on parole. No factors relating to Petitioner's prior and post-commitment conduct tend to show that he is not suitable to be released under the supervision of parole. Petitioner's lack of significant criminal history and his institutional behavior are circumstances which tend to show suitability in his particular case.

Murder, by its very nature is heinous, atrocious and cruel. For one to be found to be "especially heinous, atrocious and cruel," it must be presented to a jury (Cal. Penal Code § 190.2 (14) and § 190.4). Any murder is malicious and unlawful and justifies imprisonment and, under current law, sometimes more than imprisonment. However, certain fundamental principles applying to punishment and parole have been written into law and further articulated by the state and federal courts. These principals must be followed by the Board, however unpalatable or inconvenient they may be to the commissioners. As expressed by Justice Richman in In re Barker, 151 Cal.App.4th 346 (Cal. Ct. App. 2007), although murderous conduct cannot be excused or minimized, the system provides for parole in appropriate circumstances. If the prisoner has met the prerequisites for release, the prisoner must be released. Returning to precedent, Justice Richman wrote: "All murders represent the basest form of human behavior. Our laws, however, provide for mechanisms by which even murderers, in limited circumstances, are entitled to be paroled. The judiciary has an obligation to execute those laws. The record established that Lee does not pose an unreasonable risk to public safety. Any contrary conclusion lacks any evidentiary support." Id. at 378 (quoting Lee, 143 Cal.App.4th at 1414) (footnote omitted).

Petitioner's record does not contain the factual basis needed to support an inference that he currently pose a risk to public safety. He must be released.

CONCLUSION

Petitioner Lionel Navarro has served a term equivalent to one had he been

Petitioner Lionel Navarro accepts responsibility for his crime and does not seek to minimize its impact. He choice not to talk about the commitment offense is based on Cal. Penal § 5011. The Board's decision finding Petitioner unsuitable for parole is not supported by some evidence and it is arbitrary. Because the Superior Court's adoption of that decision is contrary to, or involves an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, the Court should grant the Petition for Review.

Dated: July 12, 2008

Respectfully submitted

Lionel Navarro

Lionel Navarro
Petitioner in Pro Se

(b)  At arraignment and plea _____

(c)  At trial _____

(d)  At sentencing _____

(e)  On Appeal _____

(f)  In any post-conviction proceeding  Jennifer M. Sheetz, 38 Miller Ave., Mill Valley,
CA 94941. This Court appointed Sua sponte.

(g)  On appeal from any adverse ruling in a post-conviction proceeding _____

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time

Yes ☒  No ☐

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack:

Yes ☐  No ☒

(a)  If so, give name and location of court which imposed sentence to be served in the future: _____

(b)  Give date and length of the above sentence: _____

(c)  Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?

Yes ☐  No ☐

Wherefore, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding

_____
Signature of Attorney (if any)

I declare under penalty of perjury that the foregoing is true and correct. Executed

_July 12, 2008_
(date)

_Lionel Navarro_
Signature of Petitioner

(7)

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS


In the matter of the Life )
Term Parole Consideration )
Hearing of:               )      CDC Number B-91886
                          )
LIONEL NAVARRO            )
                          )
_____)


SAN QUENTIN STATE PRISON

SAN QUENTIN, CALIFORNIA

JULY 24, 2007

8:56 A.M.


PANEL PRESENT:

Sandra Bryson, Presiding Commissioner
Deborah Star, Deputy Commissioner


OTHERS PRESENT:

Mike Gunning, Attorney for Inmate
Afreen Kaelble, Deputy District Attorney
Cynthia Smith, Observer
David Hymas, Observer
R.E. King, Observer
Correctional Officer(s), Unidentified


CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____    No     See Review of Hearing
_____    Yes    Transcript Memorandum


**GITA SCHMITZ**

**FOOTHILL TRANSCRIPTION COMPANY, INC.**


EXHIBIT A

**INMATE**

<u>INDEX</u>

Page

Proceedings ................................................ 1

Case Factors ............................................. 11

Pre-Commitment Factors ................................... 17

Post-Commitment Factors .................................. 22

Parole Plans ............................................. 36

Closing Statements ....................................... 42

Recess ................................................... 52

Decision ................................................. 53

Adjournment .............................................. 62

Transcriber Certification ................................ 63

--oOo--

1

 1                    P R O C E E D I N G S

 2          PRESIDING COMMISSIONER BRYSON:  This is the 15th

 3    Subsequent Parole Consideration Hearing for Lionel

 4    Navarro, CDC Number B-91886.  Today's date is July 24th,

 5    2007, and the time is 8:56.  We're located at San Quentin

 6    State Prison.  This inmate was received April 6th, 1978 in

 7    Tulare County.  The life term began in April 6th, 1978

 8    with a minimum eligible parole date of May 15th, 1984.

 9    Charging in Case Number 18308, Count One and controlling

10    offense, Penal Code 187, Murder First; with Count Two,

11    Penal Code 664/211, Attempted Robbery, that's Robbery

12    Second (inaudible) the weapon, a metal pipe, for which the

13    inmate received a term of life.  This hearing is being

14    recorded.  For the purpose of voice identification, each

15    of us will state our first and last name, spelling the

16    last name.  When it is your turn, sir, after spelling your

17    last name, please state your CDC number.  I will start and

18    go to my left.  Sandra Bryson, B-R-Y-S-O-N, Commissioner,

19    Board of Parole Hearings.

20          DEPUTY COMMISSIONER STAR:  Debra Star, S-T-A-R,

21    Deputy Commissioner, Board of Parole Hearings.

22          DEPUTY DISTRICT ATTORNEY KAELBLE:  Afreen Kaelble,

23    Deputy District Attorney, K-A-E-L-B-L-E.

24          MS. SMITH:  Cynthia (phonetic) Smith, S-M-I-T-H,

25    viewing.

2

```
 1          MR. HYMAS:  David Hymas, I'm an attorney in San
 2    Francisco with Morrison and Foerster.  I'm observing.
 3          PRESIDING COMMISSIONER BRYSON:  Please spell your
 4    last name.
 5          MR. HYMAS:  H-Y-M-A-S.
 6          MR. KING:  R.E. King, K-I-N-G, I'm observing.
 7          PRESIDING COMMISSIONER BRYSON:  Thank you.
 8          ATTORNEY GUNNING:  Mike Gunning, G-U-N-N-I-N-G,
 9    I'm the attorney for Mr. Navarro.
10          INMATE NAVARRO:  Inmate Navarro,
11    N-A-V-A double-R-O.  B-91886.
12          PRESIDING COMMISSIONER BRYSON:  Thank you.  And I
13    note for the record, we have two correctional peace
14    officers in the room who are here for security purposes.
15    And, sir, would you raise your right; I need to swear you
16    in.  Do you solemnly swear or affirm that the testimony
17    you give at this hearing will be the truth, the whole
18    truth, and nothing but the truth?
19          INMATE NAVARRO:  Yes, I do.
20          ATTORNEY GUNNING:  Can I ask a quick question?
21    What is the purpose of the observers here?
22          PRESIDING COMMISSIONER BRYSON:  They can identify
23    their source individually.
24          MR. HYMAS:  I'm an attorney and I represent
25    several inmates in life terms and so we arrange with
```

3

1    Sacramento just to observe lifer hearings.

2         ATTORNEY GUNNING:  Okay, all right.

3         MR. HYMAS:  We're not here on behalf of anybody.

4    These are two colleagues of mine that work with me.

5         ATTORNEY GUNNING:  All right, thank you.

6         PRESIDING COMMISSIONER BRYSON:  And they have been

7    approved through Sacramento.

8         ATTORNEY GUNNING:  Excellent.

9         PRESIDING COMMISSIONER BRYSON:  All right,

10   Commissioner Star, is there any confidential material in

11   the file and, if so, will it be used today?

12        DEPUTY COMMISSIONER STAR:  There is confidential

13   material in the file, however, we will not be using any of

14   it today.

15        PRESIDING COMMISSIONER BRYSON:  Thank you.  And

16   I've passed the Hearing Checklist marked Exhibit 1 to your

17   attorney, sir, and to the District Attorney to be sure

18   that we're all proceeding with the same set of documents

19   and, Mr. Gunning, do you have it all?

20        ATTORNEY GUNNING:  I do, thank you.

21        PRESIDING COMMISSIONER BRYSON:  And, Ms. Kaelble,

22   do you have it all?

23        DEPUTY DISTRICT ATTORNEY KAELBLE:  The only thing

24   I'm not sure about with regards to support letters, I

25   don't have any current letters as to this inmate.

4

1          PRESIDING COMMISSIONER BRYSON:   Thank you, and I

2     do not believe that we have any on file at this point.

3     And are there are any additional documents?

4          ATTORNEY GUNNING:   I just have one.   This is a

5     recent Anger Management chrono.

6          DEPUTY COMMISSIONER STAR:   Okay.   I'll be

7     reviewing that --

8          ATTORNEY GUNNING:   Thank you.

9          DEPUTY COMMISSIONER STAR:   -- at the appropriate

10    time.

11         PRESIDING COMMISSIONER BRYSON:   Sir, please read

12    the document in front of you there aloud.

13         INMATE NAVARRO:   The ADA Statement:

14              "The Americans with Disabilities Act, ADA, is

15              a law to help people with disabilities.

16              Disabilities are problems that can make it

17              harder for some people to see, hear, breathe,

18              talk, walk, for them to think or to take care

19              of themselves than it is for others.   Nobody

20              can be kept out of public places or

21              activities because of a disability.   If you

22              have a disability, you have the right to ask

23              for help to get ready for the BPT Hearings,

24              to get to the hearing, talk, read forms and

25              papers, and understand the hearing process.

5

1          BPT will look at what you ask for to make

2          sure that you have a disability that is

3          covered by the ADA and that you have asked

4          for the right kind of help.  If you do not

5          get help or you don't think you got the kind

6          of help you need, ask for a BPT 1074

7          Grievance Form.  You can also get help to

8          fill it out."

9          PRESIDING COMMISSIONER BRYSON:  Well, thank you,

10   sir.  Do you understand what you read?

11          INMATE NAVARRO:  Yes.

12          PRESIDING COMMISSIONER BRYSON:  All right.  The

13   record will reflect that, on March 15th, 2007, a signed

14   BPT Form 1073, the Reasonable Accommodation Notice and

15   Request in accordance with the provisions of the Americans

16   with Disabilities Act, disabilities defined under the ADA.

17   This shows you as you having no disabilities identified

18   from the file review.  You have a reading level of 8.5,

19   which is good.  There's no given GPA, but you do have a

20   GED which you apparently achieved on April 14th of 1987;

21   is that correct?

22          INMATE NAVARRO:  Yes.

23          PRESIDING COMMISSIONER BRYSON:  All right.  And

24   you do not wear glasses; is that correct?

25          INMATE NAVARRO:  Yes, I do, but they're near-

6

1    sighted.

2          PRESIDING COMMISSIONER BRYSON:  Oh, I see.  So do

3    you use them for reading then?

4          INMATE NAVARRO:  No.

5          PRESIDING COMMISSIONER BRYSON:  So you use them to

6    see distances?

7          INMATE NAVARRO:  Yes.

8          PRESIDING COMMISSIONER BRYSON:  I understand.  And

9    do they suffice?  Do they accommodate you for seeing?

10          INMATE NAVARRO:  Yes.

11          PRESIDING COMMISSIONER BRYSON:  Okay, thank you.

12    You don't appear to have any hearing difficulties; is that

13    correct?

14          INMATE NAVARRO:  No.

15          PRESIDING COMMISSIONER BRYSON:  Okay, and you

16    didn't appear to have any mobility issues getting into the

17    hearing room; is that correct?

18          INMATE NAVARRO:  No.

19          PRESIDING COMMISSIONER BRYSON:  All right.  Have

20    you ever been involved in Triple CMS or EOP Programs?

21          INMATE NAVARRO:  No.

22          PRESIDING COMMISSIONER BRYSON:  Have you ever been

23    on psychotropic medications, either in prison or in the

24    street?

25          INMATE NAVARRO:  No.

7

1        PRESIDING COMMISSIONER BRYSON:  All right, do you
2    suffer from any disabilities that might prevent you from
3    participating in today's hearing?
4        INMATE NAVARRO:  No.
5        PRESIDING COMMISSIONER BRYSON:  And, Counsel, do
6    you concur?
7        ATTORNEY GUNNING:  I do, thank you.
8        PRESIDING COMMISSIONER BRYSON:  This hearing is
9    being conducted pursuant to Penal Code Sections 3041 and
10    3042 and the rules and regulations of the Board of Parole
11    Hearings governing parole consideration hearings for life
12    inmates.  The purpose of today's hearing is to consider
13    your suitability for parole.  In doing so, the Panel will
14    consider the number and nature of the crimes for which you
15    were committed, your prior criminal and social history,
16    and your behavior and programming since your commitment.
17    The Panel has had the opportunity to review your Central
18    File.  You will be given the opportunity to correct or
19    clarify the record.  The Panel will consider your progress
20    since your commitment, your counselor's report,
21    psychological report, and any other relevant information.
22    Any change in parole plans should be brought to the
23    Panel's attention.  The Panel will reach a decision today
24    and inform you whether or not it finds you suitable for
25    parole and the reason for its decision.  If you're found

8

1    suitable for parole, the length of your confinement will

2    be explained to you.  Nothing that happens here today will

3    change the findings of the court.  The Panel is not here

4    to retry your case.  The Panel is here for the sole

5    purpose of determining your suitability for parole.  Do

6    you understand?

7         INMATE NAVARRO:  Yes.

8         PRESIDING COMMISSIONER BRYSON:  This hearing will

9    be conducted in three phases.  I will discuss with you the

10   crime for which you were committed, your prior criminal

11   and social history.  Commissioner Star will discuss with

12   you your progress since your commitment, your counselor's

13   report, and your psychological evaluation.  I will then

14   discuss with you your parole plans and any letters in

15   support or opposition that may be in the file.  Once that

16   is concluded, the Panel, and then the District Attorney,

17   and then your attorney will be given the opportunity to

18   ask you questions.  The questions from the District

19   Attorney shall be asked through the Chair and you will

20   direct your answers to the Panel.  Next the District

21   Attorney and then your attorney and then you will be given

22   an opportunity to make a final statement regarding your

23   parole suitability.  Your statement should address why you

24   feel you are suitable for parole.  The Panel will then

25   recess, clear the room, and deliberate.  Once the

9

1    deliberations are completed, the Panel will resume the

2    hearing and announce its decision.  The California Code of

3    Regulations states that regardless of time served, a life

4    inmate shall be found unsuitable for and denied parole if,

5    in the judgment of the Panel, the inmate would pose an

6    unreasonable risk of danger to society if released from

7    prison.  You have certain rights.  Those rights include

8    the right to a timely notice of this hearing.  Were you

9    given timely notice of this hearing?

10          INMATE NAVARRO:  Yes.

11          PRESIDING COMMISSIONER BRYSON:  The right to

12   review your Central File.  I don't see that you did review

13   your Central File recently.  Were you given an opportunity

14   to review it?

15          INMATE NAVARRO:  Yes.

16          PRESIDING COMMISSIONER BRYSON:  And did you

17   decline?

18          INMATE NAVARRO:  Yes.

19          PRESIDING COMMISSIONER BRYSON:  Okay, and why is

20   that?

21          INMATE NAVARRO:  I don't even know what's in

22   there.

23          PRESIDING COMMISSIONER BRYSON:  Okay.  I'll give

24   you the same I give to all the inmates, which is that it's

25   a good thing to do.  Your whole life is in that pile of

10

1    paper and things could get lost and you may have things

2    you want to put in there, so I would recommend it.  You

3    also have the right to be heard by an impartial Panel.  Do

4    you have any evidence that the Panel before you would not

5    be impartial?

6           INMATE NAVARRO:  No.

7           PRESIDING COMMISSIONER BRYSON:  You'll receive a

8    copy of the Panel's written tentative decision today.

9    That decision will become effective within 120 days.  It

10   is also subject to review by the Governor.  The copy of

11   the tentative decision and a copy of the transcript will

12   be sent to you.  The Board has eliminated its appeal

13   process.  If you disagree with anything in today's

14   hearing, you have the right to go directly to the court to

15   complain.  You are not required to admit your offense or

16   discuss your offense if you do not wish to do so.

17   However, this Panel does accept as true the findings of

18   the court and you're invited to discuss the facts and

19   circumstances of the offense.  The Board will review and

20   consider any prior statements you've made regarding the

21   offense in determining your suitability for parole.  So

22   basically, it's very simple, just tell the truth.

23   Counsel, are there any preliminary objections?

24          ATTORNEY GUNNING:  I have none, thanks.

25          PRESIDING COMMISSIONER BRYSON:  Will this inmate

11

1  be speaking with the Panel?

2      ATTORNEY GUNNING:  He will not be discussing the

3  commitment offense, as far as the facts, nor will he be

4  discussing his prior arrest and/or conviction.

5      PRESIDING COMMISSIONER BRYSON:  I'm going to read

6  into the record the probation officer's report regarding

7  the commitment offense.  And this begins on Page 3 as to

8  circumstances:

9          "The defendant appeared in Tulare County

10         Superior Court on February 28th, 1978, and was

11         found guilty by a jury trial in a felony to

12         (inaudible) 187 of the California Penal Code,

13         Murder Count One in violation of Section

14         664/211.  That's California Penal Code

15         Attempted Robbery Count Two.  At that time,

16         the matter was referred to the Probation

17         Department for report and recommendation.  At

18         that time, the hearing was set for March 20th,

19         1978.  And as to the facts, on November 10th

20         of 1977, Farmersville Police Officer, while

21         on routine patrol was driving southbound on

22         North (inaudible) Avenue when he observed

23         three Mexican male subjects running westbound

24         across a vacant lot.  The officer identified

25         the subjects as being the defendant, Lionel

12

1          Navarro, and two codefendants, Andy Navarro

2          and Carlos Garcia.  The Farmersville police

3          officers had earlier contact with the subject

4          when they were involved in a disturbance at

5          the Siete De Copas Bar in Farmersville.  The

6          officer looked down the street from which the

7          subjects had run and notice a subject to be

8          lying in the middle of the road rolling on

9          his side.  After dispatching another officer

10         to investigate, the patrolman continued his

11         pursuit of the three possible suspects who

12         had by this time run into the Navarro

13         residence, which is located at 591 North

14         Little Street.  Back-up patrol units arrived

15         at the scene and a search of the area was

16         initiated.  Upon approaching the Navarro

17         residence, an officer observed the suspect,

18         whom he recognized as Andy Navarro, walking

19         along the side of the house approaching the

20         carport area.  It was noted by the officer

21         that Andy Navarro had what appeared to be

22         blood stains on the front of this white T-

23         shirt and was carrying what appeared to be a

24         brown-colored Pendleton shirt in his hands.

25         Upon seeing the officer, the defendant began

13

```
1          running to the rear of the yard of the
2          residence.  After several minutes of pursuit,
3          Andy Navarro was taken into custody.  During
4          the search of the area, officers went to the
5          approximate area where Andy Navarro had
6          jumped over the fence while being pursued.
7          At that location, they discovered a brown-
8          colored Pendleton shirt, two brown leather
9          wallets, and a check stub belonging to the
10         victim, later identified as Pasquale
11         Gonzales.  Wrapped inside his shirt was a
12         large hunting knife with a ten-inch blade and
13         bone handle.  Identification belonging to the
14         defendant was found in a second wallet.
15         Further investigation into the matter
16         revealed that the victim, Pasquale Gonzales,
17         had been attacked by the three previously
18         mentioned subjects and was seriously injured.
19         The purpose of the attack was determined to
20         be robbery.  A second robbery is reported to
21         have occurred near the attempted robbery of
22         Pasquale Gonzales.  The second robbery victim
23         being Marcello Silva.  It was later
24         determined that the defendant was not
25         involved in the robbery of Marcello Silva."
```

14

1    And moving to Page 5, the first full paragraph:

2              "In checking the crime scene, a metal pipe,

3              approximately three feet in length and of

4              small diameter, was found leaning against a

5              tree.  The pipe was confiscated as evidence."

6    I omitted a paragraph that I'm going to go ahead and read

7    on the second robbery:

8              "Later it was determined that while officers

9              were pursuing the suspects, Marcello Silva

10             had gone to the assistance of Pasquale

11             Gonzales who was lying on the ground on the

12             roadway.  Mr. Silva reportedly placed Mr.

13             Gonzales into the rear of his, Silva's,

14             vehicle and traveled to one of the

15             investigating officer's location on North

16             Little street.  Upon their arrival, the

17             officer observed that the victim, Pasquale

18             Gonzales, had partially coagulated blood on

19             the nose and mouth area.  A mucosa substance

20             was running from the corner of his mouth.

21             The victim appeared to be having a difficult

22             time breathing.  The victim's hands were

23             continually moving in a stroking manner from

24             his upper chest to the top of his head and

25             back.  His motions appeared to be out of

15

1          control.  The officer attempted to talk to
2          the victim, but he could not get a response.
3          While laying the victim down on his back,
4          the officer noted that the victim felt cold
5          to his touch and appeared to be in shock.
6          The left side of his, Pasquale Gonzales',
7          head towards the rear area was greatly
8          swollen as if he had received a blow to the
9          head.  Upon arrival of the ambulance, the
10         victim was transported to the Kaweah Delta
11         Hospital where he died several hours later.
12         A witness to the incident, Alicio Martinez,
13         reported to officers that he had observed
14         the defendant, Carlos Garcia and Andy
15         Navarro, confront the victim, Pasquale
16         Gonzales on the roadway near his home.
17         Mr. Martinez reportedly observed the three
18         subjects to surround the victim.  One of the
19         subjects is reported to have grabbed a hold
20         of the victim at which time it is reported
21         that Carlos Garcia struck the victim on the
22         head with what appeared to the witness to be
23         a stick.  After the victim had fallen to the
24         ground, defendants reported to have stood
25         over the victim.  The other two subjects,

16

1           Andy Navarro and Carlos Garcia are reported

2           to have then approached Marcello Silva and

3           subsequently rob him at knifepoint.  At the

4           culmination of the investigation, it was

5           determined that the defendant, Andy Navarro

6           and Carlos Garcia, were responsible for

7           confronting Pasquale Gonzales for the

8           purpose of robbery and that their attempts

9           to effect said robbery resulted in the death

10          of Pasquale Gonzales.  As a result, all

11          three subjects were arrest and charged with

12          attempted robbery and murder."

13   Now, I noted that in all of the counselors' reports, this

14   inmate has basically refused to discuss the crime.  So

15   I'm going to read the defendant's statement that was in

16   the probation officer's report, which is the most current

17   statement, unless you have something further that you

18   wish to submit.

19          **ATTORNEY GUNNING:**  No, thank you.

20          **PRESIDING COMMISSIONER BRYSON:**  All right.

21          "The defendant was interviewed at the Tulare

22          County Jail on March 10th, 1978.  At the

23          request of the defendant's attorney, James

24          Oliver, the writer did not solicit a

25          statement from the defendant regarding the

17

1          incident offense.  The writer did advise the
2          defendant that Mr. Oliver did not want the
3          defendant to make a statement regarding the
4          incident offense and the defendant indicated
5          to the writer that he had nothing to say
6          anyway."
7     And through all the hearings that I was able to review,
8     the defendant, you, sir, have not talked about the crime,
9     which is your right.  I would like to ask you a question
10    and you also have a right not to answer this question, so
11    that will be up to you and your attorney.  Why have you
12    not spoken about this, sir?
13         **INMATE NAVARRO:**  I just prefer not to talk about
14    it.
15         **PRESIDING COMMISSIONER BRYSON:**  All right, sir.
16    And as to this inmate's history, his juvenile record, I
17    will just note this for the record by reading the
18    counselor's report, the most current comprehensive Board
19    Report that we do have, that is of January 2005, prepared
20    by M. Garcia, common spelling, Correctional Counselor I,
21    we note that Navarro's juvenile arrest history began in
22    May 1969 at the age of 15 for burglary.  He was made a
23    ward of the court as a result of the burglary charge.  Two
24    years later, he was placed on probation after an arrest
25    for public intoxication.  During the same year, Navarro

18

 1    was arrested for failure to disperse, which placed him as

 2    a ward of the court again.  As to adult convictions and

 3    arrests, in 1972, Navarro was arrested and convicted for

 4    possession of a switchblade.  Navarro was arrested twice

 5    for public intoxication and drunk driving.  He served 25

 6    days in jail on each occasion.  Navarro was also convicted

 7    of assault with a deadly weapon where he served 240 days

 8    in jail and was placed on two years' probation.  Navarro

 9    was arrested in 1975 for possession of an open container

10    and being in a place where unlawful activity was

11    occurring.  He has no prior prison term.  As to personal

12    factors, Mr. Navarro, you were 23-years old at the time of

13    the crime and you are now 53; is that correct?

14          INMATE NAVARRO:  Yes.

15          PRESIDING COMMISSIONER BRYSON:  Okay.  Having

16    been born on January 28th of 1954, Tulare, California, to

17    Jose Navarro and Esperanza Navarro.  Your father's

18    whereabouts are unknown; is that true today?

19          INMATE NAVARRO:  He's deceased.

20          PRESIDING COMMISSIONER BRYSON:  He's deceased,

21    okay.  And your mother was left to raise ten children on

22    welfare, ages ranging from 14 to 30 years old.  You

23    received your GED, we've already mentioned.  You were not

24    in military and the POR indicates that prior to your

25    arrest, you were employed by Atlas, Incorporated Laundry

19

1    Services from January to April of 1977; is that correct?

2         INMATE NAVARRO:  Yes.

3         PRESIDING COMMISSIONER BRYSON:  Okay.  So did you

4    have a job at the time of the commitment offense?

5         INMATE NAVARRO:  No, ma'am.

6         PRESIDING COMMISSIONER BRYSON:  Why is that?

7         INMATE NAVARRO:  I was out running around using

8    drugs.

9         PRESIDING COMMISSIONER BRYSON:  I see.  When did

10   you start using drugs?

11        INMATE NAVARRO:  An early age.

12        PRESIDING COMMISSIONER BRYSON:  About how old?

13        INMATE NAVARRO:  About 13.

14        PRESIDING COMMISSIONER BRYSON:  How did you get

15   introduced to them?

16        INMATE NAVARRO:  I saw some guys using it and

17   tried it and like it.

18        PRESIDING COMMISSIONER BRYSON:  Were you involved

19   with any gangs as a youngster?

20        INMATE NAVARRO:  No, ma'am.

21        PRESIDING COMMISSIONER BRYSON:  Okay.  What

22   specific drugs were your favorites?

23        INMATE NAVARRO:  Heroin.

24        PRESIDING COMMISSIONER BRYSON:  Okay.  Any

25   others?

20

1          INMATE NAVARRO:  No, basically Heroin.

2          PRESIDING COMMISSIONER BRYSON:  Okay.  So over

3    the years, then, were you involved -- and up until the

4    commitment offense, did you traffic in Heroin as well as

5    use it?

6          INMATE NAVARRO:  Well, I sold and I, you know,

7    cleaned up once in a while.  And then I would work a

8    little bit and that's about it.

9          PRESIDING COMMISSIONER BRYSON:  You're a very

10   lucky man, you know, to be alive today.

11         INMATE NAVARRO:  I know.

12         PRESIDING COMMISSIONER BRYSON:  It's amazing.

13   Okay.  It says you're in good physical condition, no

14   medical problems.  That's really wonderful.  And it says

15   that you drank alcohol at the age of 18.  So did alcohol

16   then become also a factor?

17         INMATE NAVARRO:  Well, I would drink a beer here

18   and there when I was a kid to cover my drug use.

19         PRESIDING COMMISSIONER BRYSON:  I see.

20         INMATE NAVARRO:  So, you know, but I drank a

21   little, but not that much.

22         PRESIDING COMMISSIONER BRYSON:  So, do you

23   consider yourself an addict?

24         INMATE NAVARRO:  Yeah, I'm a recovering addict.

25         PRESIDING COMMISSIONER BRYSON:  Okay.  How about

21

1   an alcoholic?

2        INMATE NAVARRO:  Not really.

3        PRESIDING COMMISSIONER BRYSON:  I will ask you

4   this question and you can elect to answer it or not, but

5   had you gone under the influence immediately prior to this

6   crime?

7        INMATE NAVARRO:  Yes, well, I was -- I needed

8   money.

9        PRESIDING COMMISSIONER BRYSON:  I see, for the

10  drug habit is --

11       INMATE NAVARRO:  Yes, ma'am.

12       PRESIDING COMMISSIONER BRYSON:  Okay.  So we

13  don't have much more on you.  In fact, nothing more, sir.

14  And I'd like to ask you, it must have been difficult for

15  your mother raising -- trying to raise children all by

16  herself; is that correct?

17       INMATE NAVARRO:  Yes.

18       PRESIDING COMMISSIONER BRYSON:  Did you have a

19  stepfather at any point?

20       INMATE NAVARRO:  No.

21       PRESIDING COMMISSIONER BRYSON:  So how would you

22  characterize your upbringing?  Did you get taught right

23  from wrong --

24       INMATE NAVARRO:  Yes, I was taught right from

25  wrong, I just chose wrong.

22

1        PRESIDING COMMISSIONER BRYSON:  I see.  Do you
2    keep in touch with your brothers and sisters?
3        INMATE NAVARRO:  Yes, I call them, I write.
4        PRESIDING COMMISSIONER BRYSON:  Okay.  Do they
5    come and visit you ever?
6        INMATE NAVARRO:  Once in a while.  I let them
7    bring my mom.
8        PRESIDING COMMISSIONER BRYSON:  How is she doing?
9        INMATE NAVARRO:  She's getting old.  I don't like
10   them to come and visit me here in prison too much.
11       PRESIDING COMMISSIONER BRYSON:  Well, sometimes
12   it helps them to be able to do something like this with
13   you.
14       INMATE NAVARRO:  Yeah.
15       PRESIDING COMMISSIONER BRYSON:  So maybe that's a
16   good thing.  Okay, well, if you'll turn attention now to
17   Commissioner Star, she'll talk about your post-conviction
18   factors.
19       DEPUTY COMMISSIONER STAR:  Okay, good morning,
20   Mr. Navarro.  Today I'll be referring to the correctional
21   counselor's report, as well as your Central File in
22   addressing your post-conviction factors.  I will be
23   focusing on your programming and activities since your
24   last hearing, which was held on June 30th of 2005, where
25   you received a two-year denial.  The Board Members at that

23

1    time recommended that you remain disciplinary free, that

2    you participate in self-help, and earn positive chronos,

3    so I'll also be looking at whether you met those

4    recommendations.  Starting with your disciplinary -- your

5    classification score and your disciplinary record; your

6    classification score is 19, which is the mandatory minimum

7    for lifers, and your custody level is currently Medium-A.

8    Since your last hearing in 2005, there has been no CDC

9    115s and no 128-As.  Your record of 115s is a total of

10   four, with the last one being in 1990.  All four occurred

11   between 1982 and 1990.  They were disobeying an order,

12   stimulant and sedative use, possession of alcohol, and an

13   inmate in the cell.  So I don't see any violence in those

14   115s.  So you've been disciplinary free since 1990.  You

15   have no 128As or counseling chronos in your entire life

16   term.  Vocationally I've reviewed your file.  I see a

17   number of -- a couple of vocational certifications, as

18   well as considerable work experience.  First of all,

19   there's a vocational Dry Cleaning chrono saying that you

20   participated between 1993 and 1998 and you completed that

21   program; is that accurate?

22           **INMATE NAVARRO:**  Yes.

23           **DEPUTY COMMISSIONER STAR:**  Okay.  Also, there is

24   a certification in vocational Baking, but I couldn't find

25   the date of when you did that.  Do you recall when you did

23

1    time recommended that you remain disciplinary free, that
2    you participate in self-help, and earn positive chronos,
3    so I'll also be looking at whether you met those
4    recommendations.  Starting with your disciplinary -- your
5    classification score and your disciplinary record; your
6    classification score is 19, which is the mandatory minimum
7    for lifers, and your custody level is currently Medium-A.
8    Since your last hearing in 2005, there has been no CDC
9    115s and no 128-As.  Your record of 115s is a total of
10   four, with the last one being in 1990.  All four occurred
11   between 1982 and 1990.  They were disobeying an order,
12   stimulant and sedative use, possession of alcohol, and an
13   inmate in the cell.  So I don't see any violence in those
14   115s.  So you've been disciplinary free since 1990.  You
15   have no 128As or counseling chronos in your entire life
16   term.  Vocationally I've reviewed your file.  I see a
17   number of -- a couple of vocational certifications, as
18   well as considerable work experience.  First of all,
19   there's a vocational Dry Cleaning chrono saying that you
20   participated between 1993 and 1998 and you completed that
21   program; is that accurate?

22            INMATE NAVARRO:  Yes.

23            DEPUTY COMMISSIONER STAR:  Okay.  Also, there is
24   a certification in vocational Baking, but I couldn't find
25   the date of when you did that.  Do you recall when you did

24

1    that, sir?

2            INMATE NAVARRO:   That was in 1984.

3            DEPUTY COMMISSIONER STAR:   Was it a program or

4    just a course.

5            INMATE NAVARRO:   It was a vocational program.

6            DEPUTY COMMISSIONER STAR:   And do you remember

7    how many it was that you completed?

8            INMATE NAVARRO:   When I completed the program, it

9    was over 2,000 hours.

10           DEPUTY COMMISSIONER STAR:   Two thousand hours.

11           INMATE NAVARRO:   I was in CTA, I think.

12           DEPUTY COMMISSIONER STAR:   Thank you.  I did see

13   the certificate in there.  It wasn't dated and didn't show

14   the hours.  And then I see considerable recent experience

15   in Prison Industries, Mill and Cabinet program, including

16   your current assignment, which I'll go over in a second.

17   And it looks like about eight years in that program?

18           INMATE NAVARRO:   Yes.

19           DEPUTY COMMISSIONER STAR:   Okay.  So you appeared

20   to have developed considerable vocational skills and work

21   experiences that appear to be marketable.  Anything I

22   missed in the vocational area?

23           INMATE NAVARRO:   No, ma'am.

24           DEPUTY COMMISSIONER STAR:   Okay.  Let's move onto

25   your education and Commissioner Bryson has already covered

25

1    some of this.  You have pre-prison experience, work

2    experience, in the laundry field.  And you got a GED in

3    1998.  Where you at, at that time?

4         INMATE NAVARRO:  In 1987, in Vacaville.

5         DEPUTY COMMISSIONER STAR:  Was it?  At Vacaville?

6    Okay.

7         INMATE NAVARRO:  I was doing CAT-T Program

8    (phonetic).

9         DEPUTY COMMISSIONER STAR:  Were you?  I saw your

10   GED in here.  Let me just take a quick look at it.  Okay,

11   1987.  And your current work assignment is a PIA Machinist

12   in Mill and Cabinet, which you've been doing in different

13   assignments for the last eight years, right?

14        INMATE NAVARRO:  Yes.

15        DEPUTY COMMISSIONER STAR:  But not necessarily

16   the Machinist.  There is a current, fairly recent, work

17   supervisor's chrono called a CC-101 which rates you.  It's

18   dated April 2nd, 2007, and it says you are performing

19   above average to exceptional work in that assignment, so

20   congratulations.  You are to be commended on that, sir.

21   Okay, now in terms of your self-help group participation,

22   I'm referring to the counselor's report and your Central

23   File.  There is well-documented participation with

24   quarterly chronos that you're participating in Narcotics

25   Anonymous and apparently you've been a long-term

26

1    participant of that.  You've been participating

2    continuously since the last hearing, from what I can see,

3    and you've been a long-term participant.  Do you remember

4    the year you started, Mr. Navarro?

5             INMATE NAVARRO:  Oh, way back, when they started

6    NA.  At first, they only had AA in the beginning.

7             DEPUTY COMMISSIONER STAR:  Yeah, and did you go

8    to that AA before the NA?

9             INMATE NAVARRO:  Yes, ma'am.  I've done a few

10   years of AA and then when they started NA, I started going

11   to NA.

12            DEPUTY COMMISSIONER STAR:  Okay.  Do you practice

13   the 12 Steps, sir?

14            INMATE NAVARRO:  Well, not really, but I always

15   go.

16            DEPUTY COMMISSIONER STAR:  You go?

17            INMATE NAVARRO:  Yeah.

18            DEPUTY COMMISSIONER STAR:  What do you feel you

19   get out of it?

20            INMATE NAVARRO:  I get a lot, not using drugs.

21            DEPUTY COMMISSIONER STAR:  Okay.  So if I asked

22   you what the 9th Step was, would you be familiar with it,

23   sir?

24            INMATE NAVARRO:  No, ma'am.

25            DEPUTY COMMISSIONER STAR:  Okay.  They don't go

27

1    over them at the meetings?

2          INMATE NAVARRO:  No, they go over them, I just

3    don't learn them.

4          DEPUTY COMMISSIONER STAR:  Okay.  How do you

5    practice it, then?

6          INMATE NAVARRO:  Just stay away from drugs.

7          DEPUTY COMMISSIONER STAR:  Okay.

8          INMATE NAVARRO:  I learn by listening to people.

9          DEPUTY COMMISSIONER STAR:  Okay.  And then also

10   your counselor has provided me a more recent chrono of

11   June 10th, 2007.  It says you have participated in Anger

12   Management at San Quentin, having completed eight of eight

13   sessions between September of 2006 and December of 2006.

14   What led you to participate in this and what did you get

15   out of it, sir?

16         INMATE NAVARRO:  Just being aware to manage my

17   anger a little, try and manage it.

18         DEPUTY COMMISSIONER STAR:  Okay.

19         INMATE NAVARRO:  I was an angry person.

20         DEPUTY COMMISSIONER STAR:  Okay.  Did something

21   recent happen or you just -- did it just become available

22   to you?

23         INMATE NAVARRO:  I wanted to just try it out and

24   see what I could get out of it.  I try things.

25         DEPUTY COMMISSIONER STAR:  Okay.  Did you gain

28

1    any insight from that that you'd like to share?

2         INMATE NAVARRO:  No, not really.  I know I don't

3    get angry.

4         DEPUTY COMMISSIONER STAR:  Yeah.  You feel you've

5    had an anger problem while you've been incarcerated?

6         INMATE NAVARRO:  No.

7         DEPUTY COMMISSIONER STAR:  Okay.  I don't see any

8    disciplinaries since 1990, so I'm just asking what led you

9    to get involved at this stage.

10        INMATE NAVARRO:  Just to try it out and see what

11   it was about.

12        DEPUTY COMMISSIONER STAR:  Do you feel anger was

13   a factor -- and again, as Ms. Bryson says, you don't have

14   to answer this, but do you feel it was a factor in your

15   commitment offense?

16        INMATE NAVARRO:  A lot has to do with it, being

17   angry.

18        DEPUTY COMMISSIONER STAR:  And what were you

19   angry at?

20        INMATE NAVARRO:  Just angry.

21        DEPUTY COMMISSIONER STAR:  Okay, were you angry

22   at your family or did you feel life had given you a raw

23   deal or --

24        INMATE NAVARRO:  No, just -- I guess the drugs

25   had a lot to do with it.

29

1          DEPUTY COMMISSIONER STAR:  Okay.  Any other
2     programs, Mr. Navarro, that you've participated in?
3          INMATE NAVARRO:  No, ma'am.
4          DEPUTY COMMISSIONER STAR:  All right.  Let's
5     delve into your most recent psychiatric report.  I'm going
6     to be referring to a report by a Dr. Starrett,
7     S-T-A-R-R-E-T-T, who completed a report for today's
8     hearing.  The report is dated March 22nd, 2007.  Starting
9     with a mental health diagnosis, he reviewed the prior
10    psych reports, reviewed your file, and he gave a
11    diagnosis, which I'm going to read onto the record here,
12    referring to Page 4 of his report, "His diagnostic
13    impression is Axis I, a Polysubstance Dependent in
14    Remission and Treatment."  And let me pause there because
15    I heard you tell Commissioner Bryson that you don't think
16    you have an alcohol problem, but when I read the probation
17    officer's report, sir, it refers to long-term drinking.
18    That never got in the way for you?
19         INMATE NAVARRO:  No, ma'am.
20         DEPUTY COMMISSIONER STAR:  Okay, you never felt
21    your mental state was altered by alcohol?
22         INMATE NAVARRO:  No, ma'am.  I mean, I drank, but
23    I wasn't a heavy drinker.  I drank a beer.
24         DEPUTY COMMISSIONER STAR:  Okay.  Did you not
25    have public intoxication arrests as an adult.

30

1      **INMATE NAVARRO:**  Yes, ma'am.  A lot of times I
2   would drink a beer to cover my drug addictions.  I would
3   rather get arrested for public intoxication instead of
4   drugs.

5      **DEPUTY COMMISSIONER STAR:**  Okay.

6      **INMATE NAVARRO:**  Being under the influence -- I
7   used alcohol.

8      **DEPUTY COMMISSIONER STAR:**  Okay, so are you
9   saying that when they arrested you for public
10   intoxication, you really were a danger to others and
11   couldn't care for yourself because of the underlying
12   Heroin use or because of the alcohol?

13      **INMATE NAVARRO:**  No, I was just saying I would
14   cover my being under the influence of Heroin with alcohol.

15      **DEPUTY COMMISSIONER STAR:**  When they arrested you
16   for public intoxication, did they tell you were a danger
17   or you couldn't care for yourself?

18      **INMATE NAVARRO:**  No, no, ma'am.

19      **DEPUTY COMMISSIONER STAR:**  All right.  The reason
20   I went over that, Mr. Navarro, is obviously the doctor's
21   diagnosis is showing Polysubstance Abuse, so they're
22   referring to multiple items here and not just Heroin,
23   although I clearly hear that you feel that you have a
24   Heroin problem only.  Axis II, going back to his report,
25   is Antisocial Personality Currently in Remission, Axis III

31

 1    is No Diagnosis, Axis IV is the Incarceration for the Life
 2    Term, and Axis V is his functioning score which is GAF
 3    score of 80.  Now the doctor does a risk assessment and
 4    I'm going to refer to his risk assessment, which is
 5    derived from Page 7 of his report and he does three
 6    assessments, including an overall assessment.  First of
 7    all, under what we call an Historical Assessment, and he
 8    states that you are in the moderate range for propensity
 9    of violence and he bases this on your age, your criminal
10    record, your unstable relationships, that you didn't have
11    a career, that you were a substance abuser, and you had
12    early adjustment problems and you had failed prior
13    supervisions.  Then he goes and does a second rating based
14    on a clinical rating and your insight into your behavior.
15    There he rates you low, but he -- low range and his
16    propensity for future violence, however, he makes a
17    statement that he feels there's a certain level of
18    unpredictability on this factor based on the fact that the
19    inmate refused to discuss the crime.  And then the third
20    rating is risk management.  He gives you a low range on
21    this and states that he does feel you need to develop
22    community aspects of parole plans more thoroughly than
23    what he saw.  And his overall rating was a low range when
24    compared to similar inmates.  And his overall risk
25    assessment is also -- he concludes that you've moved from

32

 1    the moderate range to the low range when compared to
 2    certain inmates.  There is a -- again, qualifying that by
 3    saying there is a certain amount of unpredictability in
 4    this rating due to the fact that the inmate continues to
 5    refuse to discuss his case.  And because of -- we don't
 6    have a prisoner's version, I do think it's important that
 7    I refer to Page 4 of the doctor's report where he did try
 8    to review with you the crime and I'm going to quote from
 9    the middle of Page 4:

10              "When asking the inmate why he participated
11              or got involved in this crime, the inmate
12              states he does not like to talk about it.
13              He says he was convicted.  The inmate states
14              he refuses to think about it.  He said,
15              quote, it happened, everyone got hurt, end
16              of quote.  He did not want to talk about it.
17              The inmate states that he feels bad about
18              what happened.  He cannot change it.  He
19              said, quote, it's been a long time, I don't
20              like to talk about it, end of quote.  When
21              asking the inmate what has changed about him
22              so something like this would not happen
23              again, he says, quote, I'm getting old, I'm
24              wiser, I realize my mistakes.  Most of my
25              problems were drugs and alcohol.  I don't

33

```
 1                    use anymore, end of quote.  When asking the
 2                    inmate why he had problems acting out as a
 3                    juvenile young man, the inmate states he
 4                    liked the lifestyle at the time, he was
 5                    attracted to the drugs.  He says he was
 6                    hanging out with the crowd."
 7       All right, have you reviewed this report, Mr. Navarro?
 8                    INMATE NAVARRO:  Yes, ma'am.
 9                    DEPUTY COMMISSIONER STAR:  Do you agree with the
10       doctor's conclusion?
11                    INMATE NAVARRO:  Some of it.
12                    DEPUTY COMMISSIONER STAR:  Okay, what do you
13       disagree with?  Is there something you would like to
14       comment on or do you feel you misinterpreted --
15                    INMATE NAVARRO:  No, not really.
16                    DEPUTY COMMISSIONER STAR:  Okay.  You understand
17       the doctor has qualified his assessment of you because you
18       haven't talked and he can't assess your insight into the
19       crime?  You understand that?
20                    INMATE NAVARRO:  Yes.
21                    DEPUTY COMMISSIONER STAR:  Okay.  How do you feel
22       about the victim today, Mr. Navarro?
23                    INMATE NAVARRO:  I feel bad for him and for his
24       family.
25                    DEPUTY COMMISSIONER STAR:  Okay.
```

34

1          INMATE NAVARRO:  That's all I can say.

2          DEPUTY COMMISSIONER STAR:  The 12 Steps addresses

3     making amends.  Have you thought about that as it pertains

4     to this victim and his family?

5          INMATE NAVARRO:  No, not really.  I don't even

6     know where his family lives.

7          DEPUTY COMMISSIONER STAR:  Okay.  Do you feel you

8     owe amends to anyone, other than the victim?

9          INMATE NAVARRO:  There are a lot of people.

10         DEPUTY COMMISSIONER STAR:  And have you made any

11    efforts in following and practicing the 12 Steps?

12         INMATE NAVARRO:  No.

13         DEPUTY COMMISSIONER STAR:  Okay, and why would

14    that be?

15         INMATE NAVARRO:  Because I haven't done it.

16         DEPUTY COMMISSIONER STAR:  I did take a look at

17    the prior two psych evaluations.  There was one in 2004 by

18    Dr. Bencich, B-E-N-C-I-C-H, who didn't give any ratings on

19    you and Dr. Starrett also reviewed it and his review he

20    indicated no ratings and didn't really -- it wasn't risk

21    assessments, weren't utilized in dangerousness was not

22    discussed.  And I wanted to take a look at his statements

23    regarding your insight into the commitment offense and he

24    states -- and now I'm reading from the top of Page 3:

25              "The inmate reports his addictive behavior

35

1          has been a life-long problem.  He realizes
2          it was a major contributing factor to his
3          criminal behavior as a young man and
4          culminating in his controlling case.  The
5          inmate has insight into discussing the
6          reasons for his criminal behavior as a
7          youth.  The inmate was very insightful in
8          discussing his addictive behavior and its
9          impact on his life.  The inmate understands
10         the need for long-term treatment.  The
11         inmate continues to refuse to discuss his
12         crime.  He does not really want to talk
13         about the reason why he's refusing to talk
14         about this crime.  The inmate states it
15         happened, everyone got hurt behind it, I
16         don't want to talk about it.  The inmate has
17         participated in substance abuse for over 20
18         years.  And the inmate at one time was very
19         active in therapeutic treatment while at
20         CMC.  All this is to the inmate's credit."
21  Okay, any other -- anything else about the doctor's report
22  that you'd like to talk about?
23         **INMATE NAVARRO:**  No.
24         **DEPUTY COMMISSIONER STAR:**  Okay.  I'm going to
25  ask you to turn your attention to Commissioner Bryson.

36

1          PRESIDING COMMISSIONER BRYSON:  What would be
2     your residence plans if you were to parole?
3          INMATE NAVARRO:  Well, I was going to parole back
4     to my mom's house at (inaudible).
5          PRESIDING COMMISSIONER BRYSON:  Do you have any
6     documentation to support that she would welcome you into
7     the home?
8          INMATE NAVARRO:  Well, I was going to go with my
9     old letters because everything's the same.  The job offer,
10    my brothers, everything's the same.  Nothing's changed.
11         PRESIDING COMMISSIONER BRYSON:  Okay.  But you
12    must understand because you've been through a number of
13    Parole Consideration Hearings, that the documentation is
14    pretty important and even a year can change everybody's
15    perspective and their desires, so it's important to have
16    current material.  Counsel, do you have something that you
17    want to add?
18         ATTORNEY GUNNING:  I would like him to explain to
19    why, in a little more detail, as to why he didn't get
20    these -- he does have these old letters here.  There's a
21    reason he felt that he wasn't going to make contact with
22    his family recently.
23         PRESIDING COMMISSIONER BRYSON:  Why is that, sir?
24         INMATE NAVARRO:  No, I'm all right, I don't want
25    to talk about that.

37

1          **ATTORNEY GUNNING:**  Then I'll tell them.  Someone
2     in the inmate's family died recently and he didn't want to
3     trouble his family at that particular time when they were
4     grieving, so I understand his point, it's not for lack of
5     contact.  I think he just didn't want to bother his
6     family.

7          **PRESIDING COMMISSIONER BRYSON:**  And this job that
8     you're referring to would be with your brother, Raymond
9     Navarro, apparently the director of this maintenance
10    operation and transportation facility in Farmersville
11    Unified School District in Exeter, California.  Was he
12    offering you a job?

13         **INMATE NAVARRO:**  Yes, ma'am.

14         **PRESIDING COMMISSIONER BRYSON:**  And what would
15    you do?

16         **INMATE NAVARRO:**  Well, I would be maintenance.

17         **PRESIDING COMMISSIONER BRYSON:**  It also mentions
18    that you've been given the opportunity to work as a
19    professional landscaper for Mr. Alfredo Munoz; is that
20    still available?

21         **INMATE NAVARRO:**  Yes, ma'am.

22         **PRESIDING COMMISSIONER BRYSON:**  Now it says you
23    were in the process of obtaining a support letter; did
24    that letter ever come forward?

25         **INMATE NAVARRO:**  No, ma'am.

38

1          PRESIDING COMMISSIONER BRYSON:  Okay.  All right,
2     Counsel, is there anything else that I've missed?
3          ATTORNEY GUNNING:  No, ma'am, nothing.
4          PRESIDING COMMISSIONER BRYSON:  All right.  We
5     sent out 3042 Notices.  These notices go out to agencies
6     having a direct interest in your case.  We have a
7     representative from the Tulare County District Attorney's
8     Office present who will have the opportunity to make a
9     statement regarding parole suitability prior to the
10    conclusion of this hearing.  And Commissioner Star, is
11    there any issue that needs to be discussed at this time?
12         DEPUTY COMMISSIONER STAR:  No, there's nothing at
13    this time.
14         PRESIDING COMMISSIONER BRYSON:  All right.  Does
15    the District Attorney have questions of this inmate?
16         DEPUTY DISTRICT ATTORNEY KAELBLE:  Yes, I do.
17    One of the questions that I wanted to find out if you
18    could ask the inmate, with regards to working for a school
19    district, does he have any information as to whether
20    having felonies on his record would affect their ability
21    to hire him?
22         ATTORNEY GUNNING:  Do you understand the
23    question?
24         INMATE NAVARRO:  Yeah.
25         ATTORNEY GUNNING:  She said if you're going to

39

1    work for a school district --

2        INMATE NAVARRO:  Yeah, they would probably check.

3    I mean, that's not the only job.  I can get different

4    jobs.

5        PRESIDING COMMISSIONER BRYSON:  But the question

6    is, did you check --

7        INMATE NAVARRO:  Yeah.

8        PRESIDING COMMISSIONER BRYSON:  -- did you check

9    into that, though (overlapping).

10        INMATE NAVARRO:  Yes, they probably wouldn't hire

11    me.

12        PRESIDING COMMISSIONER BRYSON:  Okay, thank you.

13        DEPUTY DISTRICT ATTORNEY KAELBLE:  Another

14    question I wanted to find out about was what's going to

15    stop this inmate from using drugs again once he is back in

16    the community and back around the influences that

17    surrounded him previously when all this happened?

18        INMATE NAVARRO:  Well, I know for myself, I'm not

19    using drugs.  I'm done with them.

20        DEPUTY DISTRICT ATTORNEY KAELBLE:  And another

21    question I had, in the 2000 psychological report, the

22    inmate had made some reference to not wanting to be

23    paroled to Tulare County because of the bad influences

24    there.  What has changed between 2000 and now to make him

25    believe that those bad influences are no longer there?

40

1        **INMATE NAVARRO:**  I don't recall ever saying that
2    statement, but I guess it's there.

3        **DEPUTY DISTRICT ATTORNEY KAELBLE:**  And back at
4    the time when -- prior to this incident, when you were
5    using drugs, where did this inmate get this money for the
6    drugs since he wasn't actually employed most of the time?
7    He had some seasonal employment and temporary employment.

8        **ATTORNEY GUNNING:**  Can I have one second?

9        **PRESIDING COMMISSIONER BRYSON:**  Go ahead.

10       **ATTORNEY GUNNING:**  With all due respect, I've
11   indicated to my client that I don't think he should answer
12   that question, so he's not going to.

13       **PRESIDING COMMISSIONER BRYSON:**  All right.

14       **DEPUTY DISTRICT ATTORNEY KAELBLE:**  One other
15   question.  I just wanted to find out whether the inmate
16   was currently or previous associated with a Northern gang
17   called Varrio Farmas Catorce based on the tattoo that he
18   has on his forehead, which is consistent with the tattoos
19   that gang members in Farmersville who belong to that gang
20   do have.

21       **PRESIDING COMMISSIONER BRYSON:**  I believe, sir,
22   you do have a tattoo on your forehead.

23       **ATTORNEY GUNNING:**  Okay, just for the record,
24   he's already asked -- he's been asked that question and
25   he's answered it.  He is not involved in a gang.

41

1          DEPUTY DISTRICT ATTORNEY KAELBLE:  And just on

2     that -- in that same area, whether or not -- I saw some

3     reference in some of the materials in the file that there

4     have been discussion about whether or not he was going to

5     have that tattoo removed and if he's made any decisions

6     with regards to that.

7          INMATE NAVARRO:  Yes, if I ever get out, I'm

8     going to have it removed.

9          DEPUTY DISTRICT ATTORNEY KAELBLE:  I don't have

10    any other questions.

11         PRESIDING COMMISSIONER BRYSON:  All right.

12    Counsel, do you have any questions at this time?

13         ATTORNEY GUNNING:  I don't, thank you.

14         PRESIDING COMMISSIONER BRYSON:  So, what's the

15    tattoo on your forehead for, then?

16         INMATE NAVARRO:  Just dumb.

17         PRESIDING COMMISSIONER BRYSON:  Okay.  Have you

18    heard the saying, once a doper, always a doper?

19         INMATE NAVARRO:  Yes.

20         PRESIDING COMMISSIONER BRYSON:  Heroin is a

21    terrible drug.

22         INMATE NAVARRO:  I know it is.

23         PRESIDING COMMISSIONER BRYSON:  It's incredibly

24    (inaudible).  Do you think that you have the tools to go

25    out there and not use again?

42

1          **INMATE NAVARRO:**   I know -- I know I have for

2     myself.

3          **PRESIDING COMMISSIONER BRYSON:**  All right.  I'd

4     like to provide the District Attorney to make a closing

5     statement.

6          **DEPUTY DISTRICT ATTORNEY KAELBLE:**  With regards

7     to the facts the Board has already gone over the general

8     facts relating to this case.  This was a very cruel and

9     callous crime.  There was planning involved in the crime.

10    Since this inmate and two other participants had to get

11    together and come up with this plan, they had to obtain

12    the weapons that were used in both this attack on the

13    victim who later passes away, which was the pipe, and they

14    also -- the other codefendants also obtained a knife which

15    was later used against the second victim in the attempted

16    robbery.  In this case, the reason for the attack was

17    relatively trivial.  Basically the inmate and the

18    codefendants needed more money because they wanted to get

19    more Heroin, and as a result, an innocent person was

20    killed.  This was a cruel and callous crime based on the

21    fact that there were three defendants against just one

22    innocent victim on the street and the victim had to suffer

23    blunt force trauma to the head significant enough to

24    render -- to result in his death.  He didn't die

25    immediately.  It appears from the officer's description

43

1    that he went into shock and was making involuntary
2    movements as he lay on the street.  This was a calculated
3    dispassionate crime.  This was not just and impulsive
4    decision where the defendant got -- where the inmate got
5    involved in a confrontation with somebody and then that
6    resulted in a fight.  This was a planned act where they
7    were going to commit a robbery and if the victim put up a
8    fight, they were going to use force in order to get what
9    they wanted.  He presents a significant danger to society
10   and he should remain in custody.  With regards to his
11   history, that the Board has gone over his history, his
12   criminal history from the time he was 15 until the time he
13   was 23 at the time of the murder, and he's had numerous --
14   there were numerous attempts to rehabilitate him.  He was
15   put on probation a number of times, both as a juvenile and
16   as an adult.  He has violent assaultive behavior in his
17   past with the 245 that he had committed as an adult.  With
18   regards to his work history, we don't really have any
19   solid work history on him and either that indicates that
20   he was getting money from some other illegal sources
21   during that time in order to pay for his drug habit or his
22   family was enabling him by proving him money that allowed
23   him to go on and use drugs, even though they knew he had
24   this history that he'd been getting arrested numerous
25   times and this is the same family he wants to go back and

44

1    live with when he is paroled.  Furthermore, I know that

2    earlier the Board indicated that we didn't have a

3    prisoner's version of the events.  There was a 1987 report

4    and on Page 1 of that report, there was mention that the

5    prison indicated that the victim had been murdered because

6    he started to struggle with and resist their attempts to

7    rob him.  Basically, he was blaming the victim at that

8    time and we don't have anything more current to indicate

9    what he feels now.  He indicates that he feels remorse,

10   but he doesn't really elaborate on that, so we don't

11   really know what he means by that statement.  With regards

12   to the psychological report from 2007, there are some

13   statements which the doctor uses in that report that are

14   not actually based in fact.  He indicates in his report

15   that the inmate's been involved in NA for 26 years.  If

16   you look through some of the other reports, in 1987, that

17   was when the Board told him to start attending NA meetings

18   and in the current lifer prison evaluation report, it

19   indicates on the bottom of Page 2 that he actually started

20   attending NA in July of 1991.  That would actually make it

21   16 years.  Furthermore, in a 1998 report, it indicates

22   that the Board realized that from January of '98 to July

23   of '98, he stopped attending meetings and the Board told

24   him he needs to go back.  He hasn't been taking these NA

25   meetings and AA meetings very seriously.  He's been

45

1    attending all these years and, as he even stated today, he

2    really doesn't know what the 12 Steps are and he doesn't

3    really do anything to follow-up with them.  He just

4    attends those meetings basically and that's basically a

5    way to spend his time.  That's not really something that

6    he's taking to heart and that he's gaining any insight

7    from.  Furthermore, the psychological report, as the

8    examiner explains, he can't really draw any conclusions

9    with regards to the inmate's insight because the inmate

10    doesn't want to discuss the facts and doesn't want to

11    discuss how this has changed him.  We don't have any idea

12    about whether he's internalized the things he's learned,

13    whether he's learned anything at all.  And if he hasn't

14    really learned anything, he would be a danger to society

15    because these same things that happened back in 1997 could

16    happen again.  Basically the doctor states that he is a

17    low risk because he's been attending these classes, but

18    he's basically going to speculation and making assumptions

19    to draw that conclusion.  There are no facts in the report

20    to indicate that the inmate himself can provide

21    information to say that he has the insight that he takes

22    responsibility, that he's not putting the blame on the

23    codefendants or putting the blame on the victim, or just

24    trying to blame drugs and alcohol in general.  He needs to

25    understand what he needs to do to become a responsible

46

1    citizen to avoid this situation in the future.

2    Furthermore, the doctor indicates in the report that in

3    order remain free from violence, he needs to stay away

4    from drugs and he needs support from the community.  We

5    don't have letters from his family, from friends, from any

6    organization to say that they're going to support him and

7    they're going to help him and that they're going to be

8    there for him either socially or even financially.  We

9    don't really know how he's going to be able to get on when

10   he -- if he was to be released and we don't really have

11   any details about a parole plan.  Even the doctor's report

12   indicates that he needs more details in his parole plan

13   and he needs some sort of community support.  And if you

14   look back at the 2004 report, the inmate specifically told

15   the examiner at that time that self-help groups are not

16   for him and that he feels that he doesn't need them.  So

17   it seems that that's in direct contradiction of what this

18   doctor is saying this inmate would need in order to

19   succeed if he was to be released.  With regards to the

20   tattoo, the inmate's denying any association with a gang,

21   however, there's really no other logical explanation for

22   why he has a tattoo for Farmas, which is consistent with a

23   gang that has existed in the Farmersville area for the

24   past 30 years and where gang members do have that same

25   tattoo for Varrio Farmas Catorce.  There are a lot of

47

1   southern gang members in the (inaudible) area in
2   Farmersville as well and that would lead to significant
3   problems.  There's a lot of gang activity in the city of
4   Farmersville.  If he was to be released, there is an
5   unreasonable risk of danger and there is a danger -- a
6   risk of harm to society.  The final thing I wanted to talk
7   about was the parole plan.  We don't have any letters to
8   support anything.  We don't know who else lives in this
9   residence with the mother.  We don't know if any of these
10  people are in any way involved with drugs or have any sort
11  of -- if there are any sort of financial issues that may
12  come up if he was to live there.  We don't have any
13  letters to verify any job offers.  We don't know if he's
14  going to have access to a vehicle to get to a job.  We
15  don't know how much he's going to be getting paid, whether
16  that's going to be enough money to help him to pay the
17  bills at the residence with his elderly mother.  And we
18  also don't know anything about what sort of employment
19  this would be, whether it would be part-time, full-time,
20  and what sort of hours and whether he would be able to
21  attend NA meetings, AA meetings in the area based on that.
22  He has mentioned in a few of the reports that he has
23  alternative occupations that he may be able to get
24  involved with, such as dry cleaning.  Farmersville is a
25  very small community.  There are no dry cleaning stores in

48

1      the city of Farmersville.  He'd need transportation to get

2      to a larger city, like Visalia, which is approximately

3      eight miles away.  And we don't have any indication about

4      whether he'd be able to do that.  He hasn't really done

5      the research to find out whether somebody would really

6      give him a job based on his criminal history and based on

7      everything else that has been going on.  Finally, we're

8      just asking that the Board keep this inmate in custody

9      based on the fact that he does not have an adequate parole

10     plan, based on the facts of the crime, based on his

11     criminal history, and the fact that he is a risk to the

12     public.  And we are asking that he be denied parole for at

13     least a few more years.

14          PRESIDING COMMISSIONER BRYSON:  Counselor, I'd to

15     invite you to make a closing statement.

16          ATTORNEY GUNNING:  Thank you.  As already

17     indicated, this is Mr. Navarro's 16th overall hearing and

18     the last time he did receive a two-year denial, as already

19     noted.  His MEP for this offense was the 15th of May of

20     1984.  He is presently 53 years old and from the

21     standpoint of recidivism, that's important to keep in

22     mind.  He did commit his offense when he was 23, over 30

23     years ago.  As to the commitment offense itself, as

24     already indicated, this occurred in 1977 when he was 23

25     years old.  The facts are that he and his brother and Mr.

49

1    Garcia accosted and ended up killing Mr. Gonzales.  The

2    facts are also clear that the intent was to rob and that

3    it was Mr. Garcia who elected to pick up a pipe and strike

4    Mr. Gonzales with that pipe and that's based on testimony

5    by, apparently, a witness.  So this is a felony murder.

6    That's important from the standpoint of whether or not

7    Mr. Navarro's conduct at the time of the commitment

8    offense exceeded the minimum necessary for first degree

9    murder and the elements contained therein.  Now the answer

10   is, I don't think it does.  Does that indicate that other

11   than accosting Mr. Gonzales, holding him down, anything

12   other than that, we understand his intent was to rob.

13   He's admitted that.  He had a drug problem and he wanted

14   money.  But again, this is a felony murder and the case

15   law is pretty clear on this in this regard.  When you're

16   looking at somebody who has been incarcerated for, in this

17   case, 28 years plus for this offense, again, if you were

18   to conclude that his conduct seemed (inaudible), I don't

19   think it did, the next step is to determine whether or not

20   Mr. Navarro is presently a reasonable risk to society as

21   he sits in front of you today and I would submit he is

22   not.  That is for you to conclude, but when you look at

23   his record in total, he is not a violent individual.  He

24   is a drug addict and he may have an alcohol problem in the

25   past, but he is not a violent person.  Pre-conviction

50

1    factors have already been addressed.  The alcohol issue,
2    drug issue, I'm not going to go through that again.  You
3    have a criminal history.  There was one incident of
4    violence, that was back in 1972.  That would be 35 years
5    ago -- 35-plus years ago.  That's the only reference in
6    his record that I could see of any kind of violence
7    outside of the commitment offense.  Again, he was not the
8    individual who actually struck Mr. Gonzales at the time of
9    the offense.  He has a -- from a post-conviction
10   standpoint, he has an excellent work history.  He's
11   developed marketable skills that he didn't have
12   beforehand.  He has apparently a very good work ethic and
13   that will bode well for him upon release.  And as the
14   Board is well-aware, you don't need letters of support.
15   There's nothing in Title 15 that indicates that.  I
16   understand the Boards asks that, but there's nothing in
17   Title 15 to require that.  He has marketable skills,
18   they're viable, he does have old letters of support from
19   his family.  There's nothing to indicate that they have --
20   based on what I've seen or heard, that they are no longer
21   in support, so I would submit that the same support that
22   they've been providing him since 1983 are still in place.
23   The only reason he didn't go and request new ones was
24   because of the fact he lost someone in the family and he
25   did want to bother his family.  He has participated in NA

51

1    for an extensive period of time.  And, granted, he not
2    know them verbatim, but I do think he walks that walk.
3    You don't see any write-ups from the standpoint of
4    disciplinaries since 1990.  That is 16, 17 years now,
5    approximately, without a write-up, so I do think that he
6    understands the importance of staying away from narcotics.
7    They are accessible to him in here and he's decided not to
8    take advantage of that.  I do think he takes his problems
9    with narcotics seriously.  I would note for the record
10   that again, as far as the insight, the doctor did point
11   out -- as Dr. Starrett did point out from the standpoint
12   of insight that -- and I quote on Page 3:

13            "The inmate has insight into discussing the
14            reasons for his criminal behavior as a
15            youth.  The inmate is very insightful in
16            discussing his addictive behavior and its
17            impact on his life.  The inmate understands
18            the life-long need for treatment, unquote."
19   So I think based on the doctor's opinion -- professional,
20   he does understand the dynamics of drug addiction and its
21   role -- the role it played in his criminal activity and
22   the commitment offense.  He has his education, he has his
23   vocation skills, he has participated in self-help.  He has
24   marketable skills in a variety of areas, so I think in
25   total, he meets an awful lot of criteria for suitability.

52

1    That being said, I'm go ahead and submit.

2        PRESIDING COMMISSIONER BRYSON:  Thank you.  Sir,

3    are you suitable for parole?

4        INMATE NAVARRO:  Yes, ma'am.

5        PRESIDING COMMISSIONER BRYSON:  Why?

6        INMATE NAVARRO:  I'm ready to go home.

7        PRESIDING COMMISSIONER BRYSON:  Thank you.  Thank

8    you for your remarks.  We'll now recess for deliberation.

9    The time is 9:57.

10                        R E C E S S

11                         --o0o--

12

13

14

15

16

17

18

19

20

21

22

23

24

25

53

1          CALIFORNIA BOARD OF PAROLE HEARINGS

2                    D E C I S I O N

3          PRESIDING COMMISSIONER BRYSON:   Thank you, the

4     time is now 10:36.  All parties have returned to the room

5     for the decision in the matter of Lionel Navarro.  Sir,

6     the Panel reviewed all information received from the

7     public and from you and relied on the following

8     circumstances in concluding that you are not yet suitable

9     for parole and would pose an unreasonable risk of danger

10    to society and threaten public safety if released from

11    prison.  This offense, sir, was carried out in an

12    especially cruel and callous manner.  On November 10th of

13    1977, a Farmersville Police patrol officer recognized the

14    inmate, Andy Navarro, and Carlos Garcia running across a

15    vacant lot.  Looking in the direction they were from, he

16    saw a body lying in the middle of the road.  Dispatching

17    another officer to investigate patrol and pursuit, the

18    suspect entered the Navarro residence.  Multiple victims

19    are attacked or killed in the same incident.  At the

20    Navarro residence, an officer saw Andy Navarro walking

21    alongside the home with bloodstains on his shirt,

22    carrying a brown Pendleton shirt wrapped around a hunting

23    knife with a ten-inch blade and bone handle.  Found at

24    the location were two brown leather wallets, one was the

25    NAVARRO, LIONEL   B-91886   DECISION PAGE 1  07/24/07

54

1    victim's, one was Andy Navarro's, and there was

2    identification of a check stub belonging to the victim.

3    This offense was carried in a dispassionate and

4    calculated manner.  This victim was attacked by three men

5    for the purpose of robbery.  The victim was hit on the

6    head with a metal pipe approximately three feet long,

7    which was found at the scene.  He was transported to

8    Delta Hospital and died several hours later.  Sir, this

9    Panel, contrary to your attorney, does believe in the

10   fact that you do have a violent history.  First of all,

11   you have a juvenile history of burglary, an adult history

12   of public intoxication, possession of a switchblade,

13   assault with a deadly weapon.  You do have a history of

14   prior criminality that shows an escalating pattern of

15   criminal conduct.  You also were very frank with this

16   Panel and you are commended for that in that you do have

17   a drug abuse history, and by your own testimony, starting

18   at the age of 13, involving both Heroin and alcohol

19   (inaudible) probation and adult probation and then

20   spending time in jail, as far as -- including a couple of

21   commitments to a juvenile ward, you were declared a ward

22   of the court as a juvenile a couple of times.  So you do

23   have a significant criminal history and you really

24   haven't discussed very much about that criminal history

25   NAVARRO, LIONEL   B-91886   DECISION PAGE 2   07/24/07

55

1    today but it's clear on the face of it.  As to your

2    institutional behavior, you have worked well and you are

3    to be commended for that.  Most recently in PIA in Mill

4    and Cabinet where you've been approximately eight years.

5    That seems to be a good match for you.  Currently you're

6    a Machinist there and you've received above-average to

7    exceptional work reports, so obviously they count on you

8    in that job.  As to your education, you received your GED

9    in 1987.  There has been vocational upgrading since that

10   time.  As to vocations, you have two vocational

11   certifications; one in Dry Cleaning, in which you were

12   involved from 1993 to 1998, and Baking, you achieved your

13   Baking certification in 1984.  As to your self-help, this

14   is where you've been very limited in your programming.

15   You have attended first AA and then NA fairly

16   continuously.  I would say almost continuously up until

17   the present time.  What's unclear is that you've really

18   derived very little from it.  You haven't internalized

19   the steps.  You have been really unable to discuss what

20   you've learned, if anything, and your whole answer to how

21   you're going to stay away from drugs is "I won't use

22   drugs."  You did take an Anger Management course in 2006

23   and were involved in the CAT-T Program (phonetic).  The

24   Anger Management, sir, we would say is very long in

25   NAVARRO, LIONEL   B-91886   DECISION PAGE 3   07/24/07

56

```
 1    coming and it's good that you tried it, but that really
 2    constitutes the bulk of your self-help.  Basically being
 3    in some sort of attendance in NA and not absorbing very
 4    much from it, apparently.  As to your 115s, you have
 5    four, to your credit with no violence, and the most
 6    recent was in 1990, and no 128As, so you've had a
 7    significant period of time in which you continue to
 8    display positive change as regards disciplinaries.  As to
 9    the psychological report dated March 22nd of 2007 by
10    Dr. Richard Starrett, Dr. Starrett is not totally
11    supportive of your parole.  Basically, Dr. Starrett, this
12    Panel feels, failed to address contradictions between
13    prior statements and other records and statements that
14    he, himself has made.  We are, in fact, going to submit a
15    request for a new psychological evaluation.  Basically,
16    you are denying the alcohol involvement as basically
17    saying you're saying that was only a cover for your
18    Heroin addiction.  And we don't feel you're an alcoholic,
19    but you're an addict, a recovering addict at that.  But
20    he does not reconcile that with the need for a structured
21    drug treatment program and you've made no plans for a
22    drug treatment program.  Also seemingly contradicted is
23    his feeling that you in fact have insight and remorse and
24    basically, we have no evidence of that.  We don't
25    NAVARRO, LIONEL   B-91886   DECISION PAGE 4   07/24/07
```

57

1    evidence of that in the file, sir, and we certainly
2    didn't have any evidence of your insight or remorse for
3    today.  As to parole plans, you presented no documents
4    for current parole plans and you don't appear to have
5    realistic parole plans.  Paroling back to an area that is
6    still rife with gangs and drugs, so you may feel that
7    you're too old to be a gang member, still the drugs are
8    rife in that area and it's not clear that that would be
9    the best plan for you and basically you don't have any
10   documentation to support that.  You do appear to have
11   marketable skills as a machinist and your present work in
12   Mill and Cabinet seem to be a very marketable skill.
13   It's questionable that your Dry Cleaning or Baking would
14   be reliable skills that you could fall back on just
15   because you have been so long and they have not been
16   upgraded.  As to Penal Code 3042 responses, responses
17   indicate opposition to finding a parole suitability
18   specifically by the District Attorney of Tulare County.
19   In a separate decision the Hearing Panel finds it is not
20   reasonable to expect a parole be granted at a hearing
21   during the following three years.  This Panel feels, sir,
22   that you are going backwards, not forwards.  And that's
23   why we're calling it out three years.  It's going to take
24   you, if you start today, it's going to take you three
25   **NAVARRO, LIONEL    B-91886    DECISION PAGE 5    07/24/07**

58

1   years of hard work.  Let me explain.  This offense was

2   carried in an especially cruel and callous manner.  On

3   November 10th of 1977, Farmersville Police patrol officer

4   recognized you, Andy Navarro, and Carlos Garcia running

5   across a vacation lot.  Looking in the direction they had

6   come, the patrol officer saw a body lying in the road.

7   He dispatched another officer to investigate.  Meanwhile,

8   he pursued the suspects, that was you, sir, to the

9   Navarro residence.  Multiple victims were attacked,

10  injured or killed in the same incident.  At the

11  residence, an officer saw Andy Navarro, your brother,

12  walking alongside the home with bloodstains on his shirt

13  carrying a brown Pendleton shirt wrapped around a hunting

14  knife, as it turned out, with a ten-inch blade and bone

15  handle.  Found at the location were two brown leather

16  wallets; one of them with the victim's identification and

17  the other with Andy Navarro's identification, and a check

18  stub belonging to the victim.  This offense was carried

19  in a dispassionate and calculated manner.  It was a

20  planned offense.  This gentleman was attacked by three

21  men, and one of them was you, sir, for the purpose of

22  robbery.  The victim was hit on the head with a metal

23  pipe, approximately three feet long and found at the

24  scene.  He was transported to Delta Hospital.  He died

25  **NAVARRO, LIONEL   B-91886   DECISION PAGE 6  07/24/07**

59

1     several hours later.  This victim was abused during this

2     offense.  The officer observed that the victim, Pasquale

3     Gonzales, had partially coagulated blood on his nose and

4     mouth area and mucosa running from the corner of his

5     mouth.  He had a difficult time breathing, so he was

6     alive for a significant period of time after he was

7     beaten.  His hands were continually moving in a stroking

8     manner from his upper chest to the top of his head and

9     back.  These motions were out of control.  He was in the

10    process of dying, sir.  The officer tried to talk with

11    him, but he could not get a response.  The victim felt

12    cold to the touch and appeared to be in shock.  His head

13    was greatly swollen, reflective of the blows to the head

14    from the attack.  This offense was carried out in a

15    manner demonstrating exceptionally callous disregard for

16    human suffering.  You had clear opportunity to cease your

17    participation and the second victim, Marcello Silva,

18    subsequently was robbed at knifepoint.  The motive for

19    this series of crimes was very trivial in relation to the

20    offense.  These were vicious attacks for robbery.  You

21    wanted money for Heroin and you ganged up, basically, a

22    three-to-one ratio, as far as attackers to victims.  You

23    have continued to refuse to discuss the details of the

24    commitment offense and that's your right, sir, but we

25    NAVARRO, LIONEL    B-91886    DECISION PAGE 7    07/24/07

60

1   have no evidence that you take responsibility for this

2   offense and you presented here today with a fairly

3   defiant attitude about the whole situation.  What's

4   clear, sir, is that although you're doing well in some of

5   the programming work-wise, and your engaging with that,

6   there's no evidence that you're engaging in self-help

7   that is really the basis for rehabilitation that would

8   give this Panel assurity that in fact not only have you

9   aged, but that you've matured.  It is your

10  responsibility, sir, to convince this Panel that you in

11  fact would not just be la, la, going out there again and

12  just jumping into drugs again, but that in fact you do

13  have the tools such that when, not if, but when you were

14  tempted to engage in taking Heroin again that you would

15  have some tools to fall back on.  We don't have any

16  evidence of that and you haven't taken responsibility for

17  that.  You haven't internalized the Steps and you also

18  haven't developed documented realistic parole plans.  We

19  also, sir, have seen no remorse.  In fact, it's not clear

20  from any of the paper that in fact you understand the

21  nature and magnitude of the crime you have committed.

22  That brings into question a very logical question of

23  whether you truly do understand.  We are in fact going to

24  request a new psychological evaluation.  We feel that the

25  NAVARRO, LIONEL   B-91886   DECISION PAGE 8   07/24/07

61

1    2007 psychological evaluation fails to address the

2    contradictions between prior statements and the records.

3    You're denying the alcohol and the need for structured

4    drug treatment program, plus your insight and remorse are

5    unknown.  We felt that the doctor in saying you have

6    insight and remorse -- we don't know where he got that

7    because you certainly really didn't discuss it in any

8    detail with him.  You haven't internalized AA/NA steps

9    despite years of attendance.  And overall you continue to

10   have a defiant attitude about making a true

11   rehabilitative effort.  Again, sir, a sign of maturity is

12   taking responsibility for your entire parole effort and

13   you need to do that.  And in denying you parole for three

14   years, we're placing you on the 2010 calendar for your

15   next subsequent hearing.  We recommend no more 115s, that

16   you embrace self-help in a way that will in fact show --

17   that you'll be able to show the Panel the fact you have

18   learned and made strides and that you earn positive

19   chronos.  Again, we're ordering a new psychological

20   evaluation for (inaudible).  Commissioner Star, do have

21   anything?

22        DEPUTY COMMISSIONER STAR:  I'm going to reaffirm

23   the Commissioner's statements regarding the self-help

24   efforts.  The Board views it as limited and empty and

25   NAVARRO, LIONEL   B-91886   DECISION PAGE 9   07/24/07

62

1    there's no insight in either the NA attendance or the

2    Anger Management that you have gained from this.  And, in

3    fact, Mr. Navarro, a further review of the psych reports

4    show indications of nonacceptance of the NA Steps.  The

5    first Step, nonacceptance for the need for ongoing

6    continued treatment in regard to critical elements of

7    following a substance abuse program.  Your statements

8    were not only contradictory, they were -- as the

9    Commissioner says, somewhat defiant and certainly no

10   insight provided.

11                    A D J O U R N M E N T

12                          --o0o--

13

14

15

16

17

18

19

20

21   PAROLE DENIED THREE YEARS              NOV 2 1 2007

22   THIS DECISION WILL BE FINAL ON:_____

23   YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

24   DATE, THE DECISION IS MODIFIED.

25   NAVARRO, LIONEL    B-91886   DECISION PAGE 10   07/24/07

63

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, Gita Schmitz, a duly designated transcriber, FOOTHILL

TRANSCRIPTION COMPANY, INC., do hereby declare and

certify under penalty of perjury that I have transcribed

the audio recording which covers a total of pages

numbered 1 - 62, and which recording was duly recorded at

SAN QUENTIN STATE PRISON, SAN QUENTIN, CALIFORNIA, in the

matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of

LIONEL NAVARRO, CDC NUMBER B-91886, on JULY 24, 2007, and

that the foregoing pages constitute a true, complete, and

accurate transcription of the aforementioned audio

recording to the best of my ability.

I hereby certify that I am a disinterested party in the

above-captioned matter and have no interest in the

outcome of the hearing.

Dated August 24, 2007 at Placer County, California.


_Gita Schmitz_

_____

Gita Schmitz
Transcriber
**Foothill Transcription Company, Inc.**

LIONEL NAVARRO
B-91886, 5N-100 LOW
SAN QUENTIN STATE PRISON
SAN QUENTIN, CA 94974

# FILED

JUL 1 8 2008

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

### UNITED STATES DISTRICT COURT

### IN AND FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LIONEL NAVARRO,<br><br>       Petitioner,<br><br>V.<br><br>ROBERT AYERS, JR., Warden,<br><br>       Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

No. 2: 08 cv 1659 EGH

## NOTICE AND MOTION OF RELATED CASES

Petitioner Lionel Navarro, ("Navarro"), respectfully files this Notice
and Motion of Related Cases and requests that the Court appoint Jennifer Sheetz
as counsel. Jennifer Sheetz is appointed counsel sua sponte in the related case
now pending before the Court, Case No. C-06-1531 KKK-CMK-P.

Dated: July 14, 2008

Respectfully submitted,

*Lionel Navarro*

Lionel Navarro
Petitioner in Pro Se

1

**UNITED STATES DISTRICT COURT**
EASTERN DISTRICT OF CALIFORNIA
Office of the Clerk

| | | |
|---|---|---|
| **Victoria C. Minor** | 501 "I" Street | Divisional Office |
| Clerk of Court | Sacramento, CA 95814 | 2500 Tulare Street |
| | | Fresno, CA 93721 |

**July 23, 2008**

**Case Number:**     **2:08–CV–01659–GGH**

**Case Title:**     **LIONEL NAVARRO,**                **vs.   ROBERT AYERS JR.,**

Dear Litigant,

You are hereby notified that the above case number has been assigned to your action. You are to include the complete case number on all documents sent to the court for filing in this case. Failure to do so results in delayed processing of your documents.

All matters in this action shall be sent to the following address until further notice:

> Office of the Clerk
> United States District Court
> Eastern District of California
> 501 "I" Street , Suite 4–200
> Sacramento, CA 95814

For timely processing of your pleadings or correspondence, please comply with our Local Rules of Court, in particular:

   **Local Rule 5–133**  The court requires an original plus one copy of each document sent for filing. If you desire to receive a conformed copy for your records, you must send an original and two copies of your document and a pre–addressed postage–paid envelope for us to return your copy to you.

   **Local Rule 5–135**  Once the defendant(s) have served a responsive pleading, you are under an ongoing duty to serve them with copies of all documents you submit to the court. A proof of service shall be attached to the original of any document lodged or filed with the court, showing the date, manner and place of service. A sample proof of service is attached.

   **Local Rule 7–130**  Documents submitted to the court must be legible, on 8–½ " x 11" paper, with writing on one (1) side of the page only. Each separate document must be stapled at the top left corner and pre–punched with two (2) holes centered 2–¾" apart, ½" from the top edge of the page. Each page should be numbered consecutively at the bottom.

   **Local Rule 7–132**  Every document submitted to the court must include your name, address and prisoner identification number in the upper left hand corner of the first page. The caption on the first page must include the title of this court, the title of the action, the case number assigned to this action (including all initials and letters that follow the number), and the title of your document. If you are pursuing more than one action in this court, you must submit a separate original document and the appropriate number of copies for each action in which you want the document filed.

**Local Rule 6–142**  A request for extension of time must state the reason an extension is needed. A request for extension of time should be filed before the deadline in question.

**Local Rules 30–250, 33–250, 34–250 and 36–250**  Discovery requests or responses should not be submitted to the court unless they are relevant and necessary to support or oppose a motion at issue before the court.

**Local Rule 83–182**  Each party appearing in propria persona is under a continuing duty to notify the Clerk and all other parties of any change of address.

**Other Provisions:**

**Request for Case Status**  The court will notify you as soon as any action is taken in your case. Due to the large number of civil actions pending before the court, THE CLERK IS UNABLE TO RESPOND IN WRITING TO INDIVIDUAL INQUIRES REGARDING THE STATUS OF YOUR CASE. As long as you keep the court apprised of your current address, you will receive all court decisions which might affect the status of your case.

**Copy Work**  The Clerk's Office does not provide copies of documents to parties. Copies of documents may be obtained from Attorney's Diversified Service (ADS) by writing to them at: 1424 21st Street, Sacramento, CA 95814, or by phoning 916–441–4396 or 916–441–4466. The court will provide copies of docket sheets at $0.50 per page. **Note: In Forma Pauperis** status does not include the cost of copies.

Victoria C. Minor
Clerk of Court
United States District Court

by:  /s/  K. Carlos
        Deputy Clerk

The following is a sample Proof of Service.   Pursuant to Rule 5 of the F.R.Cv.P. and Local
Rule 5–135, each document filed after the court orders service in your case shall be served on
opposing counsel and a proof of service attached to your document filed with the court.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

(Case Title) _____

                    Plaintiff or Petitioner                    Case Number: 2:99–CV–99999 ABC DFG
V.                                                             (example case no.)

_____
                    Defendant or Respondent                   **SAMPLE PROOF OF SERVICE**

_____     /

I hereby certify that on     .(Date)_____, I served a copy

of the attached     .(Title of Document Served and Filed)_____ ,

by placing a copy in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said

enevelope in the United States Mail at     .(Location of Mailing)_____ :

**(List Name and Address of Each Defendant or Attorney Served)**

I declare under penalty of perjury that the foregoing is true and correct.

_____
(Name of Person Completing Service)

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**LIONEL NAVARRO,**                                           Case No.  2:08–CV–01659–GGH

Plaintiff(s)/Petitioner(s),

                                                                        ORDER RE CONSENT

vs.                                                                  OR REQUEST FOR REASSIGNMENT

**ROBERT AYERS JR.,**

  Defendant(s)/Respondents(s).

        This case was randomly assigned to Magistrate Judge Gregory G. Hollows. Without the written consent of the parties presently appearing pursuant to 28 U.S.C Sec. 636(c), a magistrate judge cannot conduct all proceedings and enter judgment in this case with direct review by the Ninth Circuit Court of Appeals, in the event an appeal is filed. If a party declines to consent and the case is assigned to a district judge, the assigned magistrate judge shall continue to perform all duties as required by Eastern District Local Rule 72–302.

        Accordingly, within 30 days, the parties shall complete and return this form to the court.

**IT IS SO ORDERED.**

Dated: _____7/23/08_____          _____/s/ –  Gregory G. Hollows_____

                                                                        United States Magistrate Judge

---

**IMPORTANT**: You must check and sign only one section of this form and return it to the Clerk's Office within 30 days. The complaint/petition will not be reviewed by the court until plaintiff/petitioner has signed and returned this form.  Note: This form must be completed and returned regardless of the choice exercised by any other party.

---

  ☐    *CONSENT* **TO JURISDICTION OF UNITED STATES MAGISTRATE JUDGE**

The undersigned hereby voluntarily consents to have a United States Magistrate Judge conduct all further  proceedings in this case.

  Date: _____          Signature: _____

                                                              Print Name: _____

                                                              ( ) Plaintiff/Petitioner  ( ) Defendant/Respondent ( ) Counsel for *

---

  ☐    *DECLINE* **OF JURISDICTION OF UNITED STATES MAGISTRATE JUDGE AND**

        **REQUEST FOR REASSIGNMENT TO UNITED STATES DISTRICT JUDGE**

The undersigned declines to consent to the United States Magistrate Judge assigned to this case and requests random assignment to a United States District Judge.

  Date: _____          Signature: _____

                                              Print Name: _____

                                              ( ) Plaintiff/Petitioner  ( ) Defendant/Respondent ( ) Counsel for *

---

*If counsel of record, list name of each party responding: _____
_____

1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   LIONEL NAVARRO,

11              Petitioner,                    No. CIV S-08-1659 GGH P

12   vs.

13   ROBERT AYERS, et al.,

14              Respondents.                   ORDER

15   _____/

16              Petitioner, a state prisoner proceeding pro se, has filed an application for a writ of

17   habeas corpus pursuant to 28 U.S.C. § 2254.

18              Petitioner is presently incarcerated at San Quentin State Prison.  Petitioner

19   challenges the 2007 decision by the Board of Parole Hearings (BPH) finding him unsuitable for

20   parole.

21              It is established that a petitioner for habeas corpus relief under 28 U.S.C. § 2254

22   must name "the state officer having custody of him or her as the respondent to the petition."

23   Stanley v. Cal. Supreme Court, 21 F.3d 359, 360 (9th Cir.1994).  The U.S.Supreme Court

24   recently reiterated that with certain infrequent exceptions not applicable here:

25              The federal habeas statute straightforwardly provides that the
               proper respondent to a habeas petition is "the person who has
26              custody over [the petitioner]." 28 U.S.C. § 2242; see also § 2243

1

("The writ, or order to show cause shall be directed to the person having custody of the person detained"). The consistent use of the definite article in reference to the custodian indicates that there is generally only one proper respondent to a given prisoner's habeas petition. This custodian, moreover, is "the person" with the ability to produce the prisoner's body before the habeas court. *Ibid.* We summed up the plain language of the habeas statute over 100 years ago in this way: "[T]hese provisions contemplate a proceeding against some person who has the immediate custody of the party detained, with the power to produce the body of such party before the court or judge, that he may be liberated if no sufficient reason is shown to the contrary." *Wales v. Whitney*, 114 U.S. 564, 574, 5 S.Ct. 1050, 29 L.Ed. 277 (1885) (emphasis added); see also *Braden v. 30th Judicial Circuit Court of Ky.*, 410 U.S. 484, 494-495, 93 S.Ct. 1123, 35 L.Ed.2d 443 (1973) ("The writ of habeas corpus" acts upon "the person who holds [the detainee] in what is alleged to be unlawful custody," citing *Wales,* supra, at 574, 5 S.Ct. 1050); *Braden*, supra, at 495, 93 S.Ct. 1123 ("'[T]his writ ... is directed to ... [the] jailer,'" quoting In the *Matter of Jackson*, 15 Mich. 417, 439- 440 (1867)).  In accord with the statutory language and *Wales*' immediate custodian rule, longstanding practice confirms that in habeas challenges to present physical confinement–"core challenges"--the default rule is that the proper respondent is the warden of the facility where the prisoner is being held, *not the Attorney General or some other remote supervisory official.*

Rumsfeld v. Padilla, 542 U.S. 426, 434-435, 124 S.Ct. 2711, 2717-2718 (2004) (emphasis

added) (refusing to recognize the Secretary of Defense as the custodian of military detainees, and

finding that the commander of the brig where Padilla was being held is the proper custodian).

See also Brittingham v. United States, 982 F.2d 378, 379 (9th Cir. 1992) ("A

custodian 'is the person having a day-to-day control over the prisoner.  That person is the only

one who can produce 'the body' of the petitioner." Guerra v. Meese, 786 F.2d 414, 416

(D.C.Cir.1986) (Parole Commission is not custodian despite its power to release petitioner).  But

see Ortiz-Zandoval v. Gomez, 81 F.3d 891 (9th Cir. 1996) permitting the head of California

Corrections to be the proper custodian, but this case is in doubt after Padilla which held that a

remote supervisory official was not to be the custodian).

Thus, the proper custodian is the warden or sheriff in charge of the facility where

the prisoner is confined.

/////

2

1           Any warden or sheriff in California is amenable to personal jurisdiction in the

2  Eastern District in cases alleging that the BPH improperly found a prisoner unsuitable for parole

3  because personal jurisdiction is a state-wide, not individual district, concept.  However, venue

4  concepts are oriented to individual districts.  In habeas corpus cases, venue is proper: (1) in the

5  district of confinement, or (2) in the district of "conviction and sentencing."  28 U.S.C. §

6  2241(d).  Because it is difficult to stretch "conviction and sentencing" into a decision revoking

7  parole, only the first venue option is appropriate.  Moreover, since prisoners are not normally

8  transferred about for parole eligibility or revocation hearings, the district of confinement would

9  normally be the district of "conviction and sentencing" anyway even if that rubric were utilized

10  in the parole eligibility setting.[1]

11           Thus, the court should not maintain this case in this district. [2]

12  /////

13  /////

14  /////

15  /////

16  /////

17

---

18     [1] If the literal interpretation of "conviction and sentencing" were to be employed, i.e., the district where petitioner suffered his underlying conviction, maintaining the action in that place

19  in parole suitability situations would not be as appropriate as having it in the place of confinement.  First, in the logistical sense, the issue of parole suitability has little to do with the

20  place of conviction – the court will not be concerned with the ease of mustering witnesses and evidence.  Secondly, even though the local government officials at the place of conviction may

21  retain an interest in having parole denied, habeas cases are handled by the state Attorney General's Office, and local officials are not involved in the federal court litigation regarding

22  review of the parole eligibility decision.  The issues involved in the federal court review will not center about the opinions of local officials, and even if it did, those opinions will be of record

23  already.

24     [2] The opposite policy is in effect for the "usual" habeas cases involving attack upon a conviction or sentence.  In those cases there is an advantage to transferring to the district of

25  conviction because evidence and witnesses for any evidentiary hearing are more likely to be located there.  The California federal district courts have long employed a blanket transfer policy

26  to the district of conviction for "conviction" habeas cases.

1    Accordingly, in the furtherance of justice, IT IS HEREBY ORDERED that this

2  matter is transferred to the United States District Court for the Northern District of California.

3  28 U.S.C. § 2241(d).

4  DATED: 08/08/08

                                              /s/ Gregory G. Hollows
5
                                              _____
6                                             GREGORY G. HOLLOWS
                                              UNITED STATES MAGISTRATE JUDGE
7  nav1659.tra

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26